## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

BRIDGET DE MOURA CASTRO & LUIZ
DE MOURA CASTRO, by his next friend
Helena Hilario,

                Plaintiffs,

  v.

LOANPAL, LLC d/b/a GOODLEAP, PRIME
ENERGY, LLC d/b/a PRIME ENERGY
SOLAR, 1ST LIGHT ENERGY, INC.,

                Defendants.

Civil Action No.
3:21 - CV - 1020 (CSH)

**JUNE 28, 2022**

### MEMORANDUM AND ORDER SCHEDULING PRELIMINARY HEARING ON DEFENDANTS' MOTIONS TO STAY PROCEEDINGS [Doc. 19, 23]

**HAIGHT, Senior District Judge:**

## I.  INTRODUCTION

In this federal action brought by Plaintiff homeowners under the Consumer Credit Protection Act, 15 U.S.C. §§ 1640(e) and 1681p, which also asserts supplemental jurisdiction over state law claims, Defendants move to stay the proceedings to allow arbitration of Plaintiffs' claims. Plaintiffs resist that motion and wish to press on with litigation. This Ruling addresses Defendants' motions.

**A. Background:  Plaintiffs' Allegations**

In this action, Plaintiffs Luiz and Bridget de Moura Castro, self-described "elderly consumers," seek "damages and other relief" from Defendants for their allegedly fraudulent and unconscionable solicitation, sale, and installation of solar panels on Plaintiffs' home in Avon,

Connecticut. Doc. 1, ¶¶ 1-10, 13.  Plaintiffs are each 80 years old and are a married couple.[1] *Id.* ¶¶ 2, 13.  They allege that in August of 2020 they became victims of the Defendants' fraudulent scheme to sell them solar panels for installation on the roof of their home.  *Id.* ¶¶ 1-6, 40-41.

Defendants are engaged in the business of soliciting consumers "for the purchase of solar panels and/or [the] install[ation] [of] solar panels on consumers' homes." *Id.* ¶ 3.  Defendants' sales agents use electronic tablets, such as iPads, to solicit consumers to enter "25-year loans and other contracts."  *Id.*  In particular, Defendant Loanpal, LLC (d/b/a Goodleap) (herein "Loanpal") is in the business of offering consumers loans to purchase residential solar panels.  *Id.* ¶¶ 14-15.  Defendants Prime Energy, LLC ( d/b/a Prime Energy Solar)("Prime") and 1st Light Energy, Inc. ("1st Light") are licensed home improvement contractors in Connecticut.  *Id.* ¶¶ 16-19.   Plaintiffs allege that "Defendants carry on a symbiotic business relationship" in which "Prime solicits customers at their homes on behalf of and for the benefit of 1st Light and Loanpal, 1st Light sells and installs the solar panels, and Loanpal finances the transactions."  *Id.* ¶¶ 20- 21.  Consequently, "[a]ll  Defendants rely and depend on each other to carry out this course of business." *Id.* ¶ 21.

According to the Complaint, in August of 2020, Bridget de Moura Castro was solicited in her home in Avon, Connecticut, by Mark Murphy, a salesman and agent acting on behalf of Defendants.[2] *Id.* ¶¶ 22-23. Murphy allegedly told Plaintiffs that senior citizens "are given government

---

[1]  According to allegations in the Complaint, Luiz de Moura Castro has Parkinson's disease, which necessitates a live-in aide to provide him with 24-hour care. Doc. 1, ¶ 2.  Due to the disease, Luiz cannot "care for himself, speak coherently, or sign documents." *Id.*  Both Plaintiffs have given power of attorney over their finances to their daughters. *Id.* From submissions on the record, these daughters appear to be Cema Siegel and Helena Hilario.  *Id.* ¶¶ 2, 49; *see also* Doc. 24-2.

[2]  The Court takes judicial notice that a "Mark Murphy" appears as an employee on the "zoominfo" website of defendant "Prime Energy Solar, which is an Electricity, Oil & Gas company with an estimated 32 employees."  *See* https://www.zoominfo.com/p/Mark-Murphy/4170585659

benefits for 'free' solar panels" installed on their homes. *Id.* ¶ 24; Doc. 24-1 ("Certification of Bridget de Moura Castro"), ¶ 2. Based on this "promise of free solar panels and significant savings," Mrs. de Moura Castro agreed to have the solar panels installed on Plaintiffs' Avon home. Doc. 1, ¶¶ 13, 40-41. Despite neither mentioning nor requesting authorization to provide a loan or perform a credit check on the de Moura Castros, Defendants "surreptitiously and intentionally obtained and used Plaintiffs' consumer reports from the consumer reporting agencies" to create a "Loan Contract" for the purchase of solar panels. *Id.* ¶¶ 25-31. Moreover, Defendants allegedly never gave Plaintiffs the opportunity to review any paperwork or documents regarding purchase of the solar panels in either "paper or electronic" form. *Id.* ¶ 29, Doc. 24-1, ¶ 3.

Bridget de Moura Castro alleges that shortly after she was unable to open a document emailed from Loanpal regarding the alleged sale, agent Murphy of Prime Energy arrived at her Avon home with an electronic tablet to allow the solar panel project to go forward. Doc. 1, ¶ 44. He tapped the device's screen and then asked her to also tap it. *Id.* Bridget alleges that she could not see what she was tapping and received no explanation from Murphy at the time. *Id.* Additionally, Plaintiffs allege that Defendants did not provide them with any copies of contracts, other paperwork, or notice of the right to cancel any solar panel transaction. *Id.* ¶ 46. Nonetheless, Defendants allegedly forged Plaintiffs' signatures and initials on contract documents, including a 25-year "Loan Contract."[3] *Id.* ¶ 5. They then proceeded to install the solar panels on Plaintiffs' home. *Id.* ¶ 46.

---

(accessed June 28, 2022).

[3] In their opposition to Loanpal's motion to stay these proceedings, Plaintiffs assert that "Mrs. de Mauro Castro denies signing any contract with Defendants." Doc. 24, at 7 (citing Doc. 24-1, "Certification of Bridget de Moura Castro," ¶¶ 3-4). Moreover, as mentioned *supra*, "Mr. de Moura Castro is unable to sign documents, speak coherently, or care for himself." Doc. 24, at 7; *see also* Doc. 24-1, ¶ 5 ("My husband, Luiz, could not have signed or initialed any part of these documents

In January 2021, Defendants sent a letter, dated January 22, 2021, addressed to Luiz de Moura Castro, stating that he had taken out a 25-year loan and "[w]e've tried calling a few times to review your terms and was [sic] unsuccessful." Doc. 1, ¶ 47. Bridget de Moura Castro believed the letter was a scam because she did not recall taking out a loan and did not recognize the name "Loanpal." *Id.* ¶ 48. She thus gave the letter to her daughter, Cema Siegel, who "had been acting as Plaintiffs' power of attorney for financial matters." *Id.* ¶ 49. Upon Ms. Siegel's investigation, and after speaking with agent Murphy about the loan, Murphy agreed to send Ms. Siegel copies of any written agreements regarding the solar panels. *Id.* ¶ 50. On February 18, 2021, Ms. Siegel received copies of the 25-year Loan Contract and a "Contract for PV Solar System" (or "Purchase Contract") for the first time. *Id.* ¶ 51.

Upon inspection of the Loan Contract [Doc. 1, Ex. A] and Purchase Contract [Doc. 1, Ex. B], Plaintiffs discovered that the documents bore their names, forged signatures, and forged initials. *Id.* ¶ 54. Also, the email address and phone number on the documents were allegedly incorrect, insuring that Plaintiffs could not receive copies of the contract documents at the time of forgery.[4]

---

because of his Parkinson's disease, which he's had for 21 years. He can't sign documents, speak coherently, or care for himself. He is also legally blind."); Doc. 24-2 (Certification of Helena Hilario), ¶ 2 (attesting to Luiz's Parkinson's disease and resulting inability to "speak coherently" and "blind[ness]," necessitating "a live-in aide for 24-hour care"). "As such, [Luiz] could not have signed the 25-year loan instrument." Doc. 24, at 7.

[4] Plaintiffs specifically allege in their Complaint that Defendants concealed the forged Loan Contract from Plaintiffs "by fabricating and/or falsifying Plaintiffs' email address and phone number." Doc. 1, ¶ 5. Plaintiffs assert that the "email addresses listed on both the 25-year Loan Contract and the Purchase Contract were incorrect." *Id.* ¶ 55. In her "Certification," Bridget de Moura Castro thus states:

These signatures and initials are forgeries. The email address "Bridgetdecastro38@gmail.com is not mine and appears to be fake. The phone number listed – (860) 676-6363 – also is not mine.

*Id.* ¶¶ 55-57. Upon Plaintiffs' information and belief, Defendants also backdated the transaction date on the contracts so that the cancellation period had allegedly expired by the time the contracts were forged.[5] *Id.* ¶ 58.

Plaintiffs state that the cost of the solar panel system in the Purchase Contract was $54,880.88, which is allegedly more than three times the average cost to purchase such a system in Hartford County, where they reside.[6] *Id.* ¶ 60. With financing, the total cost of the solar panel system was allegedly $73,816. *Id.*; *see also* Doc. 1-1, at 4 ("Truth in Lending Disclosure Statement," "Total of Payments").

Shortly after receiving the contract documents on February 18, 2021, Plaintiffs sent Defendants a notice of cancellation of both contracts. Doc. 1, ¶ 61. Although Defendants received

---

Doc. 24-1, ¶ 4. At the time of said forgeries, Defendants also allegedly failed to provide Plaintiffs with written disclosures regarding the existence of a loan, its annual percentage rate, the finance charge, or the amount financed. Doc. 1, ¶ 7.

[5]   On its face, the Loan Contract was electronically signed  ("DocuSigned" ) by "Luiz De moura castro," as "Borrower,"  on "8/3/2020," and also electronically signed by his wife, as "Co-Borrower," on "8/7/2020." Doc. 1-1, at 12. Under "Notice of Right to Cancel," that contract provides:  "To  cancel this transaction, mail or deliver a signed and dated copy of this cancellation notice or any other written notice, or send a telegram to Loanpal at 8781 Sierra College Blvd., Roseville, CA 95746 not later than midnight of 8/11/2020." *Id.* at 15.

The Purchase Contract displays handwritten signatures and initials for both  Luiz and Bridget de Moura Castro, dated "Aug. 1, 2020;" but these writings appear to have been made by the same individual in tiny, illegible script. Doc. 1-2, at 3. With respect to cancellation, the Purchase Contract instructs:  "You may cancel this transaction, without any penalty or obligation, within three (3) business days from the above date," shown as "Aug. 1, 2020." *Id.* at 6.

[6]   Plaintiffs provide no details regarding calculation of the cost of the solar panel system. The "Amount Financed" that appears on the Loan Contract is "$51,560.88." Doc. 1-1, at 4. The Purchase Contract shows a "Loanpal Amount" of "$51,560.88," calculated by deducting an "Other Incentive" of $3,320 from a "Total Cost" of "$54,880.88." Doc. 1-2, at 2.  It is not indicated what the "incentive" of $3, 320 represents.  *Id.*

this notice, they did not cancel the contracts and instead demanded payment under the payment terms. *Id.* ¶¶ 62-63.

Plaintiffs have characterized the installation of solar panels on their "shaded, tree-covered roof" as "unconscionable" because said panels have been "ineffective." Doc. 1, ¶¶ 6, 65.  Due to "significant tree cover," the panels are completely shaded by trees.  *Id.*; *see also*  photographs of installed panels following  ¶¶ 6, 65.[7]

In sum, Plaintiffs allege that they were "duped into contracts they never saw, burdened with solar panels under terms they never agreed to, and subjected to wrongful demands for payment pursuant to these forgeries." *Id.* ¶ 66.  Due to  "Defendants' willful, wanton, reckless, and/or negligent conduct," Plaintiffs assert that they have "suffered mental and emotional distress, worry, and aggravation." *Id.*

Under these alleged circumstances, Plaintiffs bring the following claims against all Defendants in the Complaint: (1) violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681; violation of the Truth in Lending Act, 15 U.S.C. § 1638; (2) unfair or deceptive practices in violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b (which also encompasses violations of the Home Solicitation Sales Act ("HSSA"), Conn. Gen. Stat. § 42-141(b); the Home Improvement Act, Conn. Gen. Stat. § 20-418, *et seq.*; and Connecticut's elder exploitation statute, Conn. Gen. Stat. § 17b-450, *et seq.*)); (3) intentional or reckless unfair or deceptive practices in violation of CUTPA; (4)  elder exploitation under Conn. Gen. Stat. § 17b-450; and (5) common

---

[7]  In the Purchase Contract, entitled "Contract for PV Solar System" [Doc. 1, Ex. B], an additional charge of  $7,000 was designated for "tree trimming." Doc. 1-2, at 2.  However,  from the photographs inserted by Plaintiffs at paragraphs 6  and 65 of the Complaint, numerous tree branches remain to shade the installed solar panels.  It is thus questionable whether and/or to what extent any such tree trimming actually occurred.

law fraudulent concealment of the solar panel transaction (for failure to disclose and/or for prevention of discovery of facts regarding the hidden agreements with Plaintiffs' forged signatures).

In their prayer for relief, Plaintiffs seek, *inter alia*, compensatory ("actual and statutory") damages; punitive damages; declaratory judgment that the contract documents are void; return or destruction of Plaintiffs' confidential consumer report; removal of the solar panels and repair for damage to Plaintiffs' property; and attorney's fees and costs.  Doc. 1, at 20 ("Prayer for Relief").

## B.  Pending Motions to Stay Proceedings

### 1.  *Loanpal's Motion [Doc. 19] - Alleged Arbitration Agreement in "Loan Contract"*

In response to Plaintiffs' Complaint, Defendants Loanpal and 1st Energy have filed motions for a stay to allow arbitration to proceed.  Doc. 19, 23.  Loanpal has filed its motion pursuant to an arbitration provision in the "Loan Contract" [Doc. 1-1, Ex. A];  and 1st Energy has moved pursuant to an arbitration provision in the "Purchase Contract" [Doc. 1-2, Ex. B].  Doc. 19 at 1; Doc. 23 at 1.

The Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"), mandates that in any action "brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court . . ., upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ."  9 U.S.C. § 3.

Loanpal asserts that "this lawsuit arises from a loan obtained by Plaintiffs from Loanpal to permit improvements to be made on their residence;" and that loan "was issued under a loan contract" which "contains a comprehensive arbitration agreement." Doc. 19, at 1.  Paragraph 15 of the "Loan Contract" includes the following arbitration provision:

> All claims and disputes arising out of or related to this Agreement (hereafter, "Dispute(s)") shall be resolved by binding arbitration on an individual basis.  The arbitrator shall also decide any issues relating to the making, validity, enforcement or scope of this arbitration agreement, arbitrability, defenses to arbitration including unconscionability, or the validity of the jury trial, class action or representative action waivers (collectively, "arbitrability issues"). . . . The Federal Arbitration Act (9 U.S.C. §§ 1-16) (the "FAA") shall govern this agreement to arbitrate including all arbitrability issues.

Doc. 1-1, ¶ 15. *See also* Doc. 19, at 2.  Loanpal concludes that because "[t]he parties executed a Binding Agreement that contained a comprehensive arbitration agreement," the Court "should stay the judicial proceedings as required by Title 9 § 3 of the United States Code." Doc. 19, at 4.

Loanpal acknowledges that paragraph 15, creating the arbitration agreement,  also  provides that  Plaintiffs "may opt out of arbitration by sending [Loanpal] written notice within 15 days of signing the agreement stating that [they] wish  to 'opt out of the agreement to arbitrate disputes.'" *Id.* at 2.  However, according to Loanpal, Plaintiffs "elected not"  to opt out of the agreement.  *Id.* Consequently, Loanpal argues, the parties are bound to arbitrate under the FAA,  which encompasses any "written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy," 9 U.S.C. § 2.  Doc. 19, at 4.  As to the issue of a stay, Loanpal indicates "Oral Argument Requested."  *Id.* at 1.

### 2.  *1ˢᵗ Light's Motion [Doc. 23] - Alleged Arbitration Agreement in "Purchase Contract"*

1ˢᵗ Light  has also moved to "stay [this Court's] proceedings to allow for arbitration." Doc. 23, at 1.  1ˢᵗ Light asserts that Plaintiffs have brought "various claims related to the installation of a solar energy system on a residential property" and those claims "arise out of a written contract," the Purchase Contract attached to Plaintiffs' Complaint as Exhibit B [Doc. 1-2]. *Id*.  Specifically, 1ˢᵗ Light bases its motion on the following "Arbitration" provision:

> Other than breach due to the Customer's interference with the Rebate or default of
> payment by the Customer . . . , any other dispute between the parties shall be decided
> in accordance with the latest rules and procedures as set forth by the American
> Arbitration Association. Parties hereby agree that any dispute or differences arising
> out of or in connection with this Agreement shall be determined by the appointment
> of a single arbitrator to be agreed between the parties.  Parties further agree that the
> decision made by the appointed arbitrator shall be final and binding, and each party
> shall be responsible for its own cost and expenses related to arbitration.

Doc. 23, at 2 (quoting Doc. 1-2, at 5).

In light of this "Arbitration" provision, 1st Light asserts that "[i]n accordance with 9 U.S.C. § 3, and giving effect to the parties' agreement, this Court ought to stay these proceeding to allow for arbitration." Doc. 23, at 2.  "The  nature of Plaintiffs' claims do [sic]  not alter that analysis or otherwise take this matter beyond the scope of the parties' agreement to arbitrate."  *Id.*

In support of its motion, 1st Light states that Plaintiffs have attached to their Complaint "what appears to be a signed agreement." *Id.*  Moreover, the Complaint alleges that "Mrs. de Moura Castro agreed to have the solar panels installed." *Id.* (citing Doc. 1, ¶ 41). In particular, 1st Light asserts that Plaintiffs admit that Bridget de Moura Castro "tapped the screen of an electronic tablet device" and this action was taken "to allow the solar project to go forward."  *Id.* at 2-3 (citing Doc. 1, ¶¶ 44-45). Under these circumstances, she took "affirmative steps to formalize an agreement for the installation of solar panels" despite her failure to read the agreement.  *Id.* at 3.  1st Light then cites *Delk v. Go Vertical, Inc.*, 303 F.  Supp. 2d 94, 99 (D. Conn. 2004)  for the "general rule" in Connecticut that "where a person of mature years and who can read and write signs or accepts a formal written contract affecting his pecuniary interests, it is his duty to read it and notice of its contents will be imputed to him if he negligently fails to do so." Doc. 23, at 3.  In conclusion, 1st Light states that Plaintiffs' own "allegations present a prima facie case that a contract existed and that the contract

contains a mandatory arbitration clause." *Id.*

Finally, 1ˢᵗ Light lists each of Plaintiffs' claims in the Complaint and cites case law to support a finding that each should be "subject to arbitration" under the Purchase Contract. *Id.* at 4 (delineating claims and collecting cases).   Because it believes it has "made a showing that the parties executed a written agreement that contains an arbitration agreement," 1ˢᵗ Light "respectfully move[s] this Court to stay these proceedings." *Id.* at 5.

## II.  DISCUSSION

### A.  Federal Arbitration Act

The FAA "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n. 32 (1983)).   In general, the Act "embodies a national policy favoring arbitration." *Doe v. Trump Corp.*, 453 F. Supp. 3d 634, 639 (S.D.N.Y. 2020) (quoting *Doctor's Assoc's, Inc. v. Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019)), *aff'd*, 6 F.4th 400 (2d Cir. 2021). *See also Topf v. Warnaco, Inc.*, 942 F. Supp. 762, 765 (D. Conn. 1996) ("The FAA, 9 U.S.C. §§ 1-14,  reflects a 'liberal federal policy favoring arbitration agreements' as a means of settling disputes.") (quoting *Moses H. Cone Memorial Hosp.,* 460 U.S. at 24).[8]

However, with respect to this "policy favoring arbitration," the United States Supreme Court recently clarified that the policy "does not authorize federal courts to invent special, arbitration-preferring procedural rules." *Morgan v. Sundance, Inc.*, 142 S.Ct. 1708, 1713 (2022)

---

[8]  "The purpose underlying arbitration [is] to provide parties with efficient dispute resolution, thereby obviating the need for protracted litigation." *Trump Corp.*, 453 F. Supp. 3d at 639 (citations and internal quotation marks omitted).

(citing *Moses H. Cone*, 460 U.S. at 24). The Supreme Court's "frequent use of that phrase connotes something different" because "[t]he policy . . . is merely an acknowledgment of the FAA's commitment to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the *same footing as other contracts*." *Id.* (quoting *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 302 (2010) (emphasis added). "[I]n another formulation: The policy is to make 'arbitration agreements as enforceable as other contracts, but not more so.'" *Morgan*, 142 S. Ct. at 1713 (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, n.12 (1967)).

The terms of the FAA provide that "[a] written provision in . . . a contract ... to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable."[9] 9 U.S.C. § 2. Consequently, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (citation omitted).

As the United States Supreme Court recently explained in *Morgan v. Sundance, Inc.*, an opinion filed on May 23, 2022:

> [A] court must hold a party to its arbitration contract just as the court would to any other kind. But a court may not devise novel rules to favor arbitration over litigation. *See Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218–221, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985).

142 S. Ct. at 1713. *See also Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (The FAA

---

[9] Pursuant to 9 U.S.C. § 2 of the Federal Arbitration Act, "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

"places arbitration agreements on the same footing as other contracts. It thereby follows that parties are not required to arbitrate unless they have agreed to do so.") (citations and internal quotation marks omitted); *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019) ("Arbitration remains . . . a creature of contract: 'The threshold question facing any court considering a motion to compel arbitration is . . . whether the parties have indeed agreed to arbitrate.'") (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012)).

Furthermore, although the parties may "agree to arbitrate threshold questions such as whether the arbitration clause applies to a particular dispute, . . . parties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place." *Citigroup Inc. v. Sayeg Seade*, No. 21 CIV. 10413 (JPC), 2022 WL 179203, at *5 (S.D.N.Y. Jan. 20, 2022) (quoting *Doctor's Assocs.*, 934 F.3d at 251). "This is because a contract that has not been properly formed is not merely an unenforceable contract; it is not a contract at all[;] [t]o force parties to arbitrate when they have not properly contracted to arbitrate would be improper." *Delgado v. Donald J. Trump for President, Inc.*, No. 19 CIV. 11764 (AT), 2022 WL 767166, at *4 (S.D.N.Y. Mar. 14, 2022) (citations and internal quotation marks omitted).[10]

The Second Circuit has explicitly stated that "[t]his question [of whether an arbitration

---

[10] *See also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530, 202 L. Ed. 2d 480 (2019) ("[B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists.") (citing 9 U.S.C. § 2); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) ("[B]efore an agreement to arbitrate can be enforced, the district court must first determine whether such agreement exists between the parties.") (citation omitted); *ACEquip Ltd. v. Am. Eng'g Corp.*, 315 F.3d 151, 155 (2d Cir. 2003) ("The . . . type of factual scenario, involving the existence of the arbitration agreement itself, generally presents an issue for the court to decide.") (citation omitted); *Gilbert v. Dell Techs., Inc.*, 415 F. Supp. 3d 389, 395 (S.D.N.Y. 2019) ("A court, rather than an arbitrator, should decide whether a valid agreement to arbitrate exists.") (citing *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 392 (2d Cir. 2011)).

agreement exists] is determined by state contract law." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73-74 (2d Cir. 2017) (citing *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)). Therefore, "[w]hen deciding whether the parties agreed to arbitrate a certain matter," courts generally "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944, (1995); *accord Rightnour v. Tiffany & Co.*, 239 F. Supp. 3d 744, 749-50 (S.D.N.Y. 2017). Moreover, this "determination involving interpretation of state law . . . is a legal conclusion." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 26 (2d Cir. 2002).

## B. Court's Duty on Motion to Stay

"When a party who has agreed to arbitrate a dispute instead brings a lawsuit, the Federal Arbitration Act (FAA) entitles the defendant to file an application to stay the litigation." *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1710 (2022) (citing 9 U.S.C. § 3). Specifically, pursuant to § 3 of the FAA, if an action is brought in federal court "upon any issue referable to arbitration under an agreement in writing for such arbitration," the court, once satisfied that the issue in the action is covered by the arbitration agreement, "shall on application of one of the parties stay the trial of the action until such arbitration has been had . . . ." 9 U.S.C. §3.

Moreover, under the FAA, parties to an action may petition a district court to enforce an agreement to arbitrate. Pursuant to § 4, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement ... may [seek] an order directing that such arbitration proceed . . . ." 9 U.S.C. § 4. As discussed above, if the court then determines that the matter is arbitrable, it must "stay the trial of the action until . . . arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. If, however, "the making of the arbitration agreement . . . [is] in issue, the court shall proceed summarily to the trial thereof." 9

13

U.S.C. § 4.

To determine whether to compel arbitration, the Court must consider: "(1) whether the parties entered into a contractually valid arbitration agreement, and (2) whether the dispute falls within the scope of the arbitration agreement." *Murphy v. Glencore Ltd.*, No. 3:18-CV-01027 (CSH), 2019 WL 549139, at *2 (D. Conn. Feb. 11, 2019) (citing *Nicosia*, 834 F.3d at 229). As discussed *supra*, the issue of validity is "governed by state law principles of contract formation." 2019 WL 549139, at *2 (citing *Nicosia*, 834 F.3d at 229).

In seeking to stay the case at bar in order to allow arbitration to proceed, Defendants seek to compel Plaintiffs to arbitrate. The standard the Court "must apply when reviewing a motion to compel arbitration is essentially the same standard that the Court applies when it reviews a motion for summary judgment." *D'Antuono v. Serv. Rd. Corp.*, 789 F. Supp. 2d 308, 319 (D. Conn. 2011) (citations omitted). *See also Billie v. Coverall N. Am., Inc*., 444 F. Supp. 3d 332, 339 (D. Conn. 2020) (same) (citing *Bensadoun v. Jobe–Riat*, 316 F.3d 171, 175 (2d Cir. 2003)). Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. " Fed. R. Civ. P. 56(a). The party seeking an order to compel arbitration must "substantiate [its] entitlement [to arbitration] by a showing of evidentiary facts" that support its claim that the other party agreed to arbitrate . *D'Antuono,* 789 F. Supp. 2d at 319 (quoting *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir.1995)).

 If such an evidentiary showing is made, the party opposing arbitration "may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried" as to the making of the arbitration agreement. *D'Antuono,* 789 F. Supp. 2d at 319-20 (quoting *Oppenheimer*, 56 F.3d at 358). "If there is an issue of fact as to the making of the agreement for arbitration, then

a trial [on that issue] is necessary." *Bensadoun,,* 316 F.3d at 175 (citing 9 U.S.C. § 4). "Only when

there is no genuine issue of fact concerning the formation of the agreement should the court decide

as a matter of law that the parties did or did not enter into such an agreement." *D'Antuono,* 789 F.

Supp. 2d at 320  (citations omitted).

The FAA, 9 U.S.C. § 4, governs the form that will be taken by a trial on the issues of whether

an arbitration agreement exists or there has been non-compliance with it.   Section 4 of the FAA

provides in pertinent part:

> If the making of the arbitration agreement or the failure, neglect or
> refusal to perform the same be in issue, the court shall proceed
> summarily to the trial thereof.  If no jury trial be demanded by the
> party alleged to be in default, . . . the court shall hear and determine
> such issue.  Where such an issue is raised, the party alleged to be in
> default may, . . . on or before the return day of the notice of
> application, demand a jury trial of such issue, and upon such a
> demand the court shall make an order referring the issue or issues to
> a jury in the manner provided by the Federal Rules of Civil
> Procedure, or may specially call a jury for that purpose.

Depending upon the applications of the parties, an FAA § 4 trial will be before a jury, *e.g.,*

*Ayad v. PLS Check Casher of New York, Inc.,* No. 20-CV-01039 (CBA) (CLP), 2021 WL 4272472,

at *3 (E.D.N.Y. Sept. 21, 2021)*,* or a bench trial before the court, *e.g., Software for Moving, Inc. v.*

*La Rosa Del Monte Express, Inc.,* 419 F. App'x 41, 43 (2d Cir. 2011).

In the case at bar, Defendants Loanpal and 1st Energy move to stay these proceedings to

enable arbitration of Plaintiff homeowners' claims.  In so doing, they seek to compel Plaintiffs to

arbitrate.  Plaintiffs resist arbitration, denying that a mutually binding agreement to arbitrate exists

between the parties.  Under these circumstances, § 4 of the FAA entitles Plaintiffs to "demand a jury

trial on such issue."  Plaintiffs' sur-reply brief states that 'if the Court determines material facts are

genuinely in dispute, a jury should decide"  if "there was a meeting of the minds between Mrs. De Moura Castro and Defendants as to formation of a valid agreement to arbitrate." Doc. 30, at 3.  I interpret that submission as a timely § 4 demand by Plaintiffs for a trial of the factual issues presented by Defendants' "motions to stay [these] proceedings" to enable, and thus to effectively compel, arbitration.

### 1. *General Rules of Contract Formation under State Law*

In the case at bar, although there are alleged written arbitration agreements, as set forth in the "Loan Contract" and the "Purchase Contract" appended to the Complaint [Ex. A, B], the parties dispute whether they were validly formed under state contract law.  There may be numerous issues of fact surrounding formation of these contracts, which may necessitate a trial. However, prior to any such trial, the Court must determine whether there exists a "genuine issue" as to whether the parties actually entered these contracts.

Pursuant to Loanpal's Loan Contract's terms, the "Agreement shall be governed by federal law, and to the extent state law applies, the substantive laws of the state where the Residence is located." Doc. 1-1, ¶ 14.  Because the Plaintiffs'  "Residence Address" under the contract is located in "Avon, Connecticut," the state laws of Connecticut apply to the issue of contract formation. *Id.* at 4.  Similarly, the Purchase Contract provides, under "Governing Law," that "[t]his Agreement shall be governed by and construed in all respect [sic] in accordance with the laws where the property is located as they apply to a contract entered into and performed in that State." Doc. 1-2, at 5.  As the Avon property is located in Connecticut, that state's laws apply to the Purchase Contract as well.

Under Connecticut state law, "the essential elements of contract formation are offer and

acceptance." *D'Antuono*, 789 F. Supp. 2d at 322 (citing *Auto Glass Express, Inc. v. Hanover Ins. Co.*, 293 Conn. 218, 227 (2009))*. See also Bridgeport Pipe Eng'g co. v. DeMatteo Constr. Co.*, 159 Conn. 242, 246 (1970) ("It is elementary that to create a contract there must be an unequivocal acceptance of an offer. . . . The acceptance of the offer must, however, be explicit, full and unconditional.") (citations omitted); *see also Ubysz v. DiPietro*, 185 Conn. 47, 51 (1981) ("[I]n order to form a contract, generally there must be a bargain in which there is a manifestation of mutual assent to the exchange between two or more parties; and the identities of the contracting parties must be reasonably certain.") (internal citations omitted). It thus follows that "[t]o form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties." *Marinos v. Bldg. Rehabs., LLC*, A.2d 46, 49 (Conn. App. 2001). "The existence of a contract is a question of fact to be determined by the trier on the basis of all the evidence." *Id.*

"The general rule is that where a person of mature years, and who can read and write, signs or accepts a formal written contract affecting his pecuniary interests, it is his duty to read it, and notice of its contents will be imputed to him if he negligently fails to do so . . . ." *Ursini v. Goldman*, 118 Conn. 554, 562 (Conn. 1934); *accord Phoenix Leasing, Inc. v. Kosinski*, 47 Conn. App. 650, 654 (1998). Therefore, "the fact that a party signed a written agreement is usually conclusive evidence of contract formation." *D'Antuono,* 789 F. Supp. 2d at 323.   "Nonetheless, an exception to the general rule arises when things have "been said or done to mislead the person ... or to put a [person] of reasonable business prudence off his [or her] guard in the matter." *Id.*

Furthermore, "[u]nder Connecticut law, '[a]s a general proposition, a forged document is a nullity.'" *Conley v. 1008 Bank St., LLC*, No. 3:20-CV-284 (CSH), 2020 WL 4926599, at *7 (D.

Conn. Aug. 22, 2020) (quoting *Homeamerican Credit, Inc. v. Weiss*, No. CV 990591183S, 2000 WL 347785, at *3 (Conn. Super. Ct. Mar. 16, 2000)).  *See also Hanover Ins. Co. v. Designs on Travel, Inc.*, No. CV 87-38710, 1991 WL 258103, at *2 (Conn. Super. Ct. Nov. 20, 1991) ("[A] person cannot be liable on an instrument where his signature is forged or unauthorized.").  Therefore, "courts must refuse to enforce arbitration clauses contained in documents alleged to be forgeries." *Firma Melodiya v. ZYX Music GMBH*, No. 94 CIV. 6798 (DC), 1995 WL 28493, at *4 (S.D.N.Y. Jan. 25, 1995) (citing, *inter alia,  Interocean Shipping Co. v. National Shipping & Trading Corp.*, 462 F.2d 673 (2d Cir.1972)).

Parties disputing the validity of an arbitration agreement must bear in mind that the United States Supreme Court has "made clear that in enacting Section Two of the FAA, 'Congress . . . withdrew the power of the states to require a juridical forum for the resolution of claims *which the contracting parties agreed to resolve by arbitration*.'"  *Morales v. Rent-A-Ctr., Inc.*, 306 F. Supp. 2d 175, 180–81 (D. Conn. 2003)(quoting *Southland Corp. v. Keating*, 465 U.S. 1, 7 (1984) (emphasis added).  "If an arbitration agreement is found to exist, the action must be stayed and arbitration compelled on all issues which the agreement covers." *Topf v. Warnaco, Inc.*, 942 F. Supp. 762, 765 (D. Conn. 1996).  "Therefore, only 'generally applicable contract defenses, such as fraud, duress, or unconscionability may be applied to invalidate arbitration agreements without contravening § 2.'"  *Morales*, 306 F. Supp. 2d at 181 (quoting *Doctor's Assocs. v. Casarotto,* 517 U.S. 681, 687  (1996)).

### 2.  Alleged Arbitration Agreements at Issue

In the case at bar, there are conflicting allegations regarding formation of an arbitration agreement in the Loan Contract and/or the Purchase Contract.  Defendants Loanpal and 1st Light

point to arbitration clauses in their written contracts with Plaintiffs,  Doc. 1-1 and 1-2, as prima facie evidence of these agreements.   Plaintiffs' electronic signatures and initials appear on the Loan Contract;  and their alleged handwritten signatures and Luiz's initials appear on the Purchase Contract, the two arbitration agreements at issue.  Doc. 1-1, at 2, 3-5, 9, 12, & 16-19; Doc. 1-2, at 3.  When parties actually sign a contract, that is generally "presumptive" evidence that an agreement was formed.  *Morales*, 306 F. Supp. 2d at 181 (citations omitted).  *See also Gruber v. Louis Hornick & Co.*, No. 02 CIV. 5092 (SHS), 2003 WL 21222541, at *2 (S.D.N.Y. May 23, 2003) ("A person who signs a contract is presumed to know its contents and assent to them.") (citations omitted).  If Plaintiffs truly signed the agreements, they may thus be bound by them unless they are able to show special circumstances that would negate their formation.  *Morales*,  306 F. Supp. 2d at 181.

On the other hand, Plaintiffs allege that no arbitration agreement exists due to fraud and/or forgery.  Absent immediate denial of Defendants' motions to stay, Plaintiffs explicitly request a jury trial to determine whether a valid arbitration contract exists.  Doc. 24, at 10 ("[I]f the Court finds a genuine dispute of material fact, the Court should allow for discovery on the contract formation issue and schedule a prompt jury trial to resolve the same.").  As Plaintiffs acknowledge, "[a]  party moving for a jury trial under § 4 must show the existence of a *genuine issue* involving the making of the arbitration agreement."  *Topf*, 942 F. Supp. at 766 (emphasis added) (citing*, inter alia, Almacenes Fernandez, S.A. v. Golodetz*, 148 F.2d 625, 628 (2d Cir.1945)).  To prove the existence of such a genuine issue, "[t]here are two requirements": "first, the party must make an unequivocal denial that an arbitration agreement exists; and second, the party must show sufficient facts in support of their [sic] contention."  *Topf,* 942 F. Supp. at 766  (citing *Almacenes Fernandez*, 148 F.2d at 628). *See also Manning v. Energy Conversion Devices, Inc.*, 833 F.2d 1096, 1103 (2d Cir.

1987) (A party "must submit sufficient evidentiary facts in support of [its]  claim in order to precipitate the trial contemplated by 9 U.S.C. § 4.").

In the instant case, Plaintiffs assert in their submissions that they have entered no valid arbitration agreement.  In opposing the motions to stay and proceed to arbitration, Plaintiffs assert that they "neither signed nor even saw any contract, let alone an arbitration provision." Doc. 24, at 2.  In support, Plaintiffs submit Bridget de Moura Castro's "Certification," stating that the "signatures and initials [on the contracts] are forgeries." Doc. 24-1, ¶ 4.

In certain situations, supporting affidavits may suffice to obtain a jury trial under § 4. In the case at bar, the affidavits presented refute the formation of arbitration contracts in cursory form. Thus, in assessing whether Plaintiffs have submitted "sufficient evidentiary facts in support of [their] claim" for a jury trial, the Court finds that there is only the brief (six-paragraph) "Certification" of Mrs. de Moura Castro's, Doc. 24-1, and the even briefer (three-paragraph) "Certification" of Helena Hilario, Next Friend of Plaintiff Luiz de Moura Castro," Doc. 24-2.[11]   Bridget de Moura Castro mainly asserts that she "did not see, sign, initial" any part of the alleged contract documents.  Doc. 24-1, at 4.  Helena Hilario attests to her mother's representation that she does not have the email address "Bridgetdecastro38@gmail.com" and confirms that the phone number on the Loan Contract does not belong to her parents.[12]  Doc. 24-2, ¶ 3.

Although probative, these statements do not fully address Defendants' allegations that "[t]he

---

[11] The Court notes the representations of Mrs. de Moura Castro and her daughter that Luiz has debilitating Parkinson's disease, rendering him "legally blind" and unable to "sign documents, speak coherently, or care for himself." Doc. 24-2, ¶ 2. These statements assist the Court regarding Luiz's likely inability to negotiate or consent to contract with the Defendants.

[12]  The same email address and phone number appear on the Loan Contract, Doc. 1-1, at 4, and the Purchase Contract, Doc. 1-2, at 2.

parties executed a Binding Agreement that contained a comprehensive arbitration agreement . . . ." Doc. 19, at 4.  For example,  in tapping the screen on an electronic tablet, Defendant 1ˢᵗ Light suggests that Bridget de Moura Castro was indicating her approval "to allow the solar project to go forward." Doc. 23, at 3. Bridget fails to provide her full understanding when she tapped the screen of that electronic device.  Also, the Court notes an "Autopay" provision in the written Loan Contract, authorizing Loanpal and its agents to "initiate preauthorized electronic fund transfers," as specified in the agreement.  Doc. 1-1, at 18.  This payment-authorization provision partially displays specific "Bank of America" routing and account numbers over the electronic signature of "Luiz De moura castro." *Id.*  The Court cannot ascertain whether Defendants actually obtained Plaintiffs' bank account information, how that information was accessed, and/or whether any payments were made from that account.  Also, the Court has no information regarding how Loanpal and 1ˢᵗ Light obtained the Plaintiffs' email address and phone number on the contracts at issue.  Lastly, there is evidence that the solar panels were indeed installed.  Doc. 1, ¶¶ 6, 65 (and photos inserted thereunder).  Under these circumstances, the record has not been sufficiently established regarding the interactions that occurred between Plaintiffs and Defendants in August 2020, when the arbitration contracts at issue were allegedly formed.

Because the applicable standard for granting a jury trial is the same standard the Court applies when reviewing a motion for  "summary judgment" – and  in light of Defendant Loanpal's request for oral argument on its motion to stay –  the Court will hold a preliminary evidentiary hearing to determine whether there is  a "genuine issue" to warrant a jury trial regarding the existence *vel non*

of valid arbitration contracts.[13] *See, e.g., Pingel v. Gen. Elec. Co.*, No. 3:14-CV-00632 (CSH), 2014 WL 7334588, at *8 (D. Conn. Dec. 19, 2014)  ("[T]he party challenging an arbitration agreement as void is not entitled to a trial under § 4 in the absence of 'some evidence substantiating its claim.'") (quoting *Sphere Drake Ins. Ltd. v. Clarendon Nat'l  Ins. Co.*, 263 F.3d 26, 32 (2d Cir.2001)); *Vaccaro v. Ins. Co. of N. Am.*, No. 3:96-CV-1161 (AHN), 1996 WL 762234, at *2–3 (D. Conn. Dec. 23, 1996)  ("To establish a genuine issue entitling a party to a jury trial 'an unequivocal denial that the agreement [to arbitrate] had been made [is] needed, and some evidence should [be] produced to substantiate the denial.' ") (quoting  *Doctor's Assoc.*, 85 F.2d at 984). The Court will thus receive evidence, both through testimony and documents, to provide Plaintiffs with the opportunity to sustain their evidentiary burden – to sufficiently support their denial that an arbitration agreement has been made.

To "obtain a jury trial" – prove "there is a triable issue concerning the existence ... of the agreement," *Topf*, 942 F. Supp. at 766 – Plaintiffs may also present proof that any exceptions or defenses (fraud, duress, unconscionability) to contract formation exist.  For example, if Plaintiffs authorized insertion of their signatures or initials on contract documents but wish to pursue the defense of "fraudulent inducement" based on misrepresentations, they must show: "(1) that a false representation was made as a statement of fact; (2) that it was known to be false; (3) that it was made to induce action by [them] ; and (4) that [Plaintiffs] acted on the statement to their detriment." *Id.* at 768 (citing  *Miller v. Appleby*, 183 Conn. 51, 54–55 (1981) and  *Billington v. Billington*, 220

---

[13]  To fulfill the "summary judgment" standard to obtain a jury trial, a "plaintiff must show genuine factual issues regarding his allegations concerning the making of the arbitration agreement, *such that a jury could find no agreement*." *Topf*, 942 F. Supp. at 767 (emphasis added).

Conn. 212, 217 (1991)).   Moreover, Plaintiffs must show that their "reliance upon another's misrepresentation [was] justifiable or reasonable." *Topf*, 942 F. Supp. at 768.  Similarly, if Plaintiffs choose to assert "non-disclosure" as a defense,  it is incumbent on them to show: (1) Defendants' "failure to disclose a fact;" (2) "the duty to disclose that fact" existed; (3) Defendants "inten[ded] to induce reliance;" and (4) Plaintiffs' "reliance upon the non-disclosure was reasonable."  *Id.* at 769 (citing  *Duksa v. City of Middletown*, 173 Conn. 124, 127 (1977)).

In contrast, in support of an alleged arbitration agreement contained within the  "Loanpal Agreement" or Loan Contract [Doc. 1-1], Defendant Loanpal may counter with evidence to confirm that a contract was formed.  For example, to negate the existence of a "genuine issue" regarding contract formation, Loanpal should be able to explain when and how Plaintiffs' electronic signatures came to be inserted on the Loan Contract, where Loanpal obtained the allegedly erroneous email address and phone number for Plaintiffs, and what was the source of the bank account  information regarding Plaintiffs' auto-payment.  Similarly, as to the "Arbitration" provision presented in the "Contract for PV Solar System" or Purchase Contract [Doc. 1-2], 1st Light should be prepared to address the facts of contract  formation with Plaintiffs, including, for example, when and how the contract was formed, where 1st Light obtained Plaintiffs' email address and phone number, and whose handwriting made the tiny signatures in question.

### 3.  *Non-signatory Prime*

The remaining Defendant in the action, Prime Energy LLC (herein also "Prime"), does not appear to be a signatory to either the Loan Contract or the Purchase Contract. At this point, Prime has made no appearance in the case and has filed no pleadings.  There is no indication that it supports or opposes either motion to stay.

However, in general, a non-signatory may request a stay of court proceedings when there exists a valid arbitration contract and the claims involving the non-signatory give rise to factual or legal issues that may be resolved by the arbitration. "It is well-settled that claims are appropriately stayed when they involve common issues of fact and law with those subject to arbitration or when the arbitration is likely to dispose of issues common to claims against both arbitrating and non-arbitrating defendants." *Moore v. Interacciones Glob., Inc.*, No. 94 CIV. 4789 (RWS), 1995 WL 33650, at *7 (S.D.N.Y. Jan. 27, 1995). *See also Cosmotek Mumessillik Ve Ticaret Ltd. Sirkketi v. Cosmotek USA, Inc.*, 942 F. Supp. 757, 760 (D. Conn. 1996) (In determining whether to grant a stay requested by a non-signatory, "the primary questions are (1) whether there are common issues in the arbitration and the court proceeding, and (2) if so, whether those issues will be finally determined by the arbitration.") (citing *Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc.*, 885 F. Supp. 499, 502 (S.D.N.Y. 1995)).

A non-signatory to an arbitration agreement may thus be entitled to a stay pending arbitration between signatories "where there is significant factual overlap between the remaining claims and the arbitrated claims." *Pike Co., Inc. v. Tri-Krete Ltd.*, 349 F. Supp. 3d 265, 280 (W.D.N.Y. 2018) (citation omitted). "In such cases, a stay is warranted in part because the prior litigation or arbitration is likely to have preclusive effect over some or all of the claims not subject to arbitration." *Winter Inv'rs, LLC v. Panzer*, No. 14 Civ. 6852 (KPF), 2015 WL 5052563, at *11 (S.D.N.Y. Aug. 27, 2015)(citing *Bear, Stearns & Co., Bear, Stearns Sec. Corp. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d Cir. 2005)). *See also Spencer Furniture, Inc. v. Media Arts Grp., Inc.*, 349 F. Supp. 2d 49, 53 (D. Mass. 2003) (non-signatory was "entitled to the benefit of a stay" because its "potential liability derived from [co-defendant signatory's] conduct" and arose from "the same operative

facts").

Finally, the Court notes that Prime has failed to appear in the case following recent service of the summons and Complaint. On April 28, 2022, the Court granted Plaintiffs' request to re-serve Prime because, according to Plaintiffs, Prime moved its address, and its agent for service "had moved from the address [it] had provided to the Secretary of State" but failed to provide an updated address. Doc.37 (citing Doc. 34, at 1, and 34 -1 (Ex. A, "Affidavit of Non-Service")). After their initial attempts at service, Plaintiffs learned that Prime's agent for service had updated his address with the Secretary of State to 8 Hunting Lane, North Haven, Connecticut. Doc. 34, at 1. The Court thus granted Plaintiffs leave to serve Prime at that address within forty-five (45) days – on or before June 13, 2022. Doc. 37. On June 7, 2022, Plaintiff filed proof of service on the case docket to indicate that "due and legal service upon . . . Prime Energy LLC" had occurred through service on Shawn Roby, Prime's agent for service, at his North Haven address on May 11, 2022. Doc. 40. The deadline for Prime to answer or respond to the Complaint, June 1, 2022, has expired. *See* Fed. R. Civ. P. 12 (a)(1)(A)(i) (" A defendant must serve an answer: (i) within 21 days after being served with the summons and complaint[.]").

Although the Court stayed the case deadlines pending decision on the two motions to stay [Doc. 25], Prime Energy LLC must appear in the action to avoid an entry of default. *See* Fed. R. Civ. P. 55(a) (If a party has "failed to plead or otherwise defend" and that failure is "shown by affidavit or otherwise, the clerk must enter the party's default."). Accordingly, if Prime does not appear in the action on or before **July 5, 2022**, the Clerk is directed to enter default against that party, in accordance with Federal Civil Rule 55(a).

If Prime does appear, thereby avoiding entry of default, and wishes to be heard on Loanpal's

and/or 1ˢᵗ Light's motion(s) to stay, it may file memoranda in reply to those pending motions. Any such memorandum by Prime must be filed on or before **12:00 noon on July 25, 2022.**

### III.  CONCLUSION AND ORDER

To address Loanpal's and 1ˢᵗ Light's pending motions to stay these proceedings [Doc. 19, 23], the Court will hold a preliminary evidentiary hearing on **July 27, 2022**, at **10:30 a.m.  via  Zoom** to enable Plaintiffs to present evidence that  genuine factual issues  exist  regarding whether they entered a valid arbitration agreement under the "Loan Contract" and/or "Purchase Contract" under Connecticut state law.[14]

With respect to non-signatory Prime, that party must appear in the action by **July 5, 2022**, to avoid entry of default.  Upon appearing, Prime may indicate its position, if any, regarding the other Defendants' motions to compel, Doc. 19 and 23, by filing memoranda **on or before 12:00 noon on July 25, 2022**.

It is SO ORDERED.

Signed: New Haven, Connecticut
         June 28, 2022

/s/Charles S. Haight, Jr.
CHARLES S. HAIGHT, JR.
Senior United States District Judge

---

[14]  To be clear, as a result of the preliminary hearing, the Court will not decide the issue of whether an arbitration agreement exists between the parties.  Rather, the Court will determine whether there are "genuine factual issues . . . concerning the making of the arbitration agreement[s], such that a jury could find no agreement." *Topf*, 942 F. Supp. at 767.  If there are  "genuine issues," the Court will order a trial to determine whether valid arbitration contracts exist.