**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| BRIDGET DE MOURA CASTRO & LUIZ DE MOURA CASTRO, by his next friend Helena Hilario<br>       Plaintiffs,<br><br>    vs.<br><br>LOANPAL, LLC d/b/a GOODLEAP, PRIME ENERGY LLC d/b/a PRIME ENERGY SOLAR, 1ST LIGHT ENERGY INC.,<br>       Defendants. | NO. 3:21-cv-01020 CSH |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT AS TO PRIME ENERGY LLC D/B/A PRIME ENERGY SOLAR**

**I.  INTRODUCTION**

Defendant Prime Energy LLC d/b/a Prime Energy Solar ("Prime"), despite being properly served, has chosen not to participate in this litigation. A default has been entered against Prime, and it is deemed to have admitted all of the factual allegations in the Complaint establishing its liability for its fraud, forgeries, and violations of federal and state law in the course of its door-to-door sale of solar panels. Accordingly, Plaintiffs, Bridget de Moura Castro and Luiz de Moura Castro, move this Court for the entry of judgment by default against Prime, and request a jury trial on the appropriate amount of damages.

**II.  FACTS**

Plaintiffs are 80-year-old senior citizens who reside together in Connecticut. (ECF 1, Complaint ¶ 2.) Mr. Luiz de Moura Castro has Parkinson's disease and requires a live-in aid to provide 24-hour care. (*Id.*) He lacks the ability to care for himself, speak coherently, or sign documents. (*Id.*) Plaintiffs have given power of attorney over finances to their daughters. (*Id.*).

1

Defendants are in the business of soliciting consumers for the purchase of solar panels and/or installing solar panels on consumers' homes. (*Id.* ¶ 3.) Defendants' sales agents solicit consumers at their homes to enter 25-year loans and other contracts using electronic tablets such as iPads. (*Id.*)

On or about August 2020, Mrs. de Moura Castro was solicited by a salesperson at Plaintiffs' home in Avon, CT. (*Id.* ¶ 22.) The salesman, Murphy, was employed by and acting on behalf of all Defendants. (*Id.* ¶ 23.) Defendants' agent Murphy told Mrs. de Moura Castro that senior citizens like her are given government benefits for "free" solar panels installed on her home. (*Id.* ¶ 24.)

Plaintiffs' home is unfit for solar panels, as the roof is small and shaded. (*Id.* ¶¶ 6, 65.) Nevertheless, Mrs. de Moura Castro was not informed of this, and she continued conversations with Defendants' agent regarding the installation of solar panels based on the promise of free solar panels and significant savings. (*Id.* ¶ 40.) Relying on these representations of free solar panels and significant savings, Mrs. de Moura Castro agreed to have the solar panels installed. (*Id.* ¶ 41.)

During the entire solicitation, Defendants' agent Murphy did not mention anything about a loan or the need for a credit check. (*Id.* ¶ 25.) Plaintiffs were not provided, nor given the opportunity to review, any documents, paper or electronic, including any notice of right to cancel. (*Id.* ¶¶ 29, 46.)

In January 2021, Mrs. de Moura Castro received a letter from Defendants stating that she had taken out a 25-year loan. (*Id.* ¶ 47.) Believing it was a scam, Mrs. de Moura Castro gave the letter to her daughter, who began to investigate the transaction. (*Id.* ¶ 49.)

On February 18, 2021, a copy of the 25-year loan instrument was provided to Mrs. de Moura Castro's daughter for the first time, along with a "Contract for PV Solar System" ("Purchase

Contract"). (*Id.* ¶ 51.)  The total cost of everything to Plaintiffs, after financing, was $73,816. (*Id.* ¶ 60.)

Both the 25-year loan instrument and the Purchase Contract bear the names and forged signatures and initials of Plaintiffs. (*Id.* ¶ 54.)  All of the signatures and initials on the 25-year loan instrument and the Purchase Contract are forgeries. (*Id.*)  The email addresses listed on these documents are also fabricated, ensuring that Plaintiffs would not receive a copy of these documents at the time of forgery.[1] (*Id.* ¶¶ 55–56.)  The telephone number listed on these documents is also incorrect, ensuring that Defendants would not be able to call Plaintiffs to validate any purported loan contract. (*Id.* ¶ 57.)

Shortly after receiving these forged contract documents, Plaintiffs sent Defendants a notice of cancellation of the forged and hidden contracts. (*Id.* ¶ 61.)  Defendants chose not to cancel the forgery, instead deeming Plaintiffs bound by the forgeries.  (*Id.* ¶¶ 62–63.)  Indeed, Defendants have made demands for payment pursuant to the forgeries. (*Id.* ¶ 63.)

Plaintiffs filed the instant suit against Defendants for violations of Connecticut and federal law.  Prime did not file a timely answer to the Complaint or otherwise appear in the case.  Several attempts at service were made on Prime, but it could not be served within the 90-day service period, so Plaintiff filed a motion for leave to re-serve Prime at their new address registered with the Secretary of State. (ECF 34).  By electronic Order dated April 28, 2022, the Court granted Plaintiff's Motion. (ECF 37).

---

[1] Unfortunately, there appears to be an industry-wide problem of door-to-door solar salesmen using bogus email addresses to sign electronic contract documents and hide them from unsuspecting consumers. *See, e.g.*, *Knight v. Vivint Solar Developer, LLC*, 465 N.J. Super. 416, 421 (N.J. Super. Ct. App. Div. 2020) (reversing trial court order compelling arbitration of allegedly forged contract, acknowledging salesman "admitted he intentionally listed a variation of plaintiff's email address on the [contract], thereby acknowledging the document was not emailed to plaintiff.")

On July 22, 2022, Plaintiffs moved for the entry of default as to Prime. (ECF 43). On July 25, 2022, Plaintiffs' motion was granted, and default was entered against Prime. (ECF 44). The Court's Order provided that Plaintiffs must move for a default judgment by August 24, 2022.

Plaintiffs accordingly move for the entry of default judgment against Prime and request a jury trial on damages regarding the same.

### III. ARGUMENT

"Rule 55 of the Federal Rules of Civil Procedure provides a two-step process for obtaining a default judgment." *Priestley v. Headminder, Inc.*, 647 F.3d 497, 504 (2d Cir. 2011). The first is the entry of default for failure to plead or defend. Fed. R. Civ. P. 55(a). The second step is the entry of default judgment. Fed. R. Civ. P. 55(b). "Once default has been entered, the allegations of the complaint that establish the defendant's liability are accepted as true, except for those relating to the amount of damages." *Hernandez v. Apple Auto Wholesalers of Waterbury LLC*, 460 F. Supp. 3d 164, 176 (D. Conn. 2020).

To enter a default judgment, the court must first determine whether Plaintiffs' allegations establish the defaulting defendant's liability as a matter of law. *Id.* at 177. "Following such a determination, the district court must also determine the amount of damages to be awarded; to do so, it may conduct a hearing or it may make such a finding on the basis of documentary evidence if damages are ascertainable with reasonable certainty." *Id.*

In determining the amount of damages, "[i]t is the 'better practice' to empanel jury on damages after plaintiff obtains default." *Armeni v. Transunion LLC, Inc.*, No. 3:15-CV-00066, 2016 WL 7046839, at *3 (W.D. Va. Dec. 2, 2016) (FCRA case; granting jury trial on damages after default); 10A Fed. Prac. & Proc. Civ. § 2688 (4th ed.) ("[T]he court may order a jury trial as to damages in a default situation if it seems to be the best means of assessing damages").

### A. Prime willfully violated the Fair Credit Reporting Act

In 1970, Congress enacted the Fair Credit Reporting Act in recognition of the need to protect "the consumer's right to privacy" in the credit reporting system. 15 U.S.C. § 1681(a)(4). To that end, the FCRA makes it unlawful for any person to "use or obtain a consumer report for any purpose unless (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section, and (2)" the purpose is certified. 15 U.S.C. § 1681b(f). Such purposes include, *inter alia*, employment purposes,[2] for the underwriting of insurance,[3] or to review an existing account to determine whether the consumer continues to meet the account terms.[4] Under no circumstances may a third party "troll for reports" or "request a report on a whim" without a permissible purpose. *Stergiopoulos & Ivelisse Castro v. First Midwest Bancorp, Inc.*, 427 F.3d 1043, 1047 (7th Cir. 2005).

The FCRA provides a right of action to those who willfully or negligently violate this provision by using or obtaining a consumer report for an impermissible purpose. *See* 15 U.S.C. §§ 1681n, 1681*o*. Additionally, the FCRA makes it criminally liable—a felony—for '[a]ny person who knowingly and willfully obtains information on a consumer from a consumer reporting agency under false pretenses.'" 15 U.S.C. § 1681q. "By virtue of 15 U.S.C. § 1681n, a consumer may also maintain a civil action against any 'user of information' who 'willfully' violates Section 1681q." *Scott v. Real Est. Fin. Grp.*, 183 F.3d 97, 99 (2d Cir. 1999).

Here, Prime lacked a permissible purpose to use Plaintiffs' credit reports. Plaintiffs did not consent to Prime using or obtaining their consumer reports, but Prime did so anyway. (ECF 1,

---

[2] 15 U.S.C. § 1681b(a)(e)(B).
[3] 15 U.S.C. § 1681b(a)(e)(C).
[4] 15 U.S.C. § 1681b(a)(3)(F)(ii).

Complaint ¶¶ 27-28, 30–33.)⁵  Indeed, Prime "obtained Plaintiffs' consumer reports under false pretenses to the credit bureaus because Mrs. de Moura Castro never provided authorization for a credit pull, nor sought any extension of credit." (*Id.* ¶ 34.)  Prime knew or should have known that Plaintiffs did not initiate any credit transaction or authorize any inquiry into Plaintiffs' credit information at any time. (*Id.* ¶ 35.)

Potential creditors who desire to enter into credit transactions often argue that they had a "legitimate business need for the information," 15 U.S.C. § 1681b(a)(3)(F) or intended "to use the information in connection with a credit transaction involving the consumer[.]" 15 U.S.C. § 1681b(a)(3)(A).  However, both of these claimed purposes also require that the consumer either initiate the transaction or consent to the credit pull. 15 U.S.C. §§ 1681b(a)(3)(F)(i), 1681b(c)(1).

Courts around the country have found that a transaction is not initiated by the consumer when the consumer is essentially comparison shopping or requesting information. *See, e.g.*, *Littlejohn v. Vivint Solar*, No. 1:16-CV-9446, 2020 WL 2521276, at *9 (D.N.J. May 18, 2020) (door-to-door sale; "a request for general information about products and prices offered does not involve a business transaction initiated by the consumer").  For example, in *Boone v. T-Mobile USA Inc.*, No. 17-378, 2018 WL 588927 (D.N.J. Jan. 29, 2018), the consumer alleged that he "made a "general inquiry about the availability of cell phone plans and rates," stated his preference that he did not want a hard credit inquiry, and "never signed any agreement and never agreed to

---

⁵      In obtaining and using Plaintiffs' consumer reports, Prime acted through its agent, Murphy. (Complaint ¶ 23.)  In door-to-door solar sales situations such as this, it is proper to impute the solar sales agent's conduct to other companies that provide the loans for the solar products, as there is a symbiotic, mutually beneficial relationship between the sales agent and the loan provider. *Brown v. Vivint Solar, Inc.*, No. 818CV2838T24JSS, 2020 WL 1332010, at *6 (M.D. Fla. Mar. 23, 2020) (rejecting loan company's argument that because plaintiffs "only interacted with [sales company's] salesmen" they therefore could not be liable for the sales agents' conduct of pulling credit reports).

any services from" the defendant. *Id.* at *14. The court held that these actions "do not amount to a 'business transaction . . . initiated by the consumer.'" *Id.*

The court found support for this uncontroversial conclusion in a 1998 Advisory Opinion of the Federal Trade Commission addressing the extent to which a consumer "initiates" a business transaction when making inquiries at a car dealership. *See id.* (*citing* FTC Advisory Opinion on the Fair Credit Reporting Act, 1998 WL 34323748, at *1 (Feb. 11, 1998) [hereinafter "FTC Opinion"]).[6] The FTC Opinion states that as a general matter, a consumer's "request for general information about products and prices offered does not involve a business transaction initiated by the consumer." *Id.* This holds true when a consumer asks a car dealer questions about pricing and financing, because such questions do "not necessarily indicat[e] an intent to purchase or lease a vehicle from that particular dealer." *Id.*

The FTC explained that a dealer may obtain a consumer report without the consumer's permission "[o]nly in those circumstances **where it is clear** both to the consumer and to the dealer that the consumer is actually initiating the purchase or lease of a specific vehicle[.]" FTC Opinion at p. 2 (emphasis added). The dealer's need for the information must be "directly related to the completion of the transaction. For example, a dealer may obtain a report, if one is necessary, in order to arrange financing requested by the consumer." *Id.*

At no point was it "clear" that Mrs. de Moura Castro was actually initiating a purchase or credit transaction. No loan or credit transaction was ever mentioned. (ECF 1, Complaint ¶¶ 27-35.) Mrs. de Moura Castro merely expressed interest for what she believed to be free solar panels

---

[6] This opinion letter is "entitled to respect" based on its "power to persuade," as such opinion letters "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *M. Fortunoff of Westbury Corp. v. Peerless Ins. Co.*, 432 F.3d 127, 138 (2d Cir. 2005) (quoting *Skidmore v. Swift*, 323 U.S. 134, 140 (1944)). Courts have found the FTC Opinion to be persuasive. *See, e.g.*, *Miller v. Dish Network, L.L.C.*, 326 F. Supp. 3d 51, 74 (E.D. Va. 2018) ("[T]he Court finds the FTC's guidance to be persuasive and adopts it here.").

under a government program. (*Id.* ¶¶ 24, 45, 86.)  Moreover, Mr. de Moura Castro was not even present for the solicitation, nor would it have mattered, as he lacked the ability to speak coherently and sign documents. (*Id.* ¶ 2.)

Prime acted willfully in violation of the FCRA by using and obtaining Plaintiffs' consumer reports.  Prime's willful misconduct also includes:

> (a) Continuing to give sales agents access to electronic tools that allow them to obtain a consumer's credit report without the consent of the consumer;
>
> (b) Failing to adopt policies, procedures, and practices that would prevent sales agents from obtaining a consumer's credit report without the consent of the consumer;
>
> (c) Failing to supervise sales agents to ensure that they would not obtain a consumer's credit report without the consent of the consumer;
>
> (d) Failing to train sales agents to ensure that they would not obtain a consumer's credit report without the consent of the consumer;
>
> (e) Failing to discipline sales agents to ensure that they would not obtain a consumer's credit report without the consent of the consumer; and,
>
> (f) Employing quotas and/or sales goals/metrics that incentivize sales agents to pull credit reports without the consent of the consumer.

(Complaint ¶¶ 36, 38, 68.)  Because Prime acted willfully, the court may award damages, including statutory and punitive damages. 15 U.S.C. § 1681n(a)(1)-(2).  Plaintiffs request a jury trial on damages.

### B.  Prime engaged in unlawful elder exploitation

The General Assembly has enacted laws for the protection of senior citizens.  Among those statutory protections includes the right to sue for actual and punitive damages for the exploitation of an elderly person. Conn. Gen. Stat. § 17b-462(a) ("An elderly person who has been the victim of abuse, neglect, exploitation or abandonment, as such terms are defined in section 17b-450, may have a cause of action against any perpetrator and may recover actual and punitive damages for

such abuse, neglect, exploitation or abandonment together with costs and a reasonable attorney's fee."). An "elderly person" means a Connecticut resident of at least sixty years of age. Conn. Gen. Stat. § 17b-450(1). "Exploitation" is defined as "the act or process of taking advantage of an elderly person by another person or caregiver whether for monetary, personal or other benefit, gain or profit." Conn. Gen. Stat. § 17b-450(7).

Here, Prime exploited the 80-year-old[7] senior citizen Plaintiffs for financial gain within the meaning of Conn. Gen. Stat. § 17b-450(7) by marketing and purportedly selling the Plaintiffs solar panels and a solar loan, but in the course of doing so:

> (a) misrepresenting that the solar panels were "free" through a government program;
>
> (b) misrepresenting the terms of the sale and loan;
>
> (c) misrepresenting the appropriateness of the home for solar panels and the cost savings;
>
> (d) proceeding with the purported sale despite the inappropriateness of the Plaintiffs' home for solar panels, the high cost of panels and installation, the lack of savings, the Plaintiffs' ages and health conditions, and/or the Plaintiffs' lack of ownership of the home;
>
> (e) forging the Plaintiffs' signatures and/or dates on documents; [and,]
>
> (f) failing to provide required notices of cancellation and to comply with consumer protection laws[.]

(ECF 1, Complaint ¶ 97.) Prime's intentional exploitation caused Plaintiffs damages including their purported obligations under the forgeries, the costs associated with the panels, and emotional distress. (*Id.* ¶¶ 98–99.) Plaintiffs request a jury trial on damages.

---

7   (ECF 1, Complaint ¶ 2.)

9

### C. Prime willfully violated the Connecticut Unfair Trade Practices Act

The Connecticut Unfair Trade Practices Act ("CUTPA") is an expansive, remedial consumer protection law with "sweeping language" intended to proscribe "a much broader range of business conduct than does the common law tort action." *Associated Inv. Co. P'ship v. Williams Assocs. IV*, 645 A.2d 505, 510 (Conn. 1994). It provides that "[n]o person shall engage in ... unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). "This expansive prohibition is intentionally broad, embodying a fairness standard that grows, broadens, and molds itself to the circumstances. *Id.* at 511. Indeed, "[t]he Connecticut General Assembly deliberately chose not to define the scope of unfair or deceptive acts proscribed by CUTPA so that courts might develop a body of law responsive to the marketplace practices that actually generate such complaints." *Sportsmen's Boating Corp. v. Hensley*, 474 A.2d 780, 786 (Conn. 1984). It may be used to remedy violations of a law, and the ascertainable loss suffered as a result, even when that law contains no private right of action, or even if the principles of the law were violated but the law itself was not technically violated. *See, e.g.*, *Eder Bros., Inc. v. Wine Merchants of Connecticut, Inc.*, 275 Conn. 363, 380-82 (2005).

To give effect to its provisions, [General Statutes] § 42-110g(a) of [CUTPA] establishes a private cause of action, available to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by [General Statutes §] 42-110b ...." *Cenatiempo v. Bank of Am., N.A.*, 333 Conn. 769, 788 (2019) (quoting *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.,* 317 Conn. 602, 623 (2015)).

Conduct is "deceptive" when there is (1) 'a representation, omission, or other practice likely to mislead consumers'; (2) the consumer 'interpret[s] the message reasonably under the circumstances'; and (3) 'the misleading representation, omission, or practice [is] material—that is,

10

likely to affect consumer decisions or conduct.'" *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 95 F. Supp. 3d 284, 288 (D. Conn. 2015) (quoting *Smithfield Assocs., LLC v. Tolland Bank*, 860 A.2d 738 (Conn. App. 2004)). Intent to deceive need not be proved. *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 120 (2d Cir. 2004). Nor is a reliance required. *Hernandez*, 460 F. Supp. 3d at 183.

Because the CUTPA was based on the Federal Trade Commission's "elusive, but legislatively mandated standard of fairness," *Associated Inv. Co. P'ship*, 645 A.2d at 511, to determine whether a business practice is "unfair" under CUTPA, "Connecticut courts follow the Federal Trade Commission's 'cigarette rule'" in determining whether a business practice is "unfair." *Hernandez*, 460 F. Supp. at 182. Under that rule, the court weighs the following factors:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness;
>
> (2) whether it is immoral, unethical, oppressive, or unscrupulous;
>
> (3) whether it causes substantial injury to consumers (or competitors or other business[persons]).

*Fabri*, 387 F.3d at 119–20 (internal quotation marks and citation omitted). Not all criteria need to be satisfied for an unfair trade practice to be found. *Id.* at 120. "Instead, a practice may be shown to be unfair either 'because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.'" *Id.*

In addition to the CUTPA's broad prohibitions, the General Assembly has specifically defined certain conduct as constituting a *per se* unfair or deceptive trade practice. For example, the Home Improvement Act ("HIA") is made actionable through the CUPTA. Conn Gen. Stat. § 20-427. The HIA requires licensed home improvement contractors like Prime to ensure that all of

11

its agents are registered as home improvement sales contractors. Conn. Gen. Stat. § 20-427(c). Prime did not do this, as the individual who signed the Purchase Contract on behalf of Defendants was not licensed. (ECF 1, Complaint ¶ 59.)  Prime's failure to deliver completed copies of the contracts and notices of cancellation at the time of purported signing also violates Conn. Gen. Stat. § 20-429(c).  The above violations also void the Purchase Contract. Conn. Gen. Stat. § 20-429(a)(1)(A).

Similarly, the Home Solicitation Sales Act ("HSSA") proscribes certain practices as *per se* unfair or deceptive trade practices.  Specifically, it provides that any violation of its provisions in sections 42-135a, or 42-137 to 42-139, or the "failure to honor any provisions of the notice of cancellation required by this chapter shall constitute an unfair or deceptive act or practice as defined by section 42-110b." Conn. Gen. Stat. § 42-141(b).  Thus, by failing to provide a contract and oral/written notice of cancellation to Plaintiffs at the time of purported execution of subject contracts (ECF 1, Complaint ¶¶ 83, 45–58), Prime has engaged in unfair or deceptive acts or practices within the meaning of Conn. Gen. Stat. 42-110b(a).  Prime's violations of the HSSA include:

- Failing to furnish Plaintiffs with a fully completed copy of all contracts and documents pertaining to the solar panel transaction at the time of the purported execution, Conn. Gen. Stat. § 42-135a(1);

- Failing to furnish Plaintiffs with duplicate cancellation notices in conformance with the statute at the time of the purported execution, Conn. Gen. Stat. § 42-135a(2);

- Backdating the cancellation notice for the Loan Contract such that the cancellation period listed had expired at the time of the purported execution, Conn. Gen. Stat. § 42-135a(3); and,

- Failing to inform Plaintiffs of their right to cancel at the time of the purported execution, Conn. Gen. Stat. § 42-135a(5).

(ECF 1, Complaint ¶ 83).

Prime's deceptive and misleading promise of "free solar panels" that were part of a "free government program" likewise violates the CUPTA's prohibition against unfair and deceptive practices because the 25-Year Loan Contract puts the cost of the solar system at $54,880.88, and after financing, $73,816—far from "free." (ECF 1, Complaint ¶¶ 45, 60, 87.) The regulations promulgated under the CUTPA specifically prohibit "use of the word 'free' or any other terms of similar import when the merchandise or service is not, in fact, free." Conn. Agencies Regs. 42-110b-19(a). The promise of free solar panels under a free government program was deceptive, material, and likely to mislead consumers, and did in fact mislead the Plaintiffs. (ECF 1, Complaint ¶¶ 87–88.)

As for Prime's forgeries and use of bogus email addresses to conceal documents from Plaintiffs (ECF 1, Complaint ¶¶ 85, 83(m), 104) such conduct unquestionably constitute immoral, unscrupulous, unethical, and oppressive acts under the cigarette rule. Finally, Prime's intentional violations of the FCRA and the elder exploitation statute (discussed *supra*) also violate the CUTPA because those statutes embody a strong public policy in favor of consumer privacy and protection of senior citizens, respectively. *See Hernandez*, 460 F. Supp. 3d at 183 (violation of federal consumer credit law violated the CUTPA).

Prime's forgeries, misrepresentations, unlicensed conduct, and failure to provide the Purchase Contract and notice of right to cancel at the time of purported signing all violate the CUTPA as deceptive or unfair trade practices. As a result of Prime's violations, Plaintiffs have suffered ascertainable losses, which include Plaintiffs' purported contractual obligations under the forged 25-year Loan Contract and the Purchase Contract, and the costs associated with removing the solar panels form the roof of the house

(including any necessary repairs). (ECF 1, Complaint ¶ 89.) Plaintiffs would never have agreed to "free" solar panels if Prime had disclosed to them the true nature and cost of the transaction. (*Id.* ¶ 88.)

Moreover, Prime's violations of CUTPA were done with reckless indifference to the rights of the Plaintiffs and were an intentional and wanton violation of those rights, making Prime liable for punitive damages. *Whitaker v. Taylor*, 99 Conn. App. 719, 733 (2007). Prime was aware of Plaintiffs' ages and health conditions, that Plaintiffs were uncomfortable with electronic transactions, that the solar panels were not part of a free government program, and that its representations about the panels were false. (Complaint ¶ 91).

Plaintiffs request a trial on damages, including punitive damages for Prime's willful, wanton, and reckless conduct. (Complaint ¶ 66.)

### D. Prime is liable for its fraudulent nondisclosure

When a vendor "assume[s] to speak, he must make a full and fair disclosure as to the matters about which he assumes to speak." *Franchey v. Hannes*, 207 A.2d 268, 271 (Conn. 1965). The deliberate "failure to disclose the whole truth about the very subject concerning which they had assumed to speak" is actionable when the nondisclosure induces the consumer to proceed with the transaction. *Id.* "A vendor of property may not do anything to conceal from the vendee a material fact affecting it, or say or do anything to divert or forestall an intended inquiry by him, or deliberately hide defects, for, in so doing, he is not merely remaining silent, but is taking active steps to mislead." *Wedig v. Brinster*, 469 A.2d 783, 788 (Conn. App. 1983). "An action will lie for a fraudulent nondisclosure that causes one to continue in a course of action." *Bernard v. Gershman*, 559 A.2d 1171, 1173 (Conn. App. 1989).

Here, Prime is liable for its deliberate failure to disclose several material facts, which induced Mrs. de Moura Castro to continue with the transaction. Prime "prevented Plaintiffs from discovering certain facts including the existence of the hidden agreements, that their signatures were forged on the agreements, that their names were placed on documents without their knowledge or consent, and other hidden facts." (ECF 1, Complaint ¶ 103). Prime never mentioned anything about a loan or the need for a credit check. (*Id.* ¶ 25.) This was intentional. (*Id.* ¶ 104.) Had this information been disclosed, Plaintiffs would have never agreed to the transaction, and would have taken steps to stop it. (*Id.* ¶¶ 66, 105.) As a result of Prime's deliberate nondisclosure, Plaintiffs are now purportedly obligated to the Purchase Contract and 25-Year Loan Contract. (*Id.* ¶ 106.) Plaintiffs request a trial on actual and punitive damages arising from Prime's deliberate nondisclosure of material facts.

## IV.  CONCLUSION

The facts in the Complaint establish Prime's liability under the FCRA, CUPTA, elder exploitation law, and for fraudulent nondisclosure. Plaintiffs request a jury trial to determine the appropriate amount of damages to be awarded.

Dated: August 24, 2022

THE PLAINTIFFS
BRIDGET DE MOURA CASTRO &
LUIZ DE MOURA CASTRO

/s/ Jeffrey Gentes
Jeffrey Gentes (ct28561)
Sarah White (ct29329)
Connecticut Fair Housing Center
60 Popieluszko Court
Hartford, CT  06106
Phone: (860) 263-0741

<u>/s/ Andrew M. Milz</u>
Andrew M. Milz (pro hac vice)
Jody T. López-Jacobs (pro hac vice)
Flitter Milz, P.C.
450 N. Narberth Ave., Suite 101
Narberth, PA 19072
Phone: (610) 822-0781
