IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRIDGET DE MOURA CASTRO & LUIZ DE MOURA CASTRO, by his next friend Helena Hilario,<br>　　　　　　　　　Plaintiffs,<br><br>vs.<br><br>LOANPAL, LLC d/b/a GOODLEAP, PRIME ENERGY LLC d/b/a PRIME ENERGY SOLAR, 1ST LIGHT ENERGY INC.,<br>　　　　　　　　　Defendants. | NO. 3:21-cv-01020 CSH |

**PLAINTIFFS' POST-HEARING MEMORANDUM IN FURTHER
OPPOSITION TO DEFENDANTS' MOTIONS TO COMPEL ARBITRATION**

I.　INTRODUCTION[1]

A party cannot be compelled to arbitrate a claim when they have "not previously agreed to do so." *A. Dubreuil & Sons, Inc. v. Town of Lisbon*, 577 A.2d 709, 712 (Conn. 1990). The facts, as alleged in the Complaint and as borne out in the hearing held by this Court on July 27, 2022, establish that Plaintiffs did not agree to arbitrate any claim. Arbitration was never mentioned at any point during the solicitation, nor was any arbitration agreement presented to Plaintiffs. Indeed, the evidence points to multiple forgeries, as Plaintiffs deny signing the subject contracts. The forgeries render any agreement to arbitrate void *ab initio* "[b]ecause there can be no meeting of the minds of the parties when a forgery has been perpetrated." *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 370 (2d Cir. 2003).

Yet because Defendants are the movants here, it is Defendants' burden to establish the existence of an agreement to arbitrate, not Plaintiffs' burden to disprove such an agreement.

---

[1] Plaintiffs submit this post-hearing memorandum pursuant to the Court's Electronic Order of July 28, 2022 (ECF 47).

Defendants fall far short of satisfying their burden to prove a valid agreement to arbitrate. Defendants have not proffered a witness with personal knowledge that Plaintiffs signed or initialed any of the contract documents. No Defendant can attest to Plaintiffs' "electronic signature," as defined by state and federal law, which requires proof of "intent to sign the record." Conn. Gen. Stat. § 1-267(8); 15 U.S.C. § 7006(5). Defendants' agent at the de Moura Castro's door that day was conspicuously absent from the Court's evidentiary hearing.

Mrs. de Moura Castro clearly did not intend to sign Defendants' voluminous contract documents when Defendants' sales agent presented her with a screen on her cell phone bearing only check boxes, telling her that she needed to tap the boxes to proceed with the installation of the "free" solar panels. There is no evidence that Mrs. de Moura Castro—in tapping the screen—intended to agree to a 25-year loan with a total of payments exceeding $73,000 at maturity, *i.e.* once Plaintiffs are over *105 years old*. Nor have Defendants shown that Mr. de Moura Castro—who is unable to care for himself and barely able to hold a pen—signed or intended to sign any of the subject contracts.

"An agreement to arbitrate must be clear and direct and not depend on implication." *Harry Skolnick & Sons v. Heyman*, 508 A.2d 64, 67 (Conn. App. 1986). The record does not clearly establish an agreement to arbitrate. Defendants rely upon implications and inferences to assume that Plaintiffs knowingly entered into an agreement to arbitrate. Defendants' motions must be denied. In the event the Court finds a genuine dispute of material fact as to the existence of an agreement to arbitrate, then a jury trial must be held on the issue.

## II.   FACTS

Plaintiffs contend that the facts as pleaded, which were supported by the Certifications of Mrs. de Moura Castro and her daughter Helena Hilario, were more than enough to at least raise a genuine dispute of material fact as to the existence of an agreement to arbitrate. Nonetheless, the

Court held a hearing on the issue, which only confirms that Defendants' Motions must be denied. The material facts borne out in that hearing are addressed below.

### A. Defendants' offer of "free" solar panels for senior citizens[2]

Plaintiffs—Luiz and Bridget de Moura Castro—are Avon, CT residents in their 80s. H.T. at 23:07-12, 24:18-22. Mr. de Moura Castro has advanced Parkinson's disease, which leaves him unable to perform any activities of daily living. H.T. at 16:09-17:03. He is unable to walk, his left hand is completely contracted, his right hand has tremors, and he has had significant cognitive decline over the past several years. *Id.* Luiz has lived with the assistance of two full-time aids for over four years. *Id.* at 24:11-17. In August 2020, he could barely hold a pen, but he was not capable of writing or signing his name. *Id.* at 17:14-18, 31:25-32:04.

In August 2020, a man named Mark Murphy came to Plaintiffs' home "offering [them] an incredibly good deal that the State of Connecticut was offering to all senior citizens. . . . that the senior citizens would be given free solar panels." *Id.* at 27:03-22. Murphy never mentioned anything about a loan or financing. *Id.* at 28:04-06, 29:06-11, 34:17-21. Nor did he mention anything about arbitration. *Id.* at 36:04-10. Murphy told Mrs. de Moura Castro that her monthly electricity bills would go down. *Id.* at 28:07-23.

No paper documents were shown to Mrs. de Moura Castro. *Id.* at 29:14-21. Instead, he did everything on Mrs. de Moura Castro's cell phone, which was "very small." *Id.* at 29:14-30:03. Murphy told Mrs. de Moura Castro he would have to set up a Gmail account to proceed, so she gave him her phone to do so because she does not use Gmail. *Id.* at 30:01-13.[3] Murphy presented

---

[2] The Hearing Transcript, docketed on August 15, 2022 (ECF 48), is referred to herein as "H.T."

[3] Goodleap's witness testified that it is against company policy for a sales agent to create an email address for the consumer. N.T. at 104:23-105:06.

3

the phone to Mrs. de Moura Castro "to get the account with the solar panels installed and then to have it connected with Eversource," her electric company. *Id.* at 30:18-24. The only thing she saw on the phone were boxes with an "X" in them. *Id.* at 30:24-31:06.[4] When Mrs. de Moura Castro pressed the box with her finger, her understanding was that it was "simply to have the solar panels connected with the Eversource bill, that it would then be much less per month." *Id.* at 30:13-17. Mrs. de Moura Castro did not understand that she was agreeing to anything by tapping the phone. *Id.* at 48:09-23.

At the request of Murphy, Mrs. de Moura Castro gave her a cancelled Bank of America check, as Murphy explained "that the canceled check was necessary for Eversource to be or to continue to be our electric supplier and that, therefore, our bills would be less." *Id.* at 39:07-13. Murphy then held a call for the stated purpose of "just confirming that everything would go through with the reduction on the bills with the electric company." *Id.* at 43:15-44:01. Mrs. de Moura Castro explains that throughout the call, Murphy "was trying to help me through it because I didn't understand too much what was going on." *Id.* at 46:20-47:01.

### B. After the panels are installed, Plaintiffs discover the forged contracts

The panels were eventually installed. *Id.* at 50:08-11. During the installation, Mrs. de Moura Castro asked for a written agreement, but none was provided. *Id.* at 50:20-51:18.

At some point after installation, Mrs. de Moura Castro—to her extreme surprise—received a bill from a company called Loanpal. *Id.* at 37:11-17. She did not know what it was about, and was very confused by it, so she asked her daughter, Cema Seigel, for help. *Id.* at 37:11-17, 76:08. Ms.

---

[4]   Mrs. de Moura Castro explains that "somehow I had seen, probably on my phone temporarily that it would be 184 per month," but these figures ultimately came from Murphy—not any contract. N.T. at 54:03-22. When asked whether the monthly payment figures came from the 25-Year Loanpal Loan Contract, Mrs. de Moura Castro explained, "I have never seen this document until now until my daughter gave it to me." *Id.* at 57:17-58:06.

4

Seigel started making calls to find out what was going on, and during one of those calls a loan agreement was mentioned. *Id.* at 76:15:20. Ms. Seigel asked for copies to be forwarded, and copies of the Loanpal Loan Contract ("25-Year Loan Contract")[5] and 1st Light Energy Contract for PV Solar System ("Purchase Contract")[6] were received on February 18, 2022. *Id.* at 76:20-24.

Ms. Seigel reviewed the terms with her mother, who explained that these were not the terms that she understood. *Id.* at 76:25-77:02. Plaintiffs did not sign the Purchase Contract, and Mrs. de Moura Castro does not recognize any of the signatures on it. *Id.* at 33:05-13. Plaintiffs never signed any acknowledgement of any loan terms, and she would never sign her name in the way it appears on the 25-Year Loan Contract. *Id.* at 34:22-35:11. Plaintiffs were not shown the 25-Year Loan Contract or the Purchase Contract. *Id.* at 36:12-23, 46:14-19. Mrs. de Moura Castro would have never knowingly agreed to a 20-year, $51,000 loan. *Id.* at 72:10-73:02.

There are several major discrepancies on the forged instruments:

- The "Bridgetdecastro38@gmail.com" email address on both the Purchase Contract and the 25-Year Loan Contract does not belong to Mrs. de Moura Castro. *Id.* at 19:09-24, 35:13-18. Her name in the email address is incorrect. *Id.* at 19:23-24 ("It is not my mother's name. We would never say 'de Castro' as the last name.").

- The initials on the 25-Year Loan Contract are "LDMC" and "BDMC." Pl.'s Ex. 2. However, Plaintiffs never use "LDMC" and "BDMC"—they use "LMC" and "BMC" *Id.* at 32:18-33:02, 34:12-14.

---

[5] The 25-Year Loan Contract was Plaintiff's Exhibit 2 at the hearing, and is attached hereto as Plaintiff's Exhibit 2.

[6] The Purchase Contract was Plaintiff's Exhibit 1 at the hearing, and is attached hereto as Plaintiff's Exhibit 1.

5

- The phone number on the Purchase Contract and Loan Contract—(860) 676-6363—does not belong to Mrs. de Moura Castro—it is off by a digit. *Id.* at 19:25–20:11, 35:22–36:02.

Ms. Seigel attempted to log into the Bridgetdecastro38@gmail.com email address via password recovery, but she was unable to do so because the recovery phone numbers and emails listed did not belong to her mother. *Id.* at 77:14–78:04.[7] Ms. Seigel sent notices of cancellation to Defendants, but there was no response—only more bills for the solar panels. *Id.* at 77:02–08.

### C. Defendants offer no witness with personal knowledge of whether Plaintiffs signed the subject contracts

At the hearing, 1st Light did not produce a witness to contradict the above facts. The only witness was Goodleap's Chief Credit Officer, Jason Walker. *Id.* at 82:06–83:09. Walker admits he was not present during any of the interactions between Mrs. de Moura Castro and Murphy, and has no personal knowledge of what was said at that time. *Id.* at 95:13-24. Indeed, Goodleap does not speak with or meet with a potential borrower before making a lending decision. *Id.* at 85:10–12. Goodleap assumes that salespersons will act ethically, and that they will not make up phone numbers, create bogus email addresses, of signing documents for the consumer. *Id.* at 96:19–97:14.

Walker testified that borrowers apply for loans through an app, and the loan contracts are signed through DocuSign, a digital signature platform. *Id.* 85:22–86:03. DocuSign automates the signing process: "DocuSign will instruct, through the buttons the borrower will click, and take them to the points where they will either initial or electronically sign the document. At those points, it will tell them to click and either initial or sign where they are asked to." *Id.* at 87:11–16.

Goodleap assumes that the sales agent will scroll through the entirety of the 18-page lending document with the consumer, but no one from Goodleap is there to observe whether this happened. *Id.* at 97:21–98:02. Goodleap admits that it has no personal knowledge of whether Plaintiffs were

---

[7] It appears that Murphy may have used his own phone number to create the Gmail account.

6

allowed to view the details of Goodleap's 25-Year Loan Contract. *Id.* at 102:14-103:01. Indeed, Goodleap concedes that it <u>does not know</u> whether Murphy signed the 25-Year Loan Contract. *Id.* at 104:16-21, 110:20-111:04.[8]

At the hearing, Goodleap produced as Defendant's Exhibit 1 a "Certificate of Completion" that Goodleap "received from DocuSign." H.T. at 90:18-19. Walker testified that the Certificate of Completion showed that loan documents were sent to Luiz de Moura Castro on 8/1/2021 at the email address "Bridgetcastro38@gmail.com," and purportedly signed on 8/3/2021. *Id.* at 91:19-23. Walker also claims that the Certificate of Completion showed that loan documents were sent to Mrs. de Moura Castro on 8/3, and were signed on 8/7. *Id.* at 91:24-92:10.

While the 25-Year Loan Contract was purportedly signed via DocuSign, Mrs. de Moura Castro has no understanding of how to use DocuSign. *Id.* at 67:07-12. Mrs. de Moura Castro testified she never received an email with these contract documents, nor did she receive any contracts by mail, at least not until several years later. *Id.* at 37:05-10. Consistent with its policy, Goodleap did not call Mrs. de Moura Castro before underwriting the loan. *Id.* 98:09-16.

Goodleap acknowledges that under the federal E-Sign Act, a borrower must consent to work electronically (through the app) before Goodleap may proceed with the transaction electronically. *Id.* at 98:21-99:14. Goodleap, however, did not present any such acknowledgment at the hearing. *Id.* at 99:09-17.

---

[8] At the hearing, Goodleap did not know whether it had even reached out to Murphy. N.T. at 107:25-108:07.

### III. ARGUMENT

#### A. Standard of review; the Court must determine whether a valid agreement to arbitrate was formed

"Arbitration under the [Federal Arbitration Act] is a matter of consent, not coercion." *Opals on Ice Lingerie*, 320 F.3d at 369. Consistent with the policy to treat arbitration agreements the same as any other contract, "the law still requires that parties actually agree to arbitration before it will order them to arbitrate a dispute." *Id.*

Accordingly, "[t]he party seeking to stay the case in favor of arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (*citing Almacenes Fernandez, S.A. v. Golodetz*, 148 F.2d 625, 628 (2d Cir. 1945)); *Rothstein v. Fung*, No. 03-0674, 2004 WL 1151568, at *1 (S.D.N.Y. May 24, 2004) ("As the moving party, defendants bear the burden of proving written agreements obligating both plaintiffs to arbitrate."). For motions to compel arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, courts apply the summary judgment standard. *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003). "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." *Id.* (*citing* 9 U.S.C. § 4).

In cases where forgery is alleged, the court—not the arbitrator—must determine preliminarily whether an agreement to arbitrate was formed. *C.R. Klewin Ne., LLC v. City of Bridgeport*, 919 A.2d 1002, 1020 (Conn. 2007); *Dassero v. Edwards*, 190 F. Supp. 2d 544, 555 (W.D.N.Y. 2002) ("To the extent that plaintiffs have raised a genuine issue concerning whether they signed the Agreement, then, the court–not an arbitrator–must first decide whether plaintiffs did in fact enter into the Agreements containing the arbitration clause.").

8

### B. Defendants have not met their burden of proving an agreement to arbitrate

"To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties." *Marinos v. Bldg. Rehabs., LLC*, A.2d 46, 49 (Conn. App. 2001). "The existence of a contract is a question of fact to be determined by the trier on the basis of all the evidence." *Id.*

Under Connecticut law, "[a]s a general proposition, a forged document is a nullity." *Conley v. 1008 Bank St., LLC*, No. 3:20-CV-284 (CSH), 2020 WL 4926599, at *7 (D. Conn. Aug. 22, 2020) (citing *Homeamerican Credit, Inc. v. Weiss*, No. 990591183S, 2000 WL 347785, at *3 (Conn. Super. Ct. Mar. 16, 2000)); *accord Smith v. Smith*, 438 A.2d 842, 842-43 (Conn. 1981) (affirming trial court's finding that forged deed was "void and not binding upon the plaintiff"). "Basically, a person cannot be liable on an instrument where his signature is forged or unauthorized." *Id.* (citing *Hanover Ins. Co. v. Designs on Travel, Inc.*, No. 87-38710, 1991 WL 258103, at *2 (Conn. Super. Ct. Nov. 20, 1991)). This is a settled principle of general contract law. *Opals on Ice Lingerie*, 320 F.3d at 370 ("a forged signature renders a contract void *ab initio*").

Accordingly, "courts must refuse to enforce arbitration clauses contained in documents alleged to be forgeries." *Firma Melodiya v. ZYX Music GMBH*, No. 94-6798, 1995 WL 28493, at *4 n.3 (S.D.N.Y. Jan. 25, 1995) (citing *Interocean Shipping Co. v. National Shipping & Trading Corp.*, 462 F.2d 673 (2d Cir. 1972) and *In re Kinoshita & Co.*, 287 F.2d 951, 952 (2d Cir. 1961)) (refusing to enforce arbitration clause in forged document).

Here, Plaintiffs make credible and undisputed allegations of forgery. Mr. de Moura Castro is unable to sign documents, speak coherently, or care for himself. H.T. at 16:09–17:03, 17:14–18, 24:11–17, 31:25–32:04. As such, he could not have signed the 25-Year Contract or the Purchase Contract. Under no scenario should he be compelled to arbitrate.

9

Likewise, Mrs. de Moura Castro denies signing any contract with Defendants. *Id.* at 33:05-13, 34:22-35:11. Defendants never presented her with any contract document to sign. *Id.* at 36:12-23, 46:14-19. Further, Mrs. de Moura Castro asserts that the signatures and initials appearing on the 25-year loan instrument are forgeries. Ex. A, Certification of Bridget de Moura Castro ¶ 4. The instrument contains other fabrications, including the fake email address and phone number. H.T. at 19:09-20:11, 35:13-36:02. The subject contracts were not even provided to Plaintiffs until *after* the installation of solar panels. *Id.* at 76:20-24. These credible averments for forgery and fraud arising from the 25-year loan instrument—from which Defendant Loanpal asserts the contractual right to arbitrate—undermine the very existence of an agreement to arbitrate.

Where there is a *prima facie* showing of forgery that is disputed, the court must "proceed summarily" to a jury trial on the issue. *Nieto v. 2249 Corp.*, No. 16-7947, 2018 WL 1737220, at *4 (S.D.N.Y. Mar. 22, 2018) (*quoting* 9 U.S.C. § 4). In advance of the jury trial, the court may allow for discovery on the contract formation issue. *Al Maya Trading Establishment v. Glob. Exp. Mktg. Co.*, No. 14-275, 2014 WL 12661622, at *1 (S.D.N.Y. Mar. 19, 2014) ("Discovery may also shed light on which party is telling the truth—for example, discovery as to the parties' written communications, including emails and other electronic discovery, may bear on the circumstances and timing of the creation of the Agreement."). Ultimately, however, unless the Court finds no genuine dispute of fact that the contracts were forged, the jury must decide on these credible allegations of forgery and fraud whether an agreement to arbitrate was formed. *See Smith*, 438 A.2d at 843 (affirming finding of forgery; "As the evidence is conflicting, the case turns entirely on the question of credibility").

Although Defendants have the burden of proving the existence of an agreement to arbitrate, Defendants provide no evidence demonstrating that Plaintiffs themselves signed the subject contracts. The only evidence offered was the testimony of Goodleap's Walker, who disclaimed

having any personal knowledge of the solicitation, and conceded that Defendants' agent Murphy could have signed the subject contracts. H.T. at 97:21-98:02, 102:14-103:01, 104:16-21, 110:20-111:04.

During the hearing, Walker attempted to interpret a "Certificate of Completion" that Goodleap "received from DocuSign." *Id.* at 90:18-19. That document is hearsay and inadmissible under Federal Rule of Evidence 802. Even if the Certificate is credited for the truth of the matter asserted, it confirms that the 25-Year Loan Contract purportedly sent to Luiz was actually sent to an email address <u>that did not belong to Plaintiffs</u>: "bridgetdecastro38@gmail.com." H.T. at 19:09-24, 35:13-18, 91:19-23. Mrs. de Moura Castro has no understanding of how to use DocuSign. *Id.* at 67:07-12. She testified she never received an email with the subject contract documents. *Id.* at 37:05-10.

Even assuming *arguendo* that the 25-Year Loan Contract was sent to Mrs. de Moura Castro's email address for signature, there is no evidence that *she* signed any contract that was emailed to her. As mentioned, Goodleap's Walker admitted that *Murphy* could have signed the subject contracts. H.T. at 104:16-21, 110:20-111:04.

And even if Defendants had provided evidence that Mrs. de Moura Castro intentionally tapped the box on the phone's screen to enter into some agreement, Defendants misrepresented the contents or character of the entire transaction and the import of moving forward—voiding the contract due to Defendants' fraud in the execution. *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 31 (2d Cir. 1997) ("Fraud in the execution occurs where there is a 'misrepresentation as to the character or essential terms of a proposed contract,' and a party signs without knowing or having a 'reasonable opportunity to know of its character or essential terms.'").

Courts have found that such fraud—where a consumer is misled by a solar salesman to tap an innocuous screen on an electronic device—negates mutual assent. *See Knight v. Vivint Solar Dev.,*

11

*LLC*, 243 A.3d 956, 957–58 (N.J. Super. App. Div. 2020) (consumer signed iPad screen understanding that solar company would provide solar panels that would reduce her energy bills, but did not agree to 20 year contract with arbitration clause; reversing trial court's order compelling arbitration); *Droney v. Vivint Solar*, No. 18-849, 2018 WL 6191887, at *4 (D.N.J. Nov. 28, 2018) (consumer signed iPad screen to give solar salesman permission to enter her home, but solar company affixed her signature to 23-page solar PPA contract that was "radically different" from what she was led to believe she was signing; motion to compel arbitration denied with prejudice).

The motions to compel arbitration (ECF 19 & 23) should be denied with prejudice here because Defendants have not proffered any evidence disputing Plaintiffs' allegations of forgery. Alternatively, if the Court finds there are disputed facts as to whether there was a forgery (*i.e.* whether an agreement to arbitrate was formed) Plaintiffs request a jury trial on the issue.

### C. Defendants fail to prove the contracts bear Plaintiffs' "electronic signatures" as defined by state and federal law

Defendants have not proffered evidence that they have personal knowledge of Plaintiffs knowingly signing the subject contracts. The subject contracts were electronically created, so Defendants contend, and must prove, that the signatures and initials on each contract are Plaintiffs' "electronic signatures."

Plaintiffs acknowledge and agree with the general proposition that "electronic signatures" are valid. Conn. Gen. Stat. § 1-272(d) ("If a law requires a signature, an electronic signature satisfies the law.") However, "electronic signature" is a defined term under Connecticut's Uniform Electronic Transactions Act ("ETA") and the federal E-Sign Act, and Defendants have not established that the purported "electronic signatures" on the subject contracts are Plaintiffs' electronic signatures.

The ETA defines "electronic signature" as "[a]n electronic sound, symbol or process attached to or logically associated with a record and executed or adopted by a person with the intent

12

to sign the record." Conn. Gen. Stat. § 1-267(8). The definition under the E-Sign Act is virtually identical. 15 U.S.C. § 7006(5) ("an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record"). Accordingly, Defendants must establish: (a) Plaintiffs executed or adopted (b) an electronic sound, symbol, or process, (c) that was attached to or logically associated with the subjected contracts, and (d) that they did so with <u>intent to sign</u> the underlying contracts. Under this analysis "[t]he parties' intent is crucial." *Pepco Energy Servs., Inc. v. Geiringer*, No. 07-4809, 2010 WL 318284, at \*2 (E.D.N.Y. Jan. 21, 2010) (finding "little or no evidence that DePriest intended to sign the letter, there was ample evidence that he did not so intend"); *see also Sawyer v. Mills*, 295 S.W.3d 79, 88 (Ky. 2009) (no intent to sign the record because the medium used to procure the alleged agreement was "used surreptitiously," negating intent).

Here, Defendants have not offered evidence that the purported signatures and initials on the subject contracts were "executed or adopted by [Plaintiffs] with the intent to sign the record." Conn. Gen. Stat. § 1-267(8); *see also* 15 U.S.C. § 7006(5). Defendants only summarily assert in their briefing that Plaintiffs executed the subject contracts. Yet Defendants have not proffered any witness with personal knowledge of Plaintiffs signing anything. Goodleap concedes that it has no personal knowledge of whether Murphy signed (forged) the subject contracts. H.T. at 104:16–21, 110:20–111:04. 1st Light has not produced any witness. Defendants' *ipse dixit* that Plaintiffs executed the subject contracts, without offering any facts to support that assertion, is insufficient to establish that the marks and initials on those contracts are Plaintiffs' "electronic signatures."

### D. Any arbitration provision within the 25-Year Loan Contract is void because Defendants violated the Home Improvement Sales Act.

In addition to having no agreement in the first place, the forged 25-Year Loan Contract and its arbitration provision is unenforceable against the de Moura Castros because Defendants violated

Connecticut's Home Improvement Sales Act, Conn. Gen. Stat. § 42-134a, *eq seq.* (HISA). Under HISA, "[n]o agreement in a home solicitation sale shall be effective against the buyer if it is not signed and dated by the buyer," or if the seller fails to comply with a litany of contractual requirements or violates other prohibited practices. Conn. Gen. Stat. § 42-135a. These include:

- "fail[ing] to furnish the buyer with a fully completed receipt or copy of all contracts and documents pertaining to such sale at the time of its execution,"

- providing two copies of the statutory right to cancel and completing the copies by entering information, including "the date of the transaction, and the date, not earlier than the third business day following the date of the transaction, by which the buy may give notice of right to cancel,"

- "misrepresent[ing] in any manner the buyer's right to cancel," or

- failing to honor a valid notice of cancellation within 10 business days of receipt, including by cancelling any negotiable instrument"

*Id.*

Contracts that fail to comply with HISA's requirements are void, not merely voidable. *Associated Credit Co. v. Nogic*, 6 Conn. Cir. Ct. 745, 749 (1974) (contract ineffective when cancellation notice in bold type and deviated from statutory language); *see also Kronberg Bros. v. Steele*, 72 Conn. App. 53, 60 (2002) (violation based on cancellation notice without date filled in and with start date prior to signature date); *Blacker v. Crapo*, 112 Conn. App. 795, 807 (2009) (failure to provide cancellation notice); *Wadia Enterprises, Inc. v. Hirschfeld*, 27 Conn. App. 162, 167, *aff'd*, 224 Conn. 240 (1992) (same).

The 25-Year Loan Contract was part of a home solicitation sale subject to HISA and is void and unenforceable against Plaintiffs because of the numerous violations of Conn. Gen. Stat. § 42-

14

135a. Plaintiffs' signatures were forged, and they therefore did not sign the contract. H.T. at 34:22–35:11. Defendants failed to furnish Plaintiffs with copies of the contract and related documents at the time of the purported execution, as well as statutory notices of the right to cancel embedded in the contract. *Id.* at 36:12-23, 46:14-19. Defendants further failed to honor Plaintiffs' valid cancellation of the forged contract and continues to attempt to enforce to the loan. *Id.* at 77:02–08. Any of these HISA violations are sufficient to void the contract. See *Associated Credit Co.*, 6 Conn. Cir. Ct. at 749. The arbitration clause contained within a void contract is therefore unenforceable against Plaintiffs. To the extent the Court finds genuine issues of material fact regarding Defendants' compliance with the HISA, such issues of fact are for the jury.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motions to Compel Arbitration must be denied with prejudice. Alternatively, any genuine issue of material fact as to whether Plaintiffs entered into an agreement to arbitrate must be resolved by the jury.

Dated: August 29, 2022

THE PLAINTIFFS
BRIDGET DE MOURA CASTRO &
LUIZ DE MOURA CASTRO

/s/ Jeffrey Gentes
Jeffrey Gentes (ct28561)
Sarah White (ct29329)
Connecticut Fair Housing Center
60 Popieluszko Court
Hartford, CT  06106
Phone: (860) 263-0741

/s/ Andrew M. Milz
Andrew M. Milz (pro hac vice)
Jody T. López-Jacobs (pro hac vice)
Flitter Milz, P.C.
450 N. Narberth Ave., Suite 101
Narberth, PA 19072
Phone: (610) 822-0781

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2022 a copy of the foregoing was filed and served electronically. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

By:   /s/ Andrew M. Milz
ANDREW M. MILZ