## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

BRIDGET DE MOURA CASTRO & LUIZ
DE MOURA CASTRO, by his next friend
Helena Hilario,

    Plaintiffs,

 v.

LOANPAL, LLC d/b/a GOODLEAP, PRIME
ENERGY, LLC d/b/a PRIME ENERGY
SOLAR, and 1ST LIGHT ENERGY INC.,

    Defendants.

Civil Action No.
3:21 - CV - 1020 (CSH)

FEBRUARY 8, 2024

## ORDER RE:   DEFENDANTS' MOTIONS TO STAY PROCEEDINGS [Doc. 19, 23] AND RULING ON PLAINTIFFS' MOTION TO SUPPLEMENT RECORD [Doc. 60]

**HAIGHT, Senior District Judge:**

### I. INTRODUCTION

In its prior "Memorandum and Order Scheduling Preliminary Hearing" [Doc.41], the Court

provided a detailed summary of the alleged facts in the case.[1]  Although familiarity with that Order

is presumed, the Court briefly recounts the following facts, as set forth in the Complaint.

Plaintiff homeowners, Bridget de Moura Castro and Luiz de Moura Castro, are a married

couple who were each 80 years old at the commencement of this action.   In their Complaint, they

allege that in August of 2020, Defendants participated jointly in a fraudulent and unconscionable

scheme to solicit, sell, and install solar panels on the roof of their home in Avon, Connecticut. Doc.

---

[1] *See de Moura Castro v. Loanpal, LLC*, No. 3:21-CV-1020 (CSH), 2022 WL 2315697, at
*1-3  (D. Conn. June 28, 2022).

1

1, ¶¶ 1-10, 13.

Defendants Loanpal, LLC ("Loanpal"), Prime Energy, LLC ("Prime Energy"), and 1st Light Energy, Inc. ("1st Light")  engage in the business of soliciting consumers "for the purchase of solar panels and/or [the] install[ation] [of] solar panels on consumers'  homes."[2] *Id.* ¶ 3. In soliciting consumers to enter "25-year loans and other contracts,"  Defendants' sales agents employ electronic tablets such as iPads. *Id.*  Defendant Loanpal offers consumers loans to purchase the solar panels, *id.* ¶¶ 14-15; and Defendants Prime Energy and 1st Light install the panels as licensed home improvement contractors in Connecticut,[3] *id.* ¶¶ 16-19.   Plaintiffs allege that "Defendants carry on a symbiotic business relationship" in which "Prime solicits customers at their homes on behalf of and for the benefit of 1st Light and Loanpal, 1st Light sells and installs the solar panels, and Loanpal finances the transactions." *Id.* ¶¶ 20- 21.  Consequently, "[a]ll  Defendants rely and depend on each other to carry out this course of business." *Id.* ¶ 21.

Plaintiffs allege that in August of 2020, Bridget de Moura Castro was solicited in her Avon home by Mark Murphy, a salesman and agent acting on behalf of Defendants.[4] *Id.* ¶¶ 22-23. Murphy

---

[2]  At a hearing before this Court on July 27, 2022, Loanpal's counsel, Christopher D. Barraza, indicated that he represents Goodleap in this action, which was "formerly known as Loanpal." Doc. 48, at 6-7.  Other than in certain quoted passages of that hearing transcript, the Court refers to this defendant herein as Loanpal.

[3]  The Court notes that defendant Prime Energy has defaulted in this action by failing to defend or otherwise plead.  The Clerk has entered default against this party pursuant to Federal Rule 55(a) of Civil Procedure, Doc. 44; and Plaintiffs have timely moved for entry of a default judgment against Prime Energy, Doc. 49.  The Court will discuss that motion in Part II.D., *infra*.

[4]  As noted in the Court's prior Order, "Mark Murphy" appeared as an employee on the "zoominfo" website of defendant "Prime Energy Solar, which is an Electricity, Oil & Gas company with an estimated 32 employees." *See*  2022 WL 2315697, at *1 n. 2 (citing https://www.zoominfo.com/p/Mark-Murphy/4170585659 ).  Murphy's information was listed as last updated on June 17, 2023, but no longer appears on that website.  The Court has not been apprised whether Murphy remains employed by Prime Energy.

allegedly informed Bridget that senior citizens "are given government benefits for 'free' solar panels" installed on their homes. *Id.* ¶ 24; Doc. 24-1 ("Certification of Bridget de Moura Castro"), ¶ 2. Based on this alleged "promise of free solar panels and significant savings," Bridget agreed to have the solar panels installed on her Avon home. Doc. 1, ¶¶ 13, 40-41. Bridget further alleges that Murphy never mentioned or requested authorization to provide a loan or perform a credit check on the de Moura Castros. *Id.* ¶¶ 25-28. Nonetheless, Defendants "surreptitiously and intentionally obtained and used Plaintiffs' consumer reports from the consumer reporting agencies" to create a "Loan Contract" for the purchase of solar panels. *Id.* ¶¶ 30-31. Furthermore, Defendants allegedly never provided the Plaintiffs with an opportunity to review paperwork or documents regarding purchase of the solar panels in either "paper or electronic" form. *Id.* ¶¶ 29, 46; Doc. 24-1, ¶ 3.

According to Plaintiffs, "Defendants eventually caused solar panels to be installed on Plaintiffs' home, even though no contract was provided to Plaintiffs or signed by Plaintiffs." Doc. 1, ¶ 46. Thereafter, in January 2021, Defendants sent Plaintiffs a letter, addressed to Luiz, stating that he had taken out a 25-year loan and "[w]e've tried calling a few times to review your terms and was [sic] unsuccessful."[5] *Id.* ¶ 47. Bridget believed the letter was "a scam" and gave it to her daughter Cema Siegel to investigate. *Id.* ¶¶ 48-49. Siegel had been acting as her parents' power of attorney for financial matters. *Id.* ¶ 49. On February 18, 2021, Siegel received a copy of the Loan Contract and Purchase Contract for the first time. *Id.* ¶ 51. Plaintiffs have asserted that all of their signatures and initials on the contracts were "forgeries." *Id.* ¶ 54. Furthermore, the de Moura Castros' email address and phone number on the contracts were "incorrect." *Id.* ¶¶ 55-57.

---

[5] As stated in the Purchase Contract, the cost of the solar panels system was $54,880.88 and, with financing, the total cost for the system was $73,816. Doc. 1, ¶ 60.

As a result of Defendants' alleged fraudulent conduct, Plaintiffs' home is "burdened with ineffective solar panels" – installed on a roof that is "completely shaded by trees" and thus "unfit for solar." *Id.* ¶ 65.  In addition, Plaintiffs have "suffered mental and emotional distress, worry, and aggravation" due to being "duped into contracts" for the ineffective panels and "subjected to wrongful demands for payment pursuant to [the] forgeries" of their names, initials, and contact information. *Id.* ¶ 66.

Plaintiffs commenced this action in July of 2021.  In their Complaint, as self-described "elderly consumers," Plaintiffs seek "damages and other relief" arising out of the allegedly fraudulent transaction in August 2020 with Defendants for the sale and installation of solar panels, along with an accompanying loan agreement.  *Id.* ¶¶ 1-6, 40-41.  In particular, Plaintiffs bring federal claims against all Defendants pursuant to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.*, and the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*  In addition, invoking the Court to exercise supplemental jurisdiction under 28 U.S.C. § 1367(a), Plaintiffs bring state law claims pursuant to Connecticut's Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110g, *et seq.*, Connecticut's elder exploitation statute,  Conn. Gen. Stat. § 17b-462, -450, and Connecticut's common law regarding  "fraudulent concealment" as to the solar panel transaction (*i.e.*,  failure to disclose, and/or prevention of discovery of, facts regarding the hidden agreements with Plaintiffs' forged signatures).

In their prayer for relief, Plaintiffs seek, *inter alia*, compensatory ("actual and statutory") damages; punitive damages; declaratory judgment that the contract documents are void; return or destruction of Plaintiffs' confidential consumer report; removal of the solar panels and repair for damage to Plaintiffs' property; and attorney's fees and costs.  Doc. 1, at 20 ("Prayer for Relief").

4

## II.  PENDING MOTIONS TO STAY PROCEEDINGS

Defendants Loanpal and 1st Light have each filed a motion  to stay this litigation to allow arbitration to proceed under the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"). *See* Doc. 19 & 23.  Under that statute,  in any action "brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court . . ., upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ."  9 U.S.C. § 3.

Loanpal asserts that Plaintiffs agreed to arbitrate pursuant to an arbitration provision contained in the "Loan Contract" [Doc. 1-1]. Doc. 19, at 1.  Loanpal alleges it entered that contract with Plaintiffs "to permit [the solar panel] improvements to be made on their residence." *Id.* at 2. The alleged loan agreement, filed at Doc. 1-1 with the Court,  contains the following "comprehensive" arbitration provision:

> All claims and disputes arising out of or related to this Agreement (hereafter, "Dispute(s)") shall be resolved by binding arbitration on an individual basis.  The arbitrator shall also decide any issues relating to the making, validity, enforcement or scope of this arbitration agreement, arbitrability, defenses to arbitration including unconscionability, or the validity of the jury trial, class action or representative action waivers (collectively, "arbitrability issues"). . . . The Federal Arbitration Act (9  U.S.C. §§ 1-16) (the "FAA") shall govern this agreement to arbitrate including all arbitrability issues.

Doc. 1-1, ¶ 15. *See also* Doc. 19, at 2.

Similarly, 1st Light moves to "stay [this Court's] proceedings to allow for arbitration" under the FAA.  Doc. 23, at 1.  1st Light asserts that Plaintiffs have brought "various claims related to the installation of a solar energy system on a residential property" and those claims "arise out of a written contract," the Purchase Contract, entitled "Contract for PV Solar Power System" from 1st

Light Energy, Inc., and  "attach[ed ] to Plaintiffs' Complaint as Exhibit B" [Doc. 1-2].  Doc. 23, at

1. Defendant 1ˢᵗ Light bases its motion on the following "Arbitration" provision, as set forth in that

document:

> Other than breach due to the Customer's interference with the Rebate or default of
> payment by the Customer . . . , any other dispute between the parties shall be decided
> in accordance with the latest rules and procedures as set forth by the American
> Arbitration Association. Parties hereby agree that any dispute or differences arising
> out of or in connection with this Agreement shall be determined by the appointment
> of a single arbitrator to be agreed between the parties.  Parties further agree that the
> decision made by the appointed arbitrator shall be final and binding, and each party
> shall be responsible for its own cost and expenses related to arbitration.

Doc. 23, at 2 (quoting Doc. 1-2, at 5).

As the Court mentioned in its prior "Memorandum and Order" [Doc. 41], pursuant to the

FAA, "if an action is brought in federal court 'upon any issue referable to arbitration under an

agreement in writing for such arbitration,' the court, once satisfied that the issue in the action is

covered by the arbitration agreement, 'shall on application of one of the parties stay the trial of the

action until such arbitration has been had . . . .' 9 U.S.C. §3."  *de Moura Castro*, 2022 WL 2315697,

at *7.  However, if "the making of the arbitration agreement . . . [is] in issue, the court shall proceed

summarily to the trial thereof.' 9 U.S.C. § 4." 2022 WL 2315697, at *7.

The Court concluded that "[i]n seeking to stay the case . . . to allow arbitration to proceed,

Defendants seek to compel Plaintiffs to arbitrate." *Id.*  In such circumstance,   "[t]he standard the

Court 'must apply when reviewing a motion to compel arbitration is essentially the same standard

that the Court applies when it reviews a motion for summary judgment.'" *Id.* (quoting  *D'Antuono

v. Serv. Rd. Corp.*, 789 F. Supp. 2d 308, 319 (D. Conn. 2011)).

With these principles in mind, the Court noted that it must consider: "(1) whether the parties

entered into a contractually valid arbitration agreement, and (2) whether the dispute falls within the

scope of the arbitration agreement." *Id.* (citing *Murphy v. Glencore Ltd.*, No. 3:18-CV-01027 (CSH), 2019 WL 549139, at *2 (D. Conn. Feb. 11, 2019)).  Moreover, the issue of the arbitration contract's validity is covered by Connecticut law, "the state law principles of contraction formation." *Id*. (citing *Murphy*, 2019 WL 549139, at *2).

Defendants Loanpal and 1st Light point to Plaintiffs' alleged initials on the written loan and purchase contracts containing arbitration clauses as *prima facie* evidence of the parties' agreements to arbitrate. Doc. 1-1, 1-2.  On the other hand, Plaintiffs deny that a mutually binding arbitration agreement exists between the parties.  They assert that no valid agreement was formed due to Defendants' fraud and/or forgery with respect to the contracts at issue.  Doc. 24, at 6.

Specifically, in objecting to Defendants' motions to stay, Bridget de Moura Castro has certified that she and her husband "neither signed nor even saw any contract, let alone an arbitration provision,"  Doc. 24, at 2; and  the "signatures and initials" appearing on the contracts were "forgeries." Doc. 24-1, ¶ 4.  She has pointed out that her husband Luiz has debilitating "Parkinson's disease," rendering him "legally blind" and unable to "sign documents, speak coherently, or care for himself." Doc. 24-1, ¶ 5.  Moreover, both Bridget and her daughter Helena Hilario have  attested that the email address ([bridgetdecastro38@gmail.com](mailto:bridgetdecastro38@gmail.com)) and phone number ((860) 676-6363) for Plaintiffs on the Loan Contract, both inserted by Prime Energy salesman Mark Murphy on his electronic tablet, are "incorrect."[6]  Doc. 24-1, ¶ 4, Doc. , 24-2, ¶ 3.  Given these allegations of fraud

---

[6] In tapping the screen on an electronic tablet, Defendant 1st Light suggests that Bridget was indicating her approval "to allow the solar project to go forward." Doc. 23, at 3. Bridget, however, states that she was told by Mark Murphy that "senior citizens . . . are given government benefits to have 'free' solar panels installed on their homes" so, in tapping Murphy's screen, she was simply "agree[ing] to the installation of free solar panels." Doc. 24-1, ¶ 2.

with respect to the contract formation, Plaintiffs request a jury trial under § 4 of the FAA.[7]   Doc. 24, at 6 (citing *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)).

For clarity, the Court reiterated that "the applicable standard for granting a jury trial is the same standard the Court applies when reviewing a motion for 'summary judgment;' "  and  in light of Defendant Loanpal's request for oral argument on its motion to stay, the Court would "hold a preliminary evidentiary hearing to determine whether there is  a 'genuine issue' to warrant a jury trial regarding  the  existence *vel non* of  valid arbitration contracts."[8] *de Moura Castro,* 2022 WL 2315697, at *11 (citing *Pingel v. Gen. Elec. Co.*, No. 3:14-CV-00632 (CSH), 2014 WL 7334588, at *8 (D. Conn. Dec. 19, 2014) and *Vaccaro v. Ins. Co. of N. Am.*, No. 3:96-CV-1161 (AHN), 1996 WL 762234, at *2–3 (D. Conn. Dec. 23, 1996)).

Plaintiffs were instructed that to "obtain a jury trial," they must "prove 'there is a triable issue concerning the existence ... of the agreement,' *Topf*   [*v. Warnaco, Inc.*,] 942 F. Supp. [762,] 766 [(D.  Conn.  1996)],  by  presenting  "proof  that  any  exceptions  or  defenses  (fraud,  duress,

---

[7] Section 4 of the FAA  provides, in relevant part:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4.

[8] To fulfill the "summary judgment" standard to obtain a jury trial, a "plaintiff must show genuine factual issues regarding his allegations concerning the making of the arbitration agreement, *such that a jury could find no agreement*." *Topf v. Warnaco, Inc.*, 942 F. Supp. 762, 767 (D. Conn. 1996)(emphasis added).

unconscionability) to contract formation exist." *de Moura Castro*, 2022 WL 2315697, at *11. Defendants, on the other hand, were informed that they may "counter" Plaintiffs' evidence with their own proof that a contract was formed. *Id.* For example, Loanpal should be able to show "when and how Plaintiffs' electronic signatures came to be inserted on the Loan Contract, where Loanpal obtained the allegedly erroneous email address and phone number for Plaintiffs, and what was the source of the bank account information regarding Plaintiffs' auto-payment" on the alleged loan. *Id.* "Similarly, as to the 'Arbitration' provision presented in the 'Contract for PV Solar System' or Purchase Contract [Doc. 1-2], 1ˢᵗ Light should be prepared to address the facts of contract formation [of the Purchase Contract] with Plaintiffs, including, for example, when and how the contract was formed, where 1ˢᵗ Light obtained Plaintiffs' email address and phone number, and whose handwriting made the [de Moura Castros'] tiny signatures in question." *Id.*

The Court held the preliminary evidentiary hearing on July 27, 2022, via Zoom. As set forth below, from the evidence presented in that hearing, the Court determines whether genuine factual issues remain regarding whether the parties entered a valid arbitration agreement under the "Loan Contract" and/or "Purchase Contract" under Connecticut state law.

### III. DISCUSSION

#### A. Evidence at Preliminary Hearing

##### *1. Plaintiffs' Evidence – No Valid Contract to Arbitrate*

As suggested by the Court, Plaintiffs presented testimony at the hearing to support their assertion that the contracts in question, both the Loan Contract and Purchase Contract, were induced through fraudulent means and forgery by Defendants' salesman, Mark Murphy. In support of their position, Plaintiffs presented the testimony of their daughters, Helena Hilario and Cema Siegel, and

of Bridget herself.

First, Hilario made clear that Luiz was in no condition to participate in the formation of the contracts at issue at the relevant time, August of 2020. She explained that in addition to his advancing age, Luiz is in the "advanced stages of Parkinson's disease," with "which he has been living . . . for about 21 years." Tr. 14: 22-24. He is "no longer able to ambulate" and "no longer able to feed himself." *Id.* 14: 24 to 15: 1. He is "on a pure puree diet" and "requires two aid[e]s to take care of him." *Id.* 15: 1-2. He "has a very difficult time communicating and has significant cognitive impairment over the last couple of years."[9] *Id.* 15: 2-5. In short, he is "not able to perform any activities of daily living independently." *Id.* 16: 12-14.

According to Hilario, Luiz has "suffered from Parkinson's-related psychosis and anxiety," along with "significant cognitive decline over the past several years." *Id.* 16:19-22. Since 2018, he has experienced "a series of mini[-]strokes," which have resulted in "lost partial sight . . . in one eye." *Id.* 17: 4-7. He is now "legally blind." *Id.* 17: 8. As of August 2020, when Defendants allegedly contracted with the de Moura Castros, Luiz was already substantially disabled; he might have been able to "hold a pen and . . . scribble," but "he could not sign his name." *Id.* 17: 15-18. At that time, the original documents indicating his power of attorney were lost and the family had difficulty to "certify them with a notary" because his attestations were deemed unacceptable due to his "cognitive status." *Id.* 17: 23 to 18: 2.

During her testimony, Bridget de Moura Castro confirmed that her husband is "totally disabled," explaining that he "needs two aid[e]s full-time" *Id.* 24: 8-10. He was eighty-one years

---

[9] The Court notes that Luiz came into view (on camera) briefly during the Zoom hearing but appeared to have difficulty responding to his attorney's greeting. Tr. 15: 6-25. He was thus not an active participant in the hearing.

old at the time of the hearing (July 27, 2022) and, by then, had needed assistance "for four to five years." *Id*. 24: 13-20.

As to Bridget de Moura Castro's ability to contract with Defendants, Hilario testified that her mother is able to "communicat[e] via e-mail" but "struggles with any sort of electronic accounts or forms or attachments." *Id.* 18: 5-7. Moreover, her correct email address is demouracastro@comcast.net, *id.* 18:15-17; but on the Purchase Contract, 1ˢᵗ Light used bridgetcastro38@gmail.com, *id.* 19: 11-14, which "is not [Bridget's] e-mail address," *id*. 19: 17-18. Furthermore, "de Castro" is not even her mother's last name so Bridget would "never say 'de Castro' as [her] last name." *Id.* 19: 23-24.

In addition, the de Moura Castros' phone number on the Purchase Contract, "(860) 676-6363" is incorrect. *Id.* 19: 25 to 20: 3. Their actual number is "(860) 675-6363" so the number appearing on the Purchase Contract is "one digit off." *Id.* 20: 5-11.

As to the events of August 2020, the alleged time of the formation of the Loan Contract and Purchase Contract, Bridget testified that salesman Mark Murphy came to her home. *Id.* 27: 8-10. She explained that he offered her "an incredibly good deal": the "State of Connecticut was offering to all senior citizens . . . free solar panels." *Id.* 27: 15-19. "The result of that would be that the monthly [electricity] bill would be considerably less than what it had been before, so [she] thought this was probably a good thing." *Id.* 27: 19-22.

In considering solar panels, Bridget had voiced her concern that her Avon "house is surrounded by trees," but Murphy replied that this was "no problem" because Defendants would "be

cutting down three trees."[10] *Id.* 27: 23-25.

As to terms of any contract, Bridget stated that Murphy never mentioned anything about a loan. *Id.* 28: 4-6. The only monthly payments he mentioned related to her electric bill. *Id.* 28: 7-13. Bridget testified that Murphy "was asking how much [the de Moura Castros'] electric bill was because . . . after installing solar panels, the monthly bill would be much less." *Id.* 28: 9-11. "So he wanted to know" the name of their electricity provider and she "told him it was Eversource." *Id.* 28: 11-13. Murphy informed Bridget that the solar panels would "have an impact on [her] Eversource bill." *Id.* 28: 16-19. He stated that after the solar panels were installed, the de Moura Castros' Eversource bill would go down from $500 to $184 per month. *Id.* 28: 18-23. Bridget explained that she and Murphy "never talked about a loan . . . just a reduction in the electricity bill." *Id.* 29: 10-12.

Additionally, according to Bridget, Murphy never showed her any papers. *Id.* 29: 14-17. He only had a "very small" cell phone – no paper documents. *Id*. 29: 16 to 30: 3. Murphy told Bridget that he would "have to set up an account on [her] phone," a "new Gmail account." *Id.* 30: 3-4, 7-9. She explained that she was not familiar with Gmail and had never used it, but he made a Gmail account anyway. *Id.* 30: 10-13. He then asked Bridget "to tap " on her phone three times to "get the account with the solar panels installed and then to have it connected with Eversource." *Id.* 30: 20-24. Bridget specifically recalled that she was told to "check[ ] a box with an 'X.'" *Id.* 30: 25 to 31: 1. In "press[ing] the box," it was her understanding that the purpose was "simply to have the

---

[10]    At the preliminary hearing, on July 27, 2022, Bridget clarified that no trees were ever removed. Tr. 71: 1-10. "Mark had said several times that no, don't worry, we'll take down three trees, you can even choose which three." *Id.* 71: 2-4. However, to date, no trees were removed. *Id.* 71: 8-10.

solar panels connected with the Eversource bill, [and] it would then be much less per month."  *Id*. 31: 13-17.

When presented by her counsel with the alleged Purchase Contract – the "1st Light Energy Contract for PV Solar System" (Plaintiffs' Ex. 1), Doc. 1-2 – Bridget noted a number of irregularities.  First,  the capitalization of her last name was incorrect: the "'De' should be a  small 'd' [and] [t]he 'M' should be a capital 'M.'" Tr. 31: 20-25.  She also found it "strange" to see her husband's name on the contract because "he wasn't writing anything at that time" and "wasn't capable of writing or signing anything." *Id*. 31: 25 to 32: 4. Second, her phone number and email address were both incorrect.  *Id*. 32: 7-8.  Third, her initials appeared on the contract as "BDMC," but she signs her initials as "BMC" and, if he were able to sign,  Luiz would use "LMC."[11] *Id*. 32:18 to 33:2.  In short, Bridget did not recognize any signatures on the document.  *Id*. 33: 5-7.  According to Bridget, neither she nor her husband signed the document. *Id*. 33: 7-12.

Next, Bridget's counsel showed her the alleged Loan Contract – the "Loanpal, Finance Made Friendly, Loanpal Agreement for Luiz de Moura Castro and Bridget" (Plaintiffs' Ex. 2), Doc. 1-1. Tr. 33: 16-23.  In response, she testified that she had "never seen this document, nor do I have a copy of it until today." *Id*. 34: 2-3.  Moreover, she never would have signed her initials in that manner: "[N]either of us sign[s] our initials that way. It's 'LMC' or 'BMC.' " *Id*. 34: 12-15; *see also id*. 35: 9-11.   As to the "loan amount of $51,000," Bridget maintained that Murphy "didn't talk about a loan" because the solar panels were "free."  *Id*. 34: 17-21.

Furthermore, just as seen on the alleged Purchase Contract, Bridget's email address and

---

[11]  Bridget explained that "[t]he 'D' and 'de,' they're always lower case and they're not considered a name." Tr. 33: 1-2.

phone number were both wrong on the Loan Contract. She insisted she had never seen, much less used," bridgetcastro38@gmail.com," *id.* 35: 13-18; and her phone  number should have included "675, not 676," *id.* 35: 25 to 36: 2.

With respect to the provision regarding arbitration, Murphy had never mentioned arbitration to her. *Id.* 36: 4-10.  She stated that not only had Murphy failed to mention arbitration, she "d[id]n't even know what it is." *Id.* 36: 9-10.

Bridget's counsel then asked her to read an acknowledgment on the Loan Contract;  and, in response, she testified that she had no recollection of any such document.  *Id.* 36: 12-23. The acknowledgment stated,  "By signing below you acknowledge that you have read and received a complete copy of this disclosure to keep for future reference before you signed your agreement," followed by  "Borrower: Luiz De moura castro" and "Co-Borrower:  Bridget De moura castro." *Id.* 36: 12-18.  However, Bridget stated that she "didn't see it" or even "receive[ ] a copy of this" or "a copy of any document." *Id.* 36: 19-23.  Moreover, she clarified that  "[i]f there was anything [Murphy]  showed me, it must have been on the phone, but it's so small, I can barely read it." *Id.* 37: 2-4.  In that regard, she noted that she had never received an email or anything in the mail regarding contracts related to the solar panels "until some years later." *Id.*  37: 5-10.

Bridget explained that when she finally got a bill from Loanpal, she was "extremely surprised" so she  contacted her daughter Cema Siegel to investigate the matter.  *Id.* 37: 11-17. At that time, Bridget had "no idea" who Loanpal was and why they were contacting her. *Id.* 37: 15-17. Cema then discovered that a loan had been set up and her mother "had no idea of" any such loan. *Id.*  37: 20-22.

As to how her "Bank of America account"  came to appear on the loan, Bridget explained

that she had given Murphy a canceled check to set up her Eversource payments of $184 per month.

*Id.* 38: 1-7.  She stated:

> Mark [Murphy] had said in order to set up the solar panels with Eversource, they needed a copy of a canceled check that would then guarantee that . . . Eversource would be able to put the solar panel agreement, I guess, on our bills. Our bill will be reduced from whatever it was to [$]184. So I gave him a canceled copy of a check.

*Id.* 38: 10-16.  She thus allegedly believed  that Eversource would be the entity to withdraw funds from her Bank of America account.  *Id.* 38: 20-24.

Contemplating that Defendants planned to enter an audio recording of an alleged "welcome call" made by a representative of Defendants to Bridget, Plaintiffs' counsel, Andrew M. Milz, stipulated to the authenticity of the recording as a business record.[12]  *Id.* 40: 23 to 41: 11.  The Court accepted the recording as "Plaintiffs'  Exhibit 3 on this hearing."  *Id.* 40: 12-20. Milz then sought clarification of Bridget's understanding regarding the call, and she explained that "the lady on the phone said that they were going to keep [the Eversource bill]  at 184." *Id.* 44: 7-12.  Specifically, " the electric bill would be [$]184 per month instead of what [Bridget and Luiz]  were paying." *Id.* 44: 10-12.  Moreover, the caller neither mentioned arbitration to her, *id.* 45: 13-19, nor stated anything about a "financing agreement with Loanpal," *id.* 45: 21-24.  To date, Bridget has no understanding about "what [such a financing agreement] means."  *Id*. 45: 25 to 46: 2.  Therefore, when the caller spoke about a "written agreement," Bridget thought to herself, "I don't have anything in writing anyway so it doesn't make sense." *Id.* 46: 12-13.

On cross-examination, David C. Yale, 1st Light's counsel, had Bridget confirm that she

---

[12]  On the call, the woman questioning Bridget identifies herself as "Whitney" of "1st Light Energy." Also, at the beginning of the call, Mark Murphy explains to Whitney that Luiz will not be present on the call because "he actually had a stroke."  Furthermore, when questioned about her phone number and email address on the contract, Bridget specified that they were both incorrect.

tapped on her phone three times to have the solar panels installed.  *Id.* 48: 3-16.  However, when he tried to suggest that she had tapped to set up a Gmail account and "then again for Eversource," she disagreed, stating that she was tapping her phone "just to install the . . .  solar equipment."  *Id.* 49: 4-15.  Moreover, Bridget did not read the screen before she tapped.  *Id.* 49: 20 to 50: 2.  Rather, Murphy just zoomed the screen so she could see the box to tap.  *Id.* 49: 20-24.

As to not receiving any documents in connection with the solar panel installment, Attorney Yale inquired whether Bridget noted she had received no documents when workpeople arrived to actually install the solar panels on her house.  *Id.* 50: 20 to 51: 4.  Bridget said she asked one installer about whether she would receive a written agreement, but she received no documents and ended up just "presum[ing] [she] would receive something." *Id.* 51: 12-18.

Yale pointed out that during the "welcome call" recording (Plaintiffs' Ex. 3), Bridget had responded to queries regarding promises that "are not part of the written agreement" by saying, "I think everything is included in the written agreement." *Id.* 52: 10-16.  However, Bridget did not recall the call very well so could not remember her statement. *Id.* 52: 15-16.  She also reiterated that she had never received such a written agreement.  *Id.* 52: 17-21.

In addition, Yale asked Bridget about the check she gave to Murphy "for the solar panel agreement." *Id.* 53: 2-6.  Bridget, however, reiterated her position  that Defendants were "going to install solar panels for free, that they had to be connected somehow with [her] electric bill and that the Eversource company would have to be contacted because they were the ones that [she] presume[d] [we]re  also billing solar panels." *Id.* 53: 7-11; *see also id.* 69: 12-16.

As to dollar amounts for monthly payments, Bridget claims that she saw the numbers 184 and 250 on Murphy's phone. *Id.* 54: 3-9.  She said that the electric bill from Eversource would be

$184 per month unless she defaulted on the payment, in which case the monthly bill would be $250. *Id.* 54: 13-17.  She stated that after she eventually received a copy of the Loanpal agreement, she saw such figures "written down." *Id*. 55: 7-10.   Thereafter, when Attorney Barraza, Loanpal's counsel, cross-examined Bridget, he, too, asked about whether the amounts of these monthly payments appeared in the Loanpal contract; Bridget, however, stated that she never saw such a document until her daughter Cema attained a copy in February 2021. *Id.* 56: 23 to 57: 6; 57: 25 to 58: 9; 58:13 to 59:3.

When questioned by Loanpal's Attorney Barraza, Bridget admitted that she gave Murphy permission to make a Gmail account for her to allow solar panels to be installed on her home. *Id.* 62: 1-6.  Nonetheless, she contradicted his suggestion that her statements on the welcome call tape suggested that she understood that she was entering into a financing agreement with Loanpal. *Id.* 63: 10-16.  Bridget reiterated that she did not know there was a loan agreement in effect. *Id.* 63: 15-19.  She had "no idea" there was any financing agreement, because she believed there would be a "free set up of panels for a reduced electricity  bill." *Id.*

Loanpal's counsel subsequently addressed this statement by alleging that Bridget previously conceded that Loanpal emailed a document to her (via  her comcast.net email address) to sign with DocuSign, but yet claims she was unable to log in and view it.  *Id.* 67: 7-9, 13-19.  Bridget replied:

> Well, I know I don't do DocuSign so there would be no point. I mean, I wouldn't be able to understand what that is or how to do it.

*Id.* 67: 10-12.  According to Bridget, she had "never seen anything on [her] regular e-mail from Loanpal." *Id.* 67: 18-19.  In fact, she "never received anything" from Loanpal on her comcast.net account, *id*. 69: 19-22; and "certainly[had] never done anything from DocuSign," *id.* 68: 20-24.

Finally, as to the amount of the loan in the alleged Loan Contract, Bridget emphasized that

17

she "would certainly not have agreed" to "entering a loan for $51,000," that with interest would have totaled in "excess of $70,000." *Id.* 72: 10-16. Given this large sum of money and the 20-year term, it would not "make any sense." *Id.* 72: 15-20. She and her husband would be "over 100 years old at that point." *Id.* 72: 18-19. She "would not have signed" such an agreement. *Id.* 72: 25. At 80 years old, "[t]here would be absolutely no way [she] could sign a 20-year loan." *Id.* 72: 25 to 73: 2.

As a final witness, Plaintiffs' counsel, Attorney Milz, called Cema Siegel, Bridget and Luiz's other daughter. Siegel explained that her mother had contacted her in February 2021 because she had received a letter from Loanpal which stated that Loanpal was "having trouble reaching her and outlining the terms of service." Tr. 75: 13-19. Bridget told Cema that the letter mentioned terms of service for a 25-year loan with an amount of . . . over $50,000," and Bridget believed that the letter looked "like spam or a scam." *Id.* 75: 21 to 76: 1. Bridget told Siegel that she was "very confused by this letter" because Bridget had recently had solar panels installed on her home, but understood that these panels were free and would reduce the size of her electricity bills. *Id.* 76: 4-8. Bridget had "no paperwork" regarding the solar panels so she "need[ed] some assistance . . . in sorting things out."[13] *Id.* 76: 8-14.

Siegel then phoned salesman Mark Murphy on February 18, 2021, attempting to find out what the letter meant. *Id.* 76: 15-18. From that conversation, she learned that there was a "loan agreement that [her] mom knew nothing about" and her parents had been provided "no paperwork."

---

[13] Bridget testified that she "had asked for a copy of the contract" but the solar installers who arrived at her home (at the end of December 2020) "said they didn't have one." Tr. 78: 5-10, 79: 20-24. By the time Siegel first received a copy of the contract documents for her parents, the "panels had already been installed." *Id.* 79: 17-20.

*Id.* 76: 18-20.  She thus requested to have a copy of any such agreement or contract forwarded to her.  *Id.* 76: 20-23.   Copies of the loan and purchase contracts were  forwarded to Siegel on February 18, 2021. *Id.* 76: 23-24; 78: 11-16.

After receiving the contracts, Siegel  reviewed them with her mother and was told that "these were not the terms that [Bridget]  understood." *Id.* 76: 25 to 77:2.  "[B]y e-mail and by telegram," Siegel and Bridget then "sent a cancellation notice indicating that [Bridget] did not agree to those terms of service and . . . wanted to cancel the agreement" because the "agreement  was not valid." *Id.* 77: 2-6.  Loanpal, however, never responded but rather continued to send bills for the solar panels to the de Moura Castros.  *Id.* 77: 6-7.  Plaintiffs thus hired counsel to assist them. *Id.* 77: 8.

With respect to Bridget's new Gmail account, Siegel confirmed that Bridget had never accessed the account and was never given the password.  *Id.* 77: 21-23.  Mark Murphy had created the account "in order for the solar panels to be installed on the house;" however, when Cema tried to log in for her mother, she had no password and could not use "password recovery" because Bridget's contact information on the account was incorrect.  *Id.* 77: 17  to 78: 4.  Bridget's correct phone number and email address were not linked to the account. *Id.* 78: 1-4.

Based on the testimony provided by their witnesses, Plaintiffs assert that they "cannot be compelled to arbitrate a claim" because they have "not previously agreed to do so."  Doc. 50, at 1 (citation omitted).  The crux of Plaintiffs' argument, as borne out by Bridget's testimony, is that Plaintiffs never agreed to arbitrate any claim with Defendants.  As Plaintiffs describe:

> Arbitration was never mentioned at any point during the solicitation, nor was any arbitration agreement presented to Plaintiffs. Indeed, the evidence points to multiple forgeries, as Plaintiffs deny signing the subject contracts. The forgeries render any agreement to arbitrate void *ab initio* "[b]ecause there can be no meeting of the minds of the parties when a forgery has been perpetrated." *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 370 (2d Cir. 2003).

19

Doc. 50, at 1.

According to Plaintiffs, "[a]s borne out at the hearing, Defendants' salesman [Murphy] misrepresented to . . . Bridget . . . the very nature of what was proposed, leading her to believe that her tapping of the phone was 'simply to have the solar panels connected with the Eversource bill, that it would then be much less per month.'" Doc. 53, at 1 (citing Tr. 31: 13-17).  That salesman had misled Bridget into believing that the State of Connecticut would supply her, as a senior citizen, with "free solar panels."   *Id.* (citing Tr. 27: 3-22).   Under such circumstances, Murphy had misrepresented the "character or essential terms of [the] proposed contract," committing "fraud in the execution." *Id.* (quoting *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 31 (2d Cir. 1997)).

Moreover, given the facts that Bridget was shown no written contract and was fraudulently informed that clicking the box on her phone would solely reduce her electric bill, Bridget cannot be deemed "negligent for failing to read a document that was never presented to her as a formal written contract." *Id.* at 2.  Defendants wrongfully "fail[ed] to make full and fair disclosure of the existence of pages upon pages of contract documents – including a 25-year loan and embedded arbitration provisions." *Id.* at 4.

Furthermore, Plaintiffs emphasize that Defendants are incorrect in asserting that Bridget signed the Loanpal Contract using DocuSign in her Gmail and comcast.net accounts.  *Id.* Bridget testified that bridgetdecastro38@gmail.com was not her email account, *id.* (citing Tr. 19: 9-24, 35: 13-18); and Defendants' salesman, Murphy, had control over Bridget's phone so was able to

"surreptitiously sign the documents without Plaintiffs' knowledge or consent,"[14] *id.* (citing Tr. 30: 1-13). Bridget explained that she "has no understanding of how to even use DocuSign." *Id.* (citing Tr. 67: 7-12). By creating a false email address for Bridget, Murphy ensured that "she would not receive a copy of any contract, and invalid[ated] the effectiveness of any purported security procedures associated with the e-signatures." *Id.* at 5.

Finally, the phone call in which Bridget allegedly "referenced a written agreement" fails to prove that the parties had a meeting of the minds because Bridget clarified in her hearing testimony that she was relying on Murphy to "help [her] through [the situation] because [she] didn't understand too much what was going on." *Id.* at 3 (citing Tr. 46:20 to 47: 1). Her "yes" answers "were prompted by Murphy."[15] *Id.* at 5.

Based on the evidence presented, Plaintiffs argue that "there is no genuine issue of material fact that [they] have not entered into any agreement to arbitrate." *Id*. at 6. "To the extent the Court finds a genuine fact[ual] dispute, such dispute must be resolved by the jury." *Id.*

### 2. *Defendants' Evidence –Proof of Existing Contracts*

As movants on the motions to stay proceedings, Loanpal (a.k.a. "Goodleap") and 1ˢᵗ Light have the burden of proving the existence of valid arbitration contracts with Plaintiffs.[16] At the preliminary hearing, to support the existence of an arbitration agreement in the Loan Contract,

---

[14] At the hearing, a Goodleap (formerly "Loanpal") witness admitted that Goodleap does not know whether Murphy signed the contracts. *See* Tr. 104: 6-22, 110:20 to 111:4.

[15] Upon playing the proffered "welcome call," the Court notes that Bridget sounded confused when questioned about the monthly amount of $184 that she would be charged. Also, Murphy repeatedly answered questions for Bridget or prompted her to agree with a hesitant "okay," "all right," or "yes?" The tone of her voice revealed that she was unsure about the answers she provided.

[16] As previously discussed, Prime Energy has defaulted in this action so made no appearance at, and thus had no participation in, the preliminary evidentiary hearing.

Loanpal called one witness:  Jason Walker, Loanpal's Chief Credit Officer, with the "primary responsibilities [of] credit quality control and . . . post-funding functions." Tr. 83: 8-16.  He testified that the written "Certificate of Loan Completion" (Loanpal Hearing Ex. 1) indicated that, based on time stamps, the loan documents were sent to Luiz de Moura Castro at bridgetcastro38@gmail.com on 8/1/2020 and signed on 8/3/2020.  *Id*. 91: 16-23.  He also stated that time stamps indicated that the loan documents were sent to Bridget at demouracastro@comcast.net numerous times, beginning on August 3, 2020, but were ultimately viewed and signed by Bridget on 8/20/2020.  *Id.* 92: 3-12.

    With respect to salesman Mark Murphy, Walker admitted that Murphy is not an employee of Goodleap (formerly Loanpal).  *Id.* 93: 19-20.  Moreover, on cross examination by Plaintiffs' counsel, Walker conceded that it is true that  Goodleap "assumes that the sales agent will provide the consumer with an understanding of the loan transaction." *Id.* 95: 8-12.  Moreover, no one other than the sales agent is present at the consumer's doorstep to input the consumer's information into Goodleap's loan application program.  *Id.* 95: 13-24, 96: 10-14.  Walker further conceded that Goodleap "assumes the salesperson will act ethically" and "won't make up a phone number for the consumer." *Id.* 96: 15-25.  Also, Goodleap admittedly "assumes that the sales agent [will] scroll through the entirety . . . of the lending document with the consumer" but has no Goodleap employee present to observe whether that takes place.  *Id.* 97: 21 to 98: 6.

    Furthermore, on cross-examination, Walker admitted that Goodleap had no welcome call with either Luiz or Bridget.[17]  *Id.* 98: 9-16.  Nonetheless, Goodleap "went through with the underwriting and granted the funding for  this transaction." *Id.* 98: 17-20. Goodleap simply relied

---

[17]  As discussed *supra*, it was an agent of 1st Light named Whitney who called Bridget with Murphy also on the line.  *See* n.15, *supra*.

on salesman Murphy to convey the proper information to Goodleap (*i.e.*, email address, phone number). *Id.* 100: 15 to 101: 5.   In fact, Goodleap does not know whether the sales agent or the consumer provided the email address on the Loanpal Contract. *Id.* 104: 6-9.   However, Goodleap admittedly has a corporate "policy" which prohibits a salesman from creating an email address for the consumer in order to make the loan;  Walker thus stated, " We do have [this] policy and we do monitor these types of activities." *Id.* 104: 23 to 105: 6.

In addition, Walker agreed that Goodleap has no personal knowledge as to  whether either Bridget or Luiz were "allowed in any way to view the details of Goodleap's eighteen page contract" on Murphy's phone.  *Id.* 102: 10 to 103: 1.   Goodleap has no personal knowledge of how Luiz's signature was placed on the Loanpal Agreement. *Id.* 103: 13-19.   Nor does Goodleap know whether it was Bridget or the salesman who "clicked or acknowledged the boxes" on the contract.  *Id.* 104: 16-22.  Goodleap was "not present when any alleged signature was made by Bridget." *Id.* 104: 10-15.

Other than Walker, Defendants presented no witnesses regarding the alleged solar panel transaction.   In particular, Prime Energy's salesman, Mark Murphy –  who was the sole actor in soliciting the de Moura Castros to enter the solar panel transaction –  was noticeably absent.

Nonetheless, following the conclusion of the  preliminary hearing, Loanpal asserted that the hearing confirmed that "no reasonable jury could find a genuine factual dispute concerning whether Plaintiffs entered into a valid arbitration agreement." Doc. 51, at 2.   In Loanpal's words, Plaintiffs plainly "agreed to have solar panels installed on their residence."  *Id.*   Bridget stated that she intended to have solar panels installed on her home by tapping on her smartphone screen and making an "X." *Id.*  She knew that Murphy had created a Gmail account for her in order to have the panels

installed. *Id.* She thus provided Murphy with her phone for that purpose. *Id.* She understood that he created that account as part of the agreement to have the panels installed. *Id.* The Loanpal agreement was signed through Bridget's comcast.net email address. *Id.*

Loanpal emphasizes that in a recorded "verification call" on August 7, 2020, with 1st Light Energy, Bridget stated that she understood that she was purchasing the solar panels through a financing agreement with Loanpal and that the "loan amount" for the solar panel system was $54,880.88. *Id. ; see also* Plaintiffs' Hearing Exhibit 3, Aug. 7, 2020 (Phone Call Recording), Doc. 25-1 at 3, https://drive.google.com/file/d/119RugQ4ccC0lHwJwMQtO-5y3_oTLoD_j/view?usp=sharing at 3:50-9:36. Loanpal concludes that any "conclusory testimony" she gave "to the contrary during the [h]earing . . . is belied by the record evidence (*e.g.*, the Certificate of Compliance) [and] is insufficient as a matter of law to create a genuine dispute of material fact." Doc. 51, at 2. In addition, the Loanpal Contract specifically contains an arbitration provision. *Id.* at 3.

According to Loanpal, although it is "undisputed that Bridget never asked why or what she was being asked to tap or sign on her smartphone," the fact that she "chose not to review or ask for an explanation of what she was tapping does not invalidate her assent to the terms of the Loanpal Agreement or arbitration clause." *Id.* She electronically signed the Loanpal contract, including the arbitration clause, "through email addresses . . . Plaintiffs furnished to [Loanpal]." *Id.* Bridget also voluntarily gave Murphy her bank account information so that "Eversource would be able to put the solar panel agreement . . . on [Plaintiffs'] bills." *Id.* at 5 (citing Tr. 38:8-14; 69: 4-16). Moreover, both the purchase and loan agreements "were executed in the names of both Plaintiffs" and, at that time, "Bridget had power of attorney for Luiz." *Id.* (citing Tr. 21: 20-22).

Finally, Loanpal relies on the fact that the Loanpal agreement was executed from the demouracastro@comcast.net email address on August 7, 2020, stating that Loanpal "uses DocuSign, an industry-standard, secure, cloud-based platform to execute documents." *Id*. at 6 (citing Tr. 85: 22 to 86: 8 and Walker Aff. ¶¶ 9-10). DocuSign provides a digital audit trail that tracks when a borrower opens loan documents, views them, and signs them. *Id.* (citing Tr. 86: 9-13 and Walker Aff. ¶ 10). The audit trail is included in a certificate of completion ("Certificate"), which is "secure and non-modifiable." *Id.* at 7 (citing Tr.86: 14-17; 92: 13-18; Walker Aff. ¶¶ 16-17, 19).

According to Loanpal, the Certificate confirms that the Loanpal agreement, including the arbitration clause, was emailed to Luiz at bridgetdecastro38@gmail.com in a secure envelope at 9:27:41 AM Pacific on August 1, 2020, was opened and viewed from that email address at 10:46:40 AM Pacific on August 3, 2020, and was electronically signed using a pre-selected style from that email address at 10:47:10 AM Pacific on August 3, 2020. *Id.* (citingWalker Aff. ¶¶ 21-23; Tr. at 112:15-21; Certificate). Similarly, the Certificate confirms that the Loanpal agreement, including the arbitration clause, was emailed to Bridget at demouracastro@comcast.net in a secure envelope at 9:37:25 AM Pacific on August 7, 2020, was opened and viewed from that email address at 9:45:11 AM Pacific on August 7, 2020, and was electronically signed using a pre-selected style from that email address at 9:51:11 AM Pacific on August 7, 2020. *Id.* at 8 (Walker Aff. ¶¶ 24-26; Tr. at 112:15-21; Certificate). Regardless of Bridget's testimony that she did not receive the Loanpal agreement by email or did not recall receiving it, the solar panels were in fact installed on Plaintiffs' property. *Id.* (citing Tr. 76: 2-7; 79: 17-20). Given 1ˢᵗ Light's verification call and the Certificate, "no reasonable jury could believe Bridget's version of events" – *i.e.,* that she never received the Loanpal agreement or arbitration clause through her email or signed anything through DocuSign.

*Id.* at 11.

In addition, Defendants argue that Plaintiffs have failed to provide any "competent evidence" that Plaintiffs' signatures on the Loanpal Agreement or arbitration clause were forged.  *Id.* at 12. The fact that someone from Loanpal was not physically present to witness Plaintiffs e-sign the Loanpal agreement is "irrelevant" because such a presence is not required under Connecticut's CUETA statute, Conn. Gen. Stat. § 1-266, *et seq.*  Doc. 51, at 13.  That statute "expressly provides that the validity of an electronic signature can be 'shown in any manner, including a showing of the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable.'" Doc. 54, at 3 (quoting Conn. Gen. Stat. § 1-274).

Finally, Loanpal argues that Plaintiffs cannot show either "fraudulent inducement" to contract or "actionable non-disclosure" because these two legal claims share a common element missing in this case:  reliance on a purported unreasonable  representation or omission by Defendants concerning the purchase and loan contracts at issue.  Doc. 51, at 14.  Rather, "the execution of the Loanpal Agreement was the result of an arms-length transaction between competent parties."  *Id.* at 15.  Furthermore, even if Plaintiffs had been able to prove fraudulent misrepresentation or actionable nondisclosure, these allegations have been "directed at the formation of the Solar Panel Agreement and Loanpal Agreement, *not* the arbitration clause in the Loanpal Agreement;" and "[t]his distinction is critical, because 'an arbitration provision in an agreement is, in effect, a separate and distinct agreement.'" *Id.* (emphasis in original) (citing *Success Centers, Inc. v. Huntington Learning Centers, Inc.*, 223 Conn. 761, 772 (1992)).  Plaintiffs have failed to "make any claim of improprieties in the formation of the arbitration clause." *Id.* at 15-16.  Therefore, says Loanpal, "Plaintiffs' claims . . .are insufficient as a matter of law to void the arbitration clause." *Id*.

at 16 (citations omitted).

According to Loanpal, Plaintiffs may deny they signed and received copies of the Loanpal agreement and also deny they agreed to arbitration; but such "denials are insufficient to create a genuine dispute of material fact." Doc. 54, at 3.

### 3. *Post-Hearing Support and Rebuttals*

In its follow-up brief after the preliminary hearing, Loanpal adamantly asserts that the de Moura Castros signed the Loanpal and Purchase Contracts electronically through DocuSign. Doc. 54, at 5. In support, Loanpal once again points to the CUETA, Conn. Gen. Stat. §1-274(a), which states:

> (a) An electronic record or electronic signature is attributable to a person if it was the act of the person. **The act of the person may be shown in any manner, including a showing of the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable.**

Doc. 54, at 5-6 (emphasis in Loanpal original)(quoting Conn. Gen. Stat. Ann. § 1-274 (1)). Loanpal then discusses a Connecticut state case in which the plaintiff argued that "he never signed a document in which he assented to the terms of the standard shipping contract, namely, the agreement to submit to binding arbitration… " *Id.* at 6 (*quoting Beaulieu v. United Parcel Serv.*, No. CV155036003, 2016 WL 3912306, at *5 (Conn. Super. Ct. June 14, 2016)). In that case, the court rejected the plaintiff's argument, finding that he had "assented to the standard shipping contract [to ship his watches] when he initiated and completed his shipping transaction with the defendant." *Id.* (citing *Beaulieu*, 2016 WL 391230, at *5). Defendants thus argue that, as in *Beaulieu*, "Plaintiffs could not have obtained installation of the solar panels on their residence without agreeing to the terms of the [Loanpal] Agreement." Doc. 54, at 7.

Plaintiffs counter that "no formal written contract was presented to Plaintiffs, [Tr.] 36:12–23,

27

46:14–19, and it was the salesman's false representations that misled Bridget into believing that clicking the box on her phone was for the sole purpose of reducing her electric bills and connecting solar panels." Doc. 53, at 2.  If salesman Murphy failed to scroll through the contract  provisions so that they could be read, and/or mischaracterized the nature of those provisions, no valid contract was entered.  The context and surrounding circumstances suggest "fraud in the execution," so that no signed contract exists.[18] *Id*. at 3.   Bridget may have been willing to enter a contract under which she believed that Connecticut would pay for the solar panels and Eversource would reduce her electric bills. However,the Loan Contract and Sales Contract at issue were very different in terms.

Following the hearing, Defendants assert that Bridget failed to show that she "asked to review or was refused the opportunity to review the Agreements before signing." Doc. 54, at 8.  "As a person of mature years who can read and write, it was [her] duty to read the Agreements before executing them." *Id*. at 8-9  (citing *Delk v. Go Vertical*, *Inc*., 303 F. Supp. 2d 94, 99 (D. Conn. 2004)).

In response, Plaintiffs once again assert that no formal contract was presented to Bridget at

---

[18]  In that regard, Loanpal has failed to fully consider the second portion of CUETA,  § 1-274(b), which states:

> The effect of an electronic record or electronic signature attributed to a person under subsection (a) of this section *is determined from the context and surrounding circumstances at the time of its creation*, *execution or adoption*, including the parties' agreement, if any[.]

Conn. Gen. Stat. § 1-274 (emphasis added).  In the case at bar,  it is unclear whether Plaintiffs ever had the opportunity to review and/or understand the true provisions of the agreement at issue.  If salesman Murphy failed to scroll through the contract  provisions – including the arbitration provision —  so they could be read, and/or mischaracterized the nature of those provisions, there may have been no valid contract.  "[T]he context and surrounding circumstances" are key in determining the effect of a person's alleged electronic signature.

the sale so that she only had the "salesman's false representations," which misled her "into believing that clicking the box on her phone was for the sole purpose of reducing her electric bills and connecting solar panels." Doc. 53, at 2.  Without access to a formal written contract, she "cannot be negligent for failing to read a document that was never presented." *Id.*

Defendants distinguish the present case from *Droney v. Vivint Solar*, No. 18-849 (RBK/KMW), 2018 WL 6191887 (D. N.J. Nov. 28, 2018), emphasizing that, unlike the de Moura Castros,  the plaintiffs in *Droney* had no interest in having solar panels installed and were induced to signing documents by a phony salesman "conducting a roof survey," when they were actually signing to (1) release their credit reports and (2) agree to have solar panels installed on their residence.  Doc. 54, at 9.

However, as Plaintiffs  point out, Loanpal  had no representative present at the alleged sale. Doc. 53, at 4 (citing Tr. 104: 12-22).  After all, Loanpal conceded, through Walker, that it "doesn't know if any alleged signature was made by Ms. de Moura Castro, Mr. de Moura Castro or the sales agent that was there that day, Mr. Murphy." *Id.* 110:25 to 111: 4.  Plaintiffs represent that they were aware that solar panels would be installed but were misled regarding the terms for installation.  At Murphy's request, they allegedly provided him with a canceled check to enable him to arrange to have Eversource continue to be their electric provider, rather than to have any credit check for the alleged loan.  Doc. 50, at 4; *see also*  Tr. 38: 10-13, 40: 9-12.

Defendants cite the New Jersey case of *Knight v. Vivint Solar Developer, LLC*, 243 A.3d 956 (N.J. Super. Ct. Dec. 2, 2020),  in which the "sales representative admitted he used an email address that ensured [that] the plaintiffs did not receive the [solar panel] agreements." Doc. 54, at 9. Moreover, the plaintiff did not check any signature boxes.  *Id*.  Defendants state that "[t]here is no

allegation that Murphy misrepresented the purpose of his visit or that Plaintiffs were not interested in the installation of solar panels." *Id*.

In rebuttal, Plaintiffs do not focus narrowly on the "purpose of [Murphy's] visit" – installation of solar panels.  To Plaintiffs, such an approach fails to take into account Bridget's allegation that Murphy misrepresented  the terms of the agreement for that installation. Plaintiffs thus rebut Defendants' assertions regarding the formation of the Loan and Purchase Contracts by reiterating that "[n]othing was ever said about a loan, financing, or arbitration." Doc. 53, at 1 (citing Tr. 28: 4-6, 29: 6-11, 34: 17-21, 36: 4-10).  There was thus "fraud in the execution," which voided the existence of any agreement, including the arbitration provision contained within any such agreement.  Doc. 53, at 1-2 (citing *Hetchkop v. Woodlawn at Grassmere, Inc*., 116 F.3d 28, 31 (2d Cir. 1997) and *MZM Constr. Co. v. New Jersey Bldg. Laborers Statewide Benefit Funds,* 974 F.3d 386, 405 (3d Cir. 2020)).

Furthermore, Plaintiffs explain that this is not a case of "fraud in the inducement," where "someone signs the document they intended to sign" but their "assent was induced by a material misrepresentation about facts external to that [contract] document."   Doc. 53, at 3 (citing *MZM Const. Co.*, 974 F.3d at 405).  Rather, this is an example of "fraud in the execution," where the contract is "radically different" than the agreement plaintiffs believed they were entering.  *Id.* Moreover, by making affirmative representations about the nature of the proposed agreement, Defendants had a duty to disclose the existence of the material facts (*e.g.*, loan, arbitration provision).  *Id*. at 4 (citing *Duksa  v. City of Middletown*, 173 Conn. 124, 127 (1977)).  When there is an omission of material facts, that omission is actionable.  *Id.* (citing *Duksa*, 173 Conn. at 127-28).

**B. Court's Findings**

The Court applies Connecticut state law, taking into account that "the essential elements of contract formation are offer and acceptance." *D'Antuono v. Serv. Rd. Corp.*, 789 F. Supp. 2d 308, 322 (D. Conn. 2011) (citing *Auto Glass Express, Inc. v. Hanover Ins. Co.,* 293 Conn. 218, 227 (2009)). "[T]o create a contract there must be an unequivocal acceptance of an offer." *Bridgeport Pipe Eng'g Co. v. DeMatteo Const. Co.*, 159 Conn. 242, 246 (1970). Moreover, "[t]he acceptance of the offer must . . . be explicit, full and unconditional." *Id.* (citation omitted). There must be a bargain, manifesting "mutual assent to the exchange between two or more parties," and the "identities of the contracting parties must be reasonably certain." *Ubysz v. DiPietro*, 185 Conn. 47, 51 (1981) (citations omitted). Moreover, there must be "a mutual understanding of the terms that are definite and certain between the parties." *Marinos v. Bldg. Rehabs., LLC*, 67 Conn. App. 86, 89 (Conn. App. 2001) (quoting *Cheverie v. Ashcraft & Gerel*, 65 Conn. App. 425, 439 (2001)*, cert. denied*, 258 Conn. 932 (2001)). Specifically, "[t]o constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties." *Marinos,* 67 Conn. App. at 89 (quoting *Cheverie,* 65 Conn. App. at 439).

Upon a thorough review of the record, the Court finds ample evidence to create a genuine issue of material fact with respect to formation of the alleged arbitration agreements. The parties directly dispute the facts regarding offer and acceptance of both the Loan and Purchase Contracts, which contained the arbitration agreements. For example, as discussed above, the facts, as presented by Plaintiffs, suggest that neither Luiz nor Bridget actually signed either contract. Luiz was too disabled by Parkinson's disease to sign; and Bridget claims that she never saw the details of the Contracts till well after the solar panels were installed. Bridget claims, and Goodleap's

31

Walker concedes, that salesman Mark Murphy was the Defendants' only representative on the scene when the alleged solar panel transaction occurred.   Murphy was the only one who made representations regarding the contracts at issue, had the terms of the contracts displayed on his cell phone, and made up inaccurate contact information for Bridget (email address and phone number).

Granted, Goodleap assumes that "the sales agent will provide the consumer with an understanding of the loan transaction," Tr. 95: 7-12; that "the salesperson will act ethically" and "won't make up a phone number for the consumer; " *id.* 96: 10-14, 19-25, and that  the sales agent will "scroll through the entire[ ]  lending dcoument with the consumer," *id.* 97: 21-24.   However, Goodleap admitted it had  no employee present to observe whether those assumptions are correct. *Id.* 97: 25 to 98: 6.  For all Goodleap knows, Mark Murphy could have simply told Bridget to check a box on his phone without going over the essential terms of the pending contract.  *Id.* 98: 3-8. Absent testimony from  Murphy, the Court has only Plaintiff Bridget's recollection of the facts; and she has stated that Murphy misled her into believing that the  "State of Connecticut was offering to all senior citizens . . . free solar panels." *Id.* 27: 15-19.   She also alleges that she was not shown any written contract – much less an arbitration agreement – prior to the panels being installed.  *Id.* 36:12–23, 46:14–19.  Not only did Murphy fail to mention arbitration to Bridget;  she "d[id]n't even know what [arbitration]  is." *Id.* 36: 4-10.[19]

_____

[19] In regard to Bridget's alleged failure to review the contract, the Court notes that, under Connecticut law,  there is a "general rule . . .  that where a person of mature years, who can read and write, signs or accepts a formal written contract affecting his pecuniary interests, it is his duty to read it, and notice of its contents will be imputed to him if he negligently fails to do so." *Ursini v. Goldman*, 118 Conn. 554, 562, 173 A. 789 (1934).  However, there is an exception to that rule when something has "been said or done to mislead the person ... or to put a [person] of reasonable business prudence off his [or her] guard in the matter." *Id.  See also D'Antuono v. Serv. Rd. Corp.*, 789 F. Supp. 2d 308, 323 (D. Conn. 2011).  If, as Bridget alleges, salesman Murphy assured her  that the solar panels would be paid for by the State of Connecticut (because she and her husband were senior

With respect to Loanpal's "Certificate of Completion" (Defendants' Hearing Ex. 1, Doc. 52-1), Defendants' main piece of documentary evidence at the hearing, the Court notes that the parties dispute whether the Certificate constitutes "hearsay." Plaintiffs expressly "dispute the admissibility and reliability of the Certificate" and "[a]t trial . . . intend to introduce evidence from an expert showing that the Certificate has indicia of forgery" with respect to Luiz's "purported signature" and the connection of the internet service provider, Cablevision. Doc. 53, at 5 n. 1.

Defendants say that even if the Certificate were "hearsay," Plaintiffs have waived their opportunity to make such an objection because they did not raise that objection to the document during the hearing. Doc. 54, at 5 (citing, *inter alia*, Fed. R. Evid. 103(a)(1)(A) ("A party may claim error in a ruling to admit or exclude evidence only if ... a party, on the record ... timely objects or moves to strike...."). Moreover, Walker's testimony established that document is a "business record," which makes it "an exception to the rule against hearsay." *Id*. (citing Fed. R. Evid. 803(6)).

In general, "[i]t is well-established that arguments raised for the first time in a movant's reply are waived." *Parnass v. Brit. Airways*, PLC, No. 1:19-CV-04555 (MKV), 2021 WL 4311342, at *7 (S.D.N.Y. Sept. 21, 2021) (citing *Chevron Corp. v. Donziger,* 325 F. Supp. 3d 371, 379 n.21 (S.D.N.Y. 2018)). Also, "when a party fails to make an objection to evidence that it thinks is inadmissible, including in connection with summary judgment, the court is free to consider that evidence." *Parnass*, 2021 WL 4311342, at *7. *See also Lichter v. Bureau of Accts. Control, Inc.*, No. 19-cv-04476 (ER), 2021 WL 1026175, at *7 (S.D.N.Y. Mar. 17, 2021) (collecting cases); *see generally* 10A Charles Alan Wright *et al.*, Federal Practice & Procedure § 2722 (4th ed. 2020) ("[D]ocuments inadmissible under the evidence rules may be considered by the court if not

_____

citizens), she was misled with respect to the terms of the contract.

challenged. The objection must be timely or it will be deemed to have been waived.").

In addition, the Second Circuit "favors the admission of evidence [under Rule 803(6) ] rather than its exclusion if it has any probative value at all." *United States v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010) (citation and internal quotation marks omitted). "Residual doubts on the question of trustworthiness ... go to the weight of the evidence, not its admissibility." *Id.* at 576 (citation omitted).

However, even construing the Certificate at issue as a business record, applying the summary judgment standard to this case, the Court finds that the Certificate of Completion, on its own, is insufficient to prove that there is no genuine issue regarding whether a valid arbitration contract exists between Loanpal and Plaintiffs. The Certificate contains notable inconsistencies. For example, according to the record, bridgetcastro38@gmail.com,  the email address at which Luiz allegedly received the DocuSign contract, was incorrect, one to which neither he nor his wife had ever gained access. Moreover, there is no indication how a man in his state of health could have executed  the documents.  Furthermore, the documents  were allegedly sent to Bridget on four occasions to a different email address, demouracastro@comcast.net , and purportedly signed;  but Bridget testified she neither received any documents nor knew how to use DocuSign. Under such circumstances, one could deduce the possibility that the DocuSign signatures were made by someone other than Plaintiffs (*e.g.*, perhaps by Murphy).

As to the verification call on August 7, 2020, between Bridget, Murphy, and a representative of 1st Light, from that recording, as Plaintiffs note in their follow-up brief, Loanpal "make[s] much of the recorded telephone call." Doc. 53, at 5. According to Loanpal, Bridget "provided an updated phone number and confirmed that her email address is demouracastro@comcast.net." Doc. 51, at

5 (citing call at 4:18 to 5:35). She also "confirmed that she understood that she was purchasing her solar panel system through a financing agreement with Loanpal . . . and acknowledged that the 'loan amount' for the solar panel system was $54,880.88." *Id.* (citing call at 5:40 to 6:03).

However, as Plaintiffs point out, "throughout the call . . . 1st Light's representative posed several leading questions in succession." Doc. 53, at 5. Furthermore, Bridget testified that Murphy was "trying to help me through it because I didn't understand too much what was going on." *Id.* (citing Tr. 46:20 to 47: 01). The Court thus concurs with Plaintiffs that, "[l]istening to the phone call, it is apparent that Bridget did not truly understand what was going on and that her 'yes' answers were prompted by Murphy." *Id.* In short, it is not clear that Bridget understood what she was confirming. On the recording, she sounds noticeably hesitant and unsure in providing her answers. Also, the call neither establishes that contract documents were signed before this call nor does it mention "arbitration."

Furthermore, the Court finds deficient Defendants' conclusion that the absence of a Loanpal witness to Plaintiffs' e-signatures on the Loanpal Contract is "irrelevant" under Connecticut's CUETA statute, Conn. Gen. Stat. § 1-266, *et seq.* Doc. 51, at 13. As Loanpal states, that statute "expressly provides that the validity of an electronic signature can be 'shown in any manner, including a showing of the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable." Doc. 54, at 3 (quoting Conn. Gen. Stat. § 1-274). However, the second portion of that statute clarifies that the "electronic signature attributed to a person . . . is determined from the context and surrounding circumstances at the time of its creation, execution or adoption, including the parties' agreement, if any[.] " Conn. Gen. Stat. § 1-274(b). If Bridget provided any such electronic signature – and she flatly denies that

she did – one must interpret that signature in light of the representations that were made to her by Murphy.

Unlike in *Beaulieu v. United Parcel Serv.*, No. CV155036003, 2016 WL 3912306, at *5 (Conn. Super. Ct. June 14, 2016), cited by Defendants, it is unclear whether the Plaintiffs voluntary entered into either the Loan or Purchase Contract. In *Beaulieu*, the plaintiff had plainly agreed to submit to binding arbitration because he had agreed to, and availed himself of, the standard shipping contract which contained that agreement. In the case at bar, however, it is unclear whether the Plaintiffs voluntarily entered into either the Loan or Purchase Contract.

If salesman Murphy failed to scroll through the contract provisions so they could be read, and/or mischaracterized the nature of those provisions, there may have been no valid contract. Applying Conn. Gen. Stat. § 1-274(b), "the context and surrounding circumstances " are ambiguous at best on the present record. Bridget may have been willing to enter a contract under which she believed that Connecticut would pay for the solar panels and Eversource would reduce her electric bills. However, it is unclear whether she was willing to enter the Loanpal agreement and/or Purchase contract, as written.

Defendants emphasize that the contracts at issue here are the arbitration agreements, not the Loan and Purchase Contracts. Accordingly, say Defendants, even if Plaintiffs were able to prove fraudulent misrepresentation or actionable nondisclosure, these allegations have been "directed at the formation of the Solar Panel Agreement and Loanpal Agreement, not the arbitration clause in the Loanpal Agreement;" and "[t]his distinction is critical, because 'an arbitration provision in an agreement is, in effect, a separate and distinct agreement.'" Doc. 51, at 15 (citing *Success Centers, Inc. v. Huntington Learning Centers, Inc.*, 223 Conn. 761, 772 (1992)).

Although the arbitration agreements are the focus of the pending motions, these agreements are *embedded in* the Loan and Sale Contracts, and Defendants presented no evidence that such agreements were separately negotiated, discussed, or accepted by Plaintiffs.  Rather, Goodleap openly relies on an unproven assumption that Murphy must have scrolled through the entire agreements on his phone.  Under such circumstances, Defendants' argument lacks merit.

In conclusion, the Court finds that the evidence, as presented at the hearing, presents issues of material fact as to whether the parties actually agreed to arbitrate.  Specifically, there are glaring inconsistencies regarding whether a valid arbitration contract was entered by the parties.  "An agreement that has not been properly formed is not merely an unenforceable contract; it is not a contract at all." *Green v. XPO Last Mile, Inc.*, 504 F. Supp. 3d 60, 67 (D. Conn. 2020) (quoting *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019)).  Such an agreement cannot be the basis to mandate a stay to allow the parties to arbitrate.  Absent the testimony of salesman Murphy, the Defendants' representative who allegedly engaged in all contract negotiations with Plaintiffs, the Court is left with conflicting evidence regarding contract formation.

**C.  Plaintiffs' Motion to Supplement the Record**

Finally, Plaintiff has moved to supplement the record in order to include the expert opinion of Information Technology ("IT")  expert Daniel Thimot.  Doc. 60, at 1.  Following the hearing, Plaintiffs requested an opportunity to consult with Thimot and have him "review and opine upon" the alleged DocuSign Certificate that Defendants presented as "evidence that Bridget and Luiz de Moura Castro electronically signed an arbitration agreement sent to [b]ridgetdecastro38@gmail.com—a made-up email address that Plaintiffs never created or used." Doc. 60-1, at 1.

Thimot prepared a report, attached to Plaintiffs' motion as Exhibit A, which allegedly explains that "the IP address appearing on the DocuSign Certificate for Luiz de Moura Castro's alleged signature was not from Plaintiffs' home internet service from Comcast or Plaintiffs' cellular service from Verizon." *Id.*   Rather, "the IP address associated with his signature belongs to Optimum Online, meaning that the DocuSign Certificate must have been signed while connected to an Optimum Online controlled network." *Id.* Plaintiffs thus argue that this report helps establish that Luiz's signature was the result of "forgery and fraud in the execution" by Murphy, "Defendants' salesman." *Id*. at 2.

By allowing Thimot's report to supplement the hearing record, the Court would enable Plaintiffs to present "relevant evidence" – *i.e.*, discovery into new  facts addressed at the hearing. *Id.* In Plaintiffs' view, such a report is "discovery . . . bearing on arbitrability." *Id*. (citation omitted).

Defendant Loanpal (aka "Goodleap") opposes Plaintiffs' request to supplement the record with Thimot's witness statement.  Doc. 61.  Loanpal asserts that the request is "untimely, lacks good cause, and constitutes inadmissible hearsay." *Id.* at 2.  Furthermore, Loanpal characterizes Thimot's statements as "conclusory opinions that are unreliable and irrelevant." *Id.*

As to timing,  Loanpal complains that the request comes well after the deadline for the post-hearing briefs and Loanpal's introduction of the DocuSign Certificate at the hearing.  *Id.*  Moreover, the case is not in discovery so Plaintiffs should not seek admission of Thimot's report as "discovery" regarding "new facts addressed at the hearing." *Id.*  In addition, Loanpal asserts that Thimot's statement is inadmissible hearsay under Federal Rule of Evidence 802 because it is "an unsworn, out-of-court statement offered for the truth of the matter asserted, " is "not excluded from the hearsay rule" under Federal Rule of Evidence 801, and fails to fall under any exception in Federal Rule of

Evidence 803.  *Id.*

Finally, Loanpal argues that Thimot's statement "should be excluded because it is unreliable" in that it broadly includes as "facts or data considered" such vague sources as "[a]nything else, like websites, books, articles."  *Id.* at 3.  Loanpal concludes that, in any event, the report is "irrelevant" because Bridget's claims against Loanpal are "inextricably intertwined with those of her husband" and Loanpal established that Bridget electronically signed the Loanpal Contract with her comcast.net email address.  *Id.*  Therefore, she and her husband are "bound to arbitrate." *Id.*

Because the matter of the validity of the arbitration contracts remains disputed, the Court will allow Plaintiffs to supplement the case record with Thimot's expert report regarding the validity of Luiz's signature.  However, rather than incorporating that evidence into the record of this hearing, any such evidence should be presented at a later trial for purposes of establishing whether a valid arbitration contract exists.   Thimot's report documents the opinion of an "expert" witness under Federal Rule of Evidence 702, sharing testimony of a "witness who is qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 703.  To the extent that he bases his report on unidentified "websites, books, articles," that basis will be stricken from consideration by the factfinder unless he can name particular sources.  *See* Doc. 60-2, at 3 (Item #7 in list of "Facts or data considered").

Moreover, with respect to being "unsworn," Thimot is directed to replace his signature with the proper attestation of an affidavit before Plaintiffs submit it.  Although unsworn statements may be viewed as inadmissible hearsay, "[s]ubsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment." *Richardson v. Corr. Med. Care, Inc.*, No. 22-210, 2023

WL 3490904, at *2 (2d Cir. May 17, 2023)(collecting cases); and in this case, the standard to determine whether a valid arbitration contract exists is the same as that enlisted for summary judgment.

As to timing of the report, Defendants will not be prejudiced thereby.  At the pending trial, to resolve the two motions to stay [Doc. 19, 23], Defendants will have the opportunity to cross-examine Thimot, if they desire, or address his report with a rebuttal expert.  For example, Defendants  may introduce their own IT expert to try to counter Thimot's findings that the Loanpal Contract was not executed by Luiz from either his home internet service or cellular service.

**D.  Motion for Default Judgment against Prime Energy**

At this point, Prime Energy remains in default, having failed to defend or otherwise plead.  The Clerk's entry of default [Doc. 44] against this party, pursuant to Federal Rule 55(a) of Civil Procedure, remains in effect.  Prime Energy has not been named as a party to the alleged arbitration contracts at issue in this case.  However, the Court will not resolve the Plaintiffs' motion for entry of default judgment [Doc. 49] against Prime Energy until there is a finding on whether a valid arbitration contract exists between the parties and whether Prime Energy, as an agent of all Defendants, may be bound to arbitrate under any such contract.

As the Second Circuit explained in *WorldCrisa  v. Armstrong*, 129 F.3d 71 (2d Cir. 1997):

> There is authority to the effect that ordinarily such a[n arbitration] clause in a contract cannot justify a stay under § 3 of the FAA as to someone who was not a party to the contract. *Citrus Mktg. Bd. of Israel v. J. Lauritzen A/S*, 943 F.2d 220, 224–25 (2d Cir.1991); *Nederlandse Erts–Tankersmaatschappij, N.V. v. Isbrandtsen Co.*, 339 F.2d 440, 441 (2d Cir.1964). . . . Ordinary principles of agency and contract law may, however, provide grounds for holding a non-signatory to an arbitration agreement, *Thomson–CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir.1995) (citing incorporation by reference, assumption, agency relationship, veil-piercing/alter-ego, and estoppel as possible grounds).

129 F.3d at 75-76 (some internal citations omitted).   *See also  Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir.2003) (holding that the five limited theories upon which the Second Circuit is "willing to enforce an arbitration agreement against a nonsignatory"  include "(1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel") (quoting *Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir.1995)).

In Plaintiffs' words, "[a]t  all times relevant, each Defendant," including Prime Energy, "acted for the benefit of and on behalf of the other Defendants, and Defendants Prime and 1st Light acted as the agents of Loanpal." Doc. 1, at 4 (III. ¶ 20).  Moreover, "[o]n information and belief, the salesman, Mark Murphy, was employed by and/or acting as  an agent of all the Defendants." *Id.*  (IV. ¶ 23). According to Plaintiffs, Defendants' roles in the alleged transaction were thus intertwined:

> Defendants carry on a symbiotic business relationship in which Prime solicits customers at their homes on behalf of and for the benefit of 1st Light and Loanpal, 1st Light sells and installs the solar panels, and Loanpal finances the transactions. All Defendants rely and depend on each other to carry out this course of business.

*Id.* (III. ¶ 21).

Due to Prime Energy's alleged agency of Defendants in this action, as in *WorldCrisa*, "[i]t is arguable that[it] could be bound" by the alleged arbitration agreements. 129 F.3d at 76.

Furthermore, under Connecticut state law, which allegedly applies to the arbitration contracts at issue, a non-signatory may to bound by an arbitration agreement by equity:

> Equitable estoppel principles are used to compel arbitration by or against a non-signatory.  Where a non-signatory has invoked, taken advantage of, or asserted rights under a contract with an arbitration clause, traditional principles of law and equity bind the non-signatory to that contract's arbitration provisions as well. This prevents a party who knowingly exploits an agreement, from taking advantage of the benefits of the contract while simultaneously disavowing its burdens. *See, e.g., Long v. Silver*, 248 F.3d 309, 320–21 (4th Cir. [(2001)], *cert. denied*, 534 U.S. 894 (2001) (holding signatory bound to arbitrate claims against non-signatories because contract benefits of shareholder status and right to continued employment cannot be asserted

against non-signatories while "simultaneously attempting to avoid the terms of an arbitration provision contained therein"); *International Paper Co. v. Schwabedissen Maschinen & Angalen, GMBH*, 206 F.3d 411 (4th Cir.2000) (holding nonsignatory bound to arbitrate because it cannot claim the benefit of the contract and simultaneously avoid its burdens); *Deloitte Noraudit, A/S v. Deloitte, Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir.1993) (holding non-signatory bound to arbitrate when it knew of the arbitration agreement and "knowingly accepted the benefits of that agreement through continuing use of tradename covered by agreement["]).

*Armetta v. Corvo*, No. X04HHDCV136046616S, 2015 WL 5315247, at *3 (Conn. Super. Ct. Aug. 11, 2015).

Even without specifically invoking equitable estoppel, Connecticut courts have "held that where a party has accepted benefits under a contract, or claims rights pursuant a contract, it is bound by the provisions in that contract—including arbitration provisions."  *Armetta*, 2015 WL 5315247, at *4 (collecting cases).[20]

However, it is not necessary to determine whether Prime Energy is bound by the alleged arbitration contracts at this time.  The Second Circuit has "recognized that district courts, despite the inapplicability of the FAA, may stay a case pursuant to 'the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" *WorldCrisa,* 129 F.3d at 76 (citing *Nederlandse,* 339 F.2d at 441).

---

[20]  *See, e.g., Aquarion Water Co. v. Beck Law Prods. & Forms, LLC*, 98 Conn. App. 234, 239, 907 A.2d 1274 (2006) ( "Parties are bound to the terms of a contract even though it is not signed if their assent is otherwise indicated.") (citation omitted); *Kuryla v. Coady*, Superior Court, Judicial District of Ansonia–Milford at Milford, Docket No. AAN CV 12 6009961 (March 22, 2013, Hiller, J.) (non-signatory to contract can be compelled to arbitrate where non-signatory claims benefits under contract); *D'Attilo v. Koskoff Koskoff & Bieder, P.C.*, Superior Court, Judicial District of New Haven at New Haven, Docket No. CV14 6051836S (March 26, 2015, Frechette, J.) (non-signatory can compel arbitration with signatory where issues in dispute are intertwined with contract containing arbitration provision).

Under Connecticut law, "[w]hether an issue involving a non-signatory is 'referable to arbitration' is decided by reference to the written arbitration agreement executed by the signatories, which is claimed to cover the dispute." *Armetta*, 2015 WL 5315247, at *4. In the present case, if Loanpal and 1st Light meet the burden of demonstrating that any valid arbitration agreements exists (so that a stay for arbitration is justified), the case will proceed to arbitration and Prime Energy's role in the case may potentially bind it to the outcome of that arbitration. *See, e.g., Green v. XPO Last Mile, Inc.*, 504 F. Supp. 3d 60, 70 (D. Conn. 2020) ("[T]he Second Circuit instructs that '[t]raditional principles of agency law may bind a nonsignatory [non-party] to an arbitration agreement.'") (quoting *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995)). However, if no valid arbitration contract is found to exist, the Court will resolve the motion for default judgment against Prime Energy on the well-pled factual allegations of the Complaint.

Prejudice to Plaintiffs in such a delay is minimal in that resolution of this entire matter necessarily depends on whether Defendants are able to make a showing that the alleged arbitration contracts exist and are valid. If one or more arbitration contracts exist, the Court will apply principles of law and equity to determine whether Prime Energy should be bound to arbitrate and/or refer the defaulted claims to the arbitrator.[21] If Prime Energy is not bound to arbitrate, the Court will

---

[21] "[T]he issue of arbitrability may [ ] be referred to the arbitrator if there is clear and unmistakable evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be *decided by the arbitrator*." *Doctor's Assocs., Inc. v. El Turk*, No. 3:17-CV-2019 (JCH), 2018 WL 3238701, at *10 (D. Conn. Feb. 28, 2018) (emphasis added) (quoting *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005)); *see also Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002) and *All. Bernstein Inv. Research & Mgmt., Inc. v. Schaffran*, 445 F.3d 121, 125 (2d Cir. 2006). In the instant case, the Court notes that pursuant to the Loanpal Contract, the "Arbitration Agreement" provision states that "[t]he arbitrator shall . . . decide any issues relating to . . . arbitrability . . . ." Doc. 1-1 at 8 (¶ 15).

issue a separate ruling on the motion for default judgment upon determining "if [Prime Energy's] liability is established as a matter of law when the factual allegations of the complaint are taken as true." *See Bricklayers and Allied Craftworkers Local 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Constr., LLC*, 779 F.3d 182, 188 (2d Cir. 2015).

## IV. CONCLUSION

"Arbitration is essentially contractual, . . . and parties may not be forced into arbitration if that was not their true agreement." *WorldCrisa v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997)(citing *Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995)). "Although federal policy generally favors arbitration, 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *LJL 33rd Street Assocs., LLC v. Pitcairn Props. Inc.*, 725 F.3d 184, 192 (2d Cir. 2013) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). "'[T]he making of [an] arbitration agreement ... [is] in issue' within the FAA's meaning only when there are material *factual* disputes regarding the elements of contract formation under the applicable state law." *D'Antuono v. Serv. Rd. Corp.*, 789 F. Supp. 2d 308, 322 (D. Conn. 2011) (emphasis in original) (quoting *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995)).

Under Connecticut law, to form a valid and binding contract, there must be "a mutual understanding of the terms that are definite and certain between the parties,"and "an offer and acceptance . . . based on an identical understanding by the parties." *Marinos v. Bldg. Rehabs., LLC*, 67 Conn. App. 86, 89 (Conn. App. 2001) (citation and internal quotation marks omitted).

For the foregoing reasons, the Court concludes that there are "genuine factual issues . . . concerning the making of the arbitration agreement[s] [at issue], such that a jury could find no

agreement." *Topf v. Warnaco, Inc.*, 942 F. Supp. 762, 767 (D. Conn. 1996).  On the present record, the terms of the alleged agreements between the parties are not "definite and certain" so that there may be no "identical understanding" of any offer and/or acceptance.   *Marinos,* 67 Conn. App. at 89.  In light of these  "genuine issues," the Court hereby ORDERS a trial to determine whether valid arbitration contracts exist between Plaintiffs and Loanpal and between Plaintiffs and 1ˢᵗ Light.

Plaintiffs have previously requested a "jury trial" on this matter, and will receive one if that remains their desire.  In that event, to expedite the case,  the Court will likely transfer the case to another Judge of this Court for that purpose.  If, however, Plaintiffs prefer a bench trial —*i.e.*, to forego a jury trial— they may file a notice on the case docket on or before fourteen (14) days following entry of this Order; and the Court  will schedule such a trial.

Finally, given the upcoming trial and Defendants' assertion  that Luiz de Moura Castro electronically signed the Loan Contract when it was sent to  bridgetdecastro38@gmail.com, Plaintiffs' Motion to Supplement the Record [Doc. 60] is GRANTED on the terms described above. Plaintiffs' witness testimony is timely for purposes of trial and addresses Defendant Loanpal's Exhibit 1, which was disclosed to Plaintiff for the first time on the date of the hearing.  Under such circumstances, the witness is rendered timely to refute the allegation that the de Moura Castros used DocuSign (via their home internet service) to sign the Loan Contract.  Defendants may investigate and/or evaluate the bases for Mr. Thimot's statements prior to trial.[22]  The Court's ruling on Plaintiffs'

---

[22]  To this end, the parties may move the Court to allow discovery which is  narrowly limited to the issue of whether valid arbitration contracts exist.  After all, a  motion to compel arbitration may be granted "when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that movant is entitled to judgment as a matter of law."  *Patterson v. Raymours Furniture Co.*, 96 F. Supp. 3d 71, 75 (S.D.N.Y. 2015)(quoting  *Thomas v. Pub. Storage, Inc.*, 957 F.Supp.2d 496, 499 (S.D.N.Y.2013)), *aff'd*, 659 F. App'x 40 (2d Cir. 2016) *as corrected* (Sept. 7, 2016 and Sept. 14, 2016).  Parties may

"Motion for  Default Judgment" [Doc. 49] will remain *sub judice* pending the outcome of the upcoming trial.

It is SO ORDERED.

Signed: New Haven, Connecticut
February 8, 2024

*/s/Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States District Judge

---

engage in discovery limited to the issue of arbitration without waiving the right to arbitrate. *See, e.g., Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 277 (E.D.N.Y. 2019)("[A]lthough the parties have engaged in discovery, it has been limited and focused on the issue of whether Nicosia agreed to arbitrate.") (citation omitted), *aff'd*, 815 F. App'x 612 (2d Cir. 2020). *See also Alvarez v. Experian Info. Sols., Inc.*, No. 19CV03343JSJMW, 2023 WL 2519249, at *9 (E.D.N.Y. Mar. 15, 2023).