UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRIDGET DE MOURA CASTRO & <br> LUIZ DE MOURA CASTRO, by his next <br> friend Helena Hilario <br>       *Plaintiffs*, <br><br> v. <br><br> LOANPAL, LLC d/b/a GOODLEAP, <br><br> PRIME ENERGY LLC d/b/a PRIME <br> ENERGY SOLAR, <br><br> 1ST LIGHT ENERGY INC., <br>       *Defendants*. | No. 3:21-cv-01020 (RMS) |

**ORDER GRANTING MOTIONS FOR ENTRY OF DEFAULT JUDGMENT**

The plaintiffs Bridget and Luiz de Moura Castro filed this action against the defendants Loanpal, LLC,[1] Prime Energy, LLC ("Prime"), and 1st Light Energy Inc. ("1st Light"). The plaintiffs allege that the defendants violated the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, et seq., the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, et seq., Connecticut's Unfair Trade Practices Act ("CUTPA"), and Connecticut's elder exploitation law, Conn. Gen. Stat. § 17b-462(a), by entering into a fraudulent contract with two 80-year-old senior citizens for a 25-year loan for the installation of solar panels on their shaded roof. Doc. No. 1. On July 25, 2022, the Court entered default as to Prime. Doc. No. 44. On July 9, 2022, the Court entered default as to 1st Light. Doc. No. 122. On August 9, 2024, the plaintiffs filed a Stipulation of Dismissal as to Loanpal because they had reached a settlement agreement. Doc. No. 143. The plaintiffs thereafter

---
[1] Loanpal is now known as Goodleap but will be referenced as Loanpal in this decision.

1

moved for default judgment as to Prime and 1st Light under Fed. R. Civ. P. 55(b), seeking damages to be determined at an evidentiary hearing on August 21, 2024. Doc. No. 146. For the reasons that follow, the motion is granted.

I. BACKGROUND

Because both 1st Light and Prime have defaulted, the Court accepts the following factual allegations from the plaintiffs' complaint as true.

The plaintiffs are now-83-year-old senior citizens who are married and live together in Avon, Connecticut. *See* Doc. No. 1, ¶ 13. Mr. Luiz de Moura Castro has Parkinson's disease and requires a live-in aide to provide 24-hour care. *Id.* ¶ 2.

The defendants are companies in the solar energy business, whose sales agents solicit consumers at their homes to enter 25-year loans for the installation of solar panels. *Id.* ¶ 3. Prime solicits consumers at their homes on behalf of 1st Light and LoanPal, 1st Light installs the solar panels, and Loanpal finances the transactions. *Id.* ¶ 21.

In or about August 2020, a salesperson named Mark Murphy solicited Mrs. de Moura Castro at the plaintiffs' home. *Id.* ¶¶ 22-23. Murphy was employed by and acting on behalf of all defendants at this time. *Id.* ¶ 23. Murphy told Mrs. de Moura Castro about a governmental program for senior citizens that provided "free" solar panel installation for her home, resulting in significant energy savings. *Id.* ¶¶ 24, 40. During this solicitation, Murphy never mentioned the need for a loan, credit check, or Mrs. de Moura Castro's credit report. *Id.* ¶¶ 25-26.

In fact, the plaintiffs' home is unfit for solar panels because the roof is small and shaded by many trees. *Id.* ¶¶ 6, 65. Nevertheless, Murphy did not discuss these issues with Mrs. de Moura Castro, and Mrs. de Moura Castro, relying on the promise of free solar panels and significant energy savings, ultimately agreed to have the solar panels installed. *Id.* ¶¶ 40-41. Throughout the

solicitation, the plaintiffs were not provided or given an opportunity to review any documents about a loan, credit check, or right to cancel the contract. *Id.* ¶¶ 29, 46.

Shortly thereafter, Murphy came to the plaintiffs' home again, during which Mrs. de Moura Castro observed him tapping on the screen of an electronic tablet device. *Id.* ¶ 44. At that point, Murphy asked Mrs. de Moura Castro to tap the screen. *Id.* Although Mrs. de Moura Castro could not see what the screen was, and Murphy did not explain it to her, she tapped the screen to allow the solar project to go forward. *Id.* ¶¶ 44-45. Solar panels were eventually installed on the plaintiffs' home in December 2020 and January 2021. *Id.* ¶ 46; Transcript of Record at 10:11:00 AM, *de Moura Castro et al v. Loanpal, LLC et al*, 3:21-cv-1020-RMS (Aug. 21, 2024) (Testimony of Cema Siegel). The defendants did not provide the plaintiffs with any paperwork or copies of any contract. Doc. No. 1, ¶ 46.

In January 2021, Mrs. de Moura Castro received a letter from the defendants stating that she and her husband had taken out a 25-year loan. Transcript of Record at 9:59:20 AM (Aug. 21, 2024), Exhibit 2 (collection notices). Because Mrs. de Moura Castro did not recall taking out a loan and did not recognize Loanpal, she believed the letter to be a scam and gave the letter to her daughter, Cema Siegel, to investigate the transaction. Doc. No. 1. ¶¶ 47-49.

On February 18, 2021, Ms. Siegel received a copy of the 25-year loan contract for the first time, along with a "Contract for PV Solar System" ("Purchase Contract"). *Id.* ¶ 51. The cost of the solar panel system in the Purchase Contract was $54,880.88. *Id.* ¶ 60. After financing, the total cost of the solar panel system was $73,816. *Id.*

Upon viewing the loan and purchase contracts for the first time, the plaintiffs discovered that all their signatures and initials were forged. *Id.* ¶ 54. Namely, the plaintiffs' email addresses and phone numbers were fabricated. *Id.* ¶¶ 55, 57. As a result, the plaintiffs did not receive a copy

3

of these documents when they were executed, and the defendants could not call the plaintiffs to validate their agreement to any of these written terms. *Id.* ¶¶ 56-57.

Shortly after receiving these contract documents for the first time, the plaintiffs sent the defendants a notice of cancellation. *Id.* ¶ 61. Nevertheless, the defendants did not cancel the contracts and deemed the plaintiffs to be bound by the contracts and the payment terms. *Id.* ¶¶ 62-63. The solar system was never hooked up with the plaintiffs' utility company, Eversource. Transcript of Record at 12:32:40 PM (Aug. 21, 2024) (Testimony of Helena Hilario).

## II.  PROCEDURAL HISTORY

### A.  Prime Energy

Prime did not file a timely answer to the Complaint and has not otherwise appeared in this case. Although several service attempts were made on Prime, it could not be served within the 90-day service period. As a result, the plaintiffs filed a motion for leave to re-serve Prime at its new address registered with the Secretary of State, which the Court granted on April 28, 2022. Doc. No. 37. The plaintiffs subsequently served Prime at its new address on May 11, 2022. Doc. No. 40.

On July 22, 2022, the plaintiffs moved for entry of default as to Prime. Doc. No. 43. The Court granted the motion on July 25, 2022 and entered default against Prime, requiring the plaintiffs to move for default judgment by August 24, 2022. Doc. No. 44. Although the plaintiffs did so, the Court denied the plaintiffs' motion for default judgment on March 27, 2024, without prejudice to refile, based on the then-scheduled jury trial on the issue of the validity of the agreement and the arbitration clause contained within it. Doc. No. 83.

### B.  1st Light

At the outset of this action, 1st Light appeared and was represented by counsel. Doc. Nos. 17-18. However, 1st Light's counsel moved to withdraw on June 10, 2024. Doc. No. 105. Counsel for 1st Light appeared at a hearing on the matter on June 20, 2024, during which the Court explained that a failure to hire new counsel by June 28, 2024 would result in an entry of default. Doc. No. 113. Nevertheless, 1st Light indicated that "it would not be retaining new counsel and planned to allow for a default judgment to be entered against it." *Id.* Indeed, 1st Light never retained new counsel, and the plaintiffs moved for entry of default as to 1st Light on July 5, 2024. Doc. No. 119. The Court granted the motion on July 9, 2024, and ordered that a motion for default judgment be made on or before July 19, 2024. Doc. No. 122.

The plaintiffs now move for default judgment against both Prime and 1st Light. On August 21, 2024, the Court held an evidentiary hearing on the issue of damages at which Mrs. de Moura Castro and her daughters Cema Siegel and Helena Hilario testified. The Court now makes the following findings of fact and conclusions of law.

## III. LEGAL STANDARD

Rule 55 of the Federal Rules of Civil Procedure provides a "two-step process" for obtaining a default judgment. *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir. 2011); *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005). First, a plaintiff must request an entry of default against the defendant, by showing that the defaulting party "has failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). Second, once default has been entered, a plaintiff must either request a default judgment from the clerk or move the Court for a default judgment. Fed. R. Civ. P. 55(b)(1)-(2). In all cases where the amount sought is not a sum certain, "the party must apply to the Court for default judgment." Fed. R. Civ. P. 55(b)(2).

To enter a default judgment, the Court must accept as true all well-pleaded allegations, except for those concerning damages. *See Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981); *Hernandez v. Apple Auto Wholesalers of Waterbury LLC*, 460 F. Supp. 3d 164, 176 (D. Conn. 2020). Although a defendant who defaults thereby admits all well-pleaded factual allegations in the complaint, the Court must still "determine whether the [plaintiff's] allegations establish liability as a matter of law." *Mickalis Pawn Shop, LLC*, 645 F.3d at 137.

Once a Court determines a plaintiff is entitled to default judgment as a matter of law, the Court must "conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *Credit Lyonnaise Sec. (USA), Inc. v. Alcantara*, 183 F.3d 51, 155 (2d Cir. 1999). The Court has discretion "to determine the amount of damages to be included in a default judgment by an evidentiary hearing, detailed affidavits, or documentary evidence." *Grace v. Bank Leumi Trust Co. of N.Y.*, 443 F.3d 180, 191 (2d Cir. 2006). The Court must fulfill its obligation to ensure that damages are appropriate and "not just accept [the plaintiff's] statement of the damages." *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 111 (2d Cir. 1997).

## IV. DISCUSSION

### A. Count One: FCRA

Congress enacted the FCRA "to promote efficiency in the nation's banking system and to protect consumer privacy." *Cortez v. TransUnion, LLC*, 617 F.3d 688, 706 (3d Cir. 2010). Among other things, the FCRA makes it unlawful to obtain a consumer's credit report under false pretenses or without a statutorily permissible purpose. 15 U.S.C. §§ 1681q, 1681b(f). Potential creditors can use a consumer's credit information if they have a "legitimate business need for the information," including when the consumer initiates or consents to the transaction. *Id.* § 1681b(a)(3)(F)(i),

6

1681b(c)(1). However, a consumer does not initiate or consent to a transaction by merely generally inquiring about a business transaction. *See Boone v. T-Mobile USA Inc.*, No. 17-378, 2018 WL 588927, at *14 (D.N.J. Jan. 29, 2018); *Miller v. Dish Network, L.L.C.*, 326 F. Supp. 3d 51, 67-68 (E.D. Va. 2018). The FCRA provides for actual damages if a person negligently fails to comply with any requirement, *see* 15 U.S.C. § 1681o, and actual and punitive damages if a person willfully fails to comply with any requirement. *Id.* § 1681n(a).

Accepting the factual allegations as true and drawing all reasonable inferences in the plaintiffs' favor, the Court finds that the complaint alleges sufficient facts to state a plausible FCRA claim. The complaint alleges that the defendants (1) gave sales agents access to electronic tools which allowed them to access a consumer's credit report without the consumer's consent, and (2) that the defendants failed to supervise, train, and discipline sales agents and to adopt policies to prevent that nonconsensual access from happening. Doc. No. 1, ¶ 68. Specifically, the complaint alleges that Prime and 1st Light not only lacked a permissible purpose to obtain the plaintiffs' credit reports but did so upon false pretenses "because Mrs. de Moura Castro never provided authorization for a credit pull, nor sought any extension of credit." *Id.* ¶ 34. Indeed, Mrs. de Moura Castro merely expressed interest in what she believed to be a free government program that would reduce her electricity bill. *Id.* ¶¶ 24, 45, 86. Meanwhile, Mr. de Moura Castro was not present during the solicitation and could not sign documents or speak coherently because of his medical disabilities. *Id.* ¶ 2. Therefore, Prime and 1st Light willfully failed to comply with the requirements of the FCRA, and the Court may award actual and punitive damages against them. 15 U.S.C. §§ 1681n(a)(1)-(2).

B.     **Count 2: TILA**

Congress enacted the TILA to promote the informed use of credit by requiring creditors to disclose certain credit terms in a uniform manner such that the consumer can make an informed buying decision. *Sterling v. Farran & Ezedine, LLC*, No. 10-1119, 2011 WL 219697, at *3 (D. Conn. Jan. 20, 2011) (quoting *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 364 (1973)). Specifically, the TILA requires that the terms "amount financed," "finance charge," and "Annual Percentage Rate" be clearly and conspicuously disclosed along with a "descriptive explanation" for consumers to be able to compare credit alternatives. 15 U.S.C. §§ 1638(a); 1638(a)(2)-(5). Accepting the factual allegations as true, Prime and 1st Light did not comply with the requirements of TILA because the plaintiffs never received any documents or copies of the contracts at the time they were executed. Doc. No. 1, ¶ 74. Therefore, Prime and 1st Light are liable to plaintiffs for actual damages as described below. 15 U.S.C. § 1640(a)(1).

### C. Counts 3 and 4: Intentional or Reckless Unfair or Deceptive Practices in Violation of CUTPA

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). To effectuate its provisions, CUTPA establishes a private cause of action for "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b. . . ." *Id.* § 42-110g(a). Connecticut Courts follow the Federal Trade Commission's "cigarette rule," under which the Court balances (1) whether the conduct "offends public policy as it has been established by statutes, the common law, or otherwise"; (2) "whether it is immoral, unethical, oppressive, or unscrupulous"; and (3) "whether it causes substantial injury to consumers." *Cenatiempo v. Bank of Am., N.A.*, 333 Conn. 769, 790 (2019) (quoting *Ulbrich v. Growth*, 310 Conn. 375, 409 (2013)).

The General Assembly has defined certain conduct as a *per se* unfair or deceptive trade practice, including violations of the Home Improvement Act ("HIA") and the Home Solicitation Sales Act ("HSSA"). For example, the HIA requires licensed home improvement contractors to ensure all its agents are registered as home improvement sales contractors. Conn. Gen. Stat. § 20-427(c). Similarly, the HSSA renders "the failure to honor any provisions of the notice of cancellation" an unfair or deceptive practice under CUTPA. Conn. Gen. Stat. § 42-141(b).

Accepting the factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiffs' favor, the Court finds that the complaint alleges sufficient facts to state a plausible CUTPA claim. As to the HIA, Prime and 1st Light's conduct constitutes a *per se* CUTPA violation because Brandon Alexander, the person who signed the Purchase Contract on behalf of defendants, was not licensed as a Home Improvement Sales Contractor in Connecticut, and the license listed on the contract was expired and registered to someone else. Doc. No. 1, ¶ 59. As to the HSSA, Prime and 1st Light's conduct similarly constitutes a *per se* CUTPA violation because they failed to provide the plaintiffs with a copy of the contract documents and any oral or written notice of the right of cancellation at the time the contract was executed. *Id.* ¶¶ 46, 61, 83. Further, Prime and 1st Light intentionally engaged in unfair and deceptive practices when they (1) promised the plaintiffs "free" solar panels as part of a government program, when the actual cost of the solar panel system in the Purchase Contract was $54,880.88, *id.* ¶¶ 45, 60, 87; and (2) forged the plaintiffs' signatures and used bogus email addresses to conceal documents from them. *Id.* ¶¶ 54-57. The plaintiffs consequently suffered ascertainable losses, including their contractual obligations under the 25-year Loan Contract, and the costs required to remove the solar panels from the plaintiffs' home. *Id.* ¶ 89. Therefore, Prime and 1st Light's conduct constituted an

intentional and wanton violation of CUTPA and warrants actual and punitive damages, as discussed below.

### D. Count 5: Elder Exploitation

Connecticut law protects elderly people from abuse and exploitation. Conn. Gen. Stat. § 17b-462(a). For purpose of the statute, a Connecticut resident is "elderly" when they are at least sixty years of age. Conn. Gen. Stat. § 17b-450(1). Exploitation is defined as "the act or process of taking advantage of an elderly person by another person or caregiver whether for monetary, personal or other benefit, gain, or profit." *Id.* § 17b-450(7). The statute permits a victim to sue their perpetrator for actual and punitive damages for a violation of these rights. *Id.* § 17b-462(a).

Here, the plaintiffs' allegations, which are deemed admitted, establish that Prime and 1st Light exploited the plaintiffs for financial gain by misrepresenting several important facts in connection with the solar panel installation. Prime and 1st Light misrepresented that the solar panels were "free" through a government program, lied about the terms of the sale and the loan, and were deceptive as to the appropriateness of the home for solar panels and the cost savings from the solar panels. Doc. No. 1, ¶ 97. Further, Prime and 1st Light proceeded with the sale despite the inappropriateness of solar panels for plaintiffs' home, the high cost of the installation, and the plaintiffs' lack of savings, their age, and their health conditions. *Id.* Finally, Prime and 1st Light forged the plaintiffs' signatures on the documents and failed to cancel the transaction when requested. *Id.* Prime and 1st Light's conduct therefore constituted intentional and wanton exploitation of the plaintiffs' rights under Connecticut law, and Prime and 1st Light are liable to them for damages, as discussed below.[2]

---

[2] The plaintiffs' complaint also includes Count VI for fraudulent concealment. Doc. No. 1, ¶¶ 101-107. However, because this count is not raised in the motion for default judgment and because the conduct underlying this count is already addressed within the CUTPA count, the Court will not address it.

10

E.   **Damages**

"A default constitutes an admission of all well-pleaded factual allegations in the complaint, except for those related to damages." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). "Even when a default judgment is warranted based on a party's failure to defend," the Court must nevertheless "conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *Credit Lyonnais Sec. (USA), Inc.*, 183 F.3d at 155.

The plaintiffs claim actual and punitive damages. On August 21, 2024, the Court held a hearing on damages, at which defendants did not appear. Doc. No. 148. At the hearing, Mrs. de Moura Castro and her daughters Cema Siegel and Helena Hilario testified. The plaintiffs also produced excerpts of video depositions taken of Mr. de Moura Castro, who was in the hospital at the time, and Mr. Murphy. Finally, the plaintiffs produced all of the contracts, documents and photographs pertaining to the solar panel installation and loan agreement. Transcript of Record, Exhibits 1-26 (Aug. 21, 2024) (all exhibits admitted in full). In sum, the plaintiffs produced evidence of reasonably certain ascertainable losses caused by the defendants' conduct and are entitled to damages.

1.   **Economic Damages**

The plaintiffs seek economic damages under the FCRA, CUTPA, and Connecticut's elder exploitation law. Specifically, the plaintiffs seek economic damages for the loan obligation, the cost to remove the solar panels from their home and to repair the roof, the cost of restoring the electrical workings, and the 'benefit of the bargain" based on the utility savings promised, totaling $123,193. The Court finds the amount of the loan obligation, totaling $56,956.73, which includes both the original loan amount and interest up to the date of the evidentiary hearing, to be an ascertainable economic loss because it caused a Uniform Commercial Code lien to be placed on

the plaintiffs' home. As demonstrated by the loan agreement, for three and a half years, the plaintiffs had a debt obligation they would have had to pay if they wanted to remove the lien on their home during that time. With interest, the total amount the plaintiffs would have had to pay is $56,956.73 and that amount is recoverable. The Court also finds that the plaintiffs established they are entitled to reimbursement of $23,150 for the cost of removing the solar panels and repairing the roof, and $2,127 for the electrical work required in removing the panels.

The Court does not find the "benefit of the bargain" to be an ascertainable economic loss. The plaintiffs argued that, because they were promised significant energy savings, they are entitled to the savings they would have received had the contract been performed as promised, including reimbursement of approximately $17,000 in energy savings and $7,000 in tree removal costs. The evidence presented at the hearing, however, showed only that the solar panels were installed, but never hooked up, and that plaintiffs tried to cancel the loan immediately upon learning of it. At no point were any trees removed. Therefore, the "benefit of the bargain" is not an ascertainable economic loss. The plaintiffs' total economic damages is therefore $82,233.73, as against both Prime and 1st Light.

2.     **Emotional Distress Damages**

In the Second Circuit, evidence of garden variety emotional distress claims is generally limited to the plaintiff's testimony describing her injuries. *Parris v. Pappas*, 844 F. Supp. 2d 271, 278 (D. Conn. 2012). These claims do not require medical corroboration or expert testimony and "generally merit $30,000 to $125,000 awards." *Id.* (quoting *Thorsen v. County of Nassau*, 722 F. Supp. 2d 277, 292 (E.D.N.Y. 2010)). At the damages hearing, the plaintiffs clearly established they are each entitled to the maximum $125,000 award. The testimony of all witnesses showed the loan obligated the then-79- and 80-year-old plaintiffs for 25 years, when they would have been 104 and

105 years old. This loan was particularly burdensome because the plaintiffs are on a fixed budget and are especially mindful of their spending since they need sufficient savings to afford Mr. de Moura Castro's medical expenses. The witnesses also testified about the mental and emotional distress and anxiety the defendants' conduct caused the plaintiffs and the weight this ordeal has put on their family. Mrs. de Moura Castro testified credibly that defendants' conduct has caused her to feel vulnerable, taken advantage of, and scammed, and she now has trouble sleeping. Therefore, the plaintiffs are each entitled $125,000 in emotional distress damages, totaling $250,000 against both defendants.

### 3. Punitive Damages

The FCRA, CUTPA and Connecticut's elder exploitation statute permit punitive damages when the defendant's conduct is sufficiently willful or reckless. *See* 15 U.S.C. § 1681n(a) (punitive damages available under FCRA when any person "willfully" fails to comply); *Staehle v. Michael's Garage, Inc.*, 35 Conn. App. 455, 462-63 (1994) (punitive damages available under CUTPA when evidence shows "reckless indifference to the rights of others or an intentional and wanton violation of those rights"); *Prange v. Arsyla*, No. 3:22-CV-1133, 2023 WL 7277256 (D. Conn. July 10, 2023) (punitive damages under Connecticut elder exploitation law assessed analogously to CUTPA). While economic damages are intended to compensate the plaintiffs for the concrete loss suffered, "punitive damages serve a broader function; they are aimed at deterrence and retribution." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). "While there is no exact formula for an appropriate punitive damages award, the Supreme Court has found that 'few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.'" *Hutchins v. Mountain Run Sols., LLC*, No. CV 20-5853, 2021 WL 5356774, at *4 (E.D. Pa. Nov. 17, 2021) (quoting *Campbell*, 538 U.S. at 425); *see also Perkins v.*

13

*Colonial Cemeteries, Inc.*, 53 Conn. App. 646, 649 (1999) ("[I]t appears that in terms of consistency or frequency, punitive damages under CUTPA are generally equal to or twice the amount of the compensatory award.").

Here, through the August 21, 2024 hearing testimony and the full exhibits admitted during the hearing, the plaintiffs established that Prime and 1st Light's conduct was not only reckless, but willful. The defendants' agents lied to the plaintiffs about a free government program for senior citizens designed to reduce their utility bill, when the true cost exceeded $50,000. Moreover, the defendants' agents used a fake email address and forged plaintiffs' signatures repeatedly across multiple contract documents. Indeed, even after the defendants forged the plaintiffs' signatures and contact information on August 1, 2020, they modified the loan contract to fill in key missing information and to add in a $7,000 charge for tree trimming, a service that Murphy had advised Mrs. de Moura Castro would be free. This conduct is reprehensible and took a significant toll on the plaintiffs. Accordingly, the Court finds that the plaintiffs are entitled to an additional $667,766.27 in punitive damages, which rounds the total judgment against Prime and 1st Light to $1,000,000. At roughly a two-to-one ratio, this amount falls well within the outer bounds of punitive damages allowed by the Due Process Clause of the United States Constitution and comports with Connecticut common law's analysis of punitive damage awards under CUTPA. *See Campbell*, 538 U.S. at 425; *Perkins*, 53 Conn. App. at 649.

## V. CONCLUSION

For the reasons set forth above, the plaintiffs' motion for default judgment against Prime Energy and 1st Light Energy is GRANTED, jointly and severally in the amount of $1,000,000. The Clerk of Court shall enter judgment and close this case.

IT IS SO ORDERED.

/s/ *Robert M. Spector*
Robert M. Spector
United States Magistrate Judge

Dated: New Haven, Connecticut
September 4, 2024