**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| BRIDGET DE MOURA CASTRO AND | : | |
| LUIZ DE MOURA CASTRO, by his next best | : | |
| friend Helena Hilario | : | |
|                      *Plaintiffs* | : | |
| v. | : | 3:21-CV-01020 (RMS) |
| | : | |
| GOODLEAP, LLC, f/k/a LOANPAL, LLC, | : | |
| PRIME ENERGY, LLC AND 1ST LIGHT | : | September 23, 2024 |
| ENERGY, INC. | : | |
|                      *Defendants* | : | |

**PLAINTIFFS' MOTION FOR THE AWARD OF**
**STATUTORY ATTORNEY FEES**

By Order dated September 4, 2024 (ECF 151), this Court granted the Motion for Default Judgment (ECF 146) filed by Plaintiffs Luiz and Bridget de Moura Castro against Defendants Prime Energy, LLC ("Prime") and 1st Light Energy, Inc. ("1st Light") ("collectively, "Defendants"). On September 9, 2024, the Court entered default judgment against Defendants in the total amount of $1,000,000 pursuant to the federal Fair Credit Reporting Act ("FCRA"), the Connecticut Unfair Trade Practices Act ("CUTPA"), and Connecticut's Elder Exploitation statute. (ECF 152). Pursuant to Federal Rule of Civil Procedure 54(d)(2), Plaintiffs now move for the award of **$152,719.27** in attorney fees.

    **I.**    **STANDARD FOR AWARD OF REASONABLE ATTORNEY FEES**

The FCRA, CUTPA, and Elder Exploitation statutes all provide that a consumer is entitled to reasonable counsel fees, so as not to decrease the award to the prevailing consumer:

- FCRA, 15 U.S.C. §§ 1681n(3), 1681*o*(2): "Any person [violating FCRA] … is liable to that consumer in an amount equal to the sum of … in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as

1

determined by the court."

- CUTPA, Conn. Gen. Stat. § 42-110g(d): "In any action brought by a person under this section, the court may award, to the plaintiff, in addition to the relief provided in this section, costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery."

- Elder Exploitation, Conn. Gen. Stat. § 17b-462(a): "An elderly person who has been the victim of abuse, neglect, exploitation or abandonment, as such terms are defined in section 17b-450, may have a cause of action against any perpetrator and may recover actual and punitive damages for such abuse, neglect, exploitation or abandonment together with costs and a reasonable attorney's fee."

In *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany and Albany County Bd. of Elections*, 522 F.3d 182 (2d Cir. 2008) ("*Arbor Hill*"), the Second Circuit set forth the method for determining attorneys' fees under fee-shifting statutes like CUTPA. Moving away from the "lodestar" approach, the court directed that "the focus of the district court [should] no longer [be] on calculating a reasonable *fee*, but rather on setting a reasonable hourly rate, taking account of all case-specific variables." *Id.* at 189 (emphasis in original).

The court relied on the factors in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) as well as the "complexity and difficulty of the case...the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side) and the timing demands of the case," as variables that courts have previously identified as relevant to the reasonableness of the fee. *Arbor Hill,* supra, 522 F.3d at 183-184; *see also So. New England Telephone Co. v. Global Naps, Inc.*, 2008 WL 1848899, *1 (D. Conn. April 25, 2008) (Hall, J).

2

The twelve *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717-19. Those factors support the full award of fees sought here.

## II.    PLAINTIFFS' FEE REQUEST SHOULD BE GRANTED

### A. The *Johnson* Factors

#### 1. The amount involved and the results obtained

The U.S. Supreme Court has instructed that "[t]he most critical factor [in determining the reasonableness of a fee] is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 760 (2d Cir. 1998); *Sabir v. Jowett*, 214 F. Supp. 2d 226, 249 (D. Conn. 2002) ("The degree of success is the most critical factor in determining the reasonableness of a fee award").

There is no question the award of $1,000,000 to the de Moura Castros was a successful result. At the damages trial, they demonstrated through Defendants' own documents how they and their home were burdened by a loan obligation of $56,956.73 with a 25-year term requiring payments by this elderly couple into their 100s. They demonstrated through contractors' estimates that it would cost in excess of $25,000 for removal of the panels and associated electrical work, followed by installation of a new roof. More significantly, they and their daughters testified about the traumatic impact Defendants' fraud and forgery had on the Plaintiffs, which supported the award

3

of the maximum of "garden variety" emotional distress damages of $125,000 for each of the two Plaintiffs. The Court's award will allow the de Moura Castros to remove the fraudulently installed solar power system, fix their roof and electrical system, and move on with their lives.

This judgment is important not only for the de Moura Castros, but for other consumers who have been defrauded by door-to-door solar sales companies. (Ex. 1, Milz Cert. at ¶45). Plaintiffs demonstrated at trial that these defaulted Defendants have been sued in other matters for similar conduct. Unfortunately, solar fraud is endemic today, with "fintech" companies (like GoodLeap) putting iPads with electronic loan applications in the hands of salesmen (like Defendants' agent Mark Murphy) motivated to make a sale at any cost, even if it means forging sales documents and hiding them from consumers via a fake email address. This case is not a "one-off." *See*, *e.g.*, TIME, "The Rooftop Solar Industry Could Be on the Verge of Collapse," January 25, 2024, https://time.com/6565415/rooftop-solar-industry-collapse/. The Court's punitive damage award of $667,766.27 will demonstrate that our society and civil justice system will not tolerate this kind of egregious fraud, and will serve as a warning to solar fraudsters within these companies, throughout Connecticut, and around the country.

Importantly, the endeavors of the de Moura Castros and their counsel in this litigation are in the public record. Typically, the settlement agreements into which consumers enter with companies in consumer fraud matters frequently include confidentiality provisions. (Ex. 1, Milz Cert. at ¶45). Plaintiffs' public recovery of a seven-figure judgment against these solar sales companies will help other consumers recover their losses when they have been similarly defrauded. The result here is excellent, and this "most critical" factor weighs heavily in favor of the approval of the fees requested in this motion.

### 2. Awards in similar cases

To Plaintiffs' counsel's knowledge, this is the first judgment from a U.S. District Court awarding damages to consumer victims of solar sales fraud. (Id.). This fact makes it difficult to value these types of cases and to compare them to the results here. Moreover, the prevalence of clauses calling for confidential arbitration in the underlying contracts means that the results of consumers' complaints often stay shielded from the public. Counsel can say that he is aware of a small handful of confidential settlements in similar egregious solar fraud cases, and that these confidential settlements are consistent with the Court's award against the defaulted defendants. (Id.). This *Johnson* factor is neutral.

### 3. The novelty and difficulty of the case

Door-to-door sales has been marred with fraud throughout history, indeed, as long as people have had doors to knock upon. Alas, as demonstrated above, solar fraud is not novel these days. What is novel about this case, however, was the ability of these consumers to get relief after they had been defrauded. Solar companies like 1st Light include forced arbitration clauses in their contracts which require consumers to waive their Seventh Amendment right to a jury trial in lieu of proceeding in private arbitration, where the arbitrator is often business-friendly, discovery is curtailed, and the deck is often stacked against the consumer.[1] As discussed above, forced arbitration also means that the proceedings are often confidential and a fraudster's bad acts can be swept under the rug.

For three years, 1st Light fought hard to send the de Moura Castros to arbitration on the basis

---

[1] See generally "CFPB Study Finds That Arbitration Agreements Limit Relief for Consumers," Consumer Financial Protection Bureau, Mar. 10, 2015, available at https://www.consumerfinance.gov/about-us/newsroom/cfpb-study-finds-that-arbitration-agreements-limit-relief-for-consumers/ (last visited Sept. 20, 2024).

of arbitration clauses in forged contracts.  But the de Moura Castros and their counsel fought back, arguing that forgery, fraud in the execution, and failure of adherence to Connecticut's e-sign law meant that there was no agreement to arbitrate here and the case should stay in court.  In 2021, Defendants 1st Light and GoodLeap both filed motions to stay this litigation send the case to arbitration.  (ECF 19, 23).  Plaintiffs filed an omnibus opposition.  (ECF 24).  Defendants Replied (ECF 25, 26), and Plaintiffs Sur-replied (ECF 30).  On June 28, 2022, Judge Haight issued his first opinion on arbitration, indicating the motion required a factual hearing.  (ECF 41).  That hearing was held on July 27, 2022, with Defendants and Plaintiffs appearing, testifying, and being subjected to cross-examination.  (ECF 48).  Supplemental briefing from 1st Light and GoodLeap followed.  (ECF 51, 52).  Plaintiffs responded again.  (ECF 53).  On February 8, 2024, Judge Haight issued his second opinion on the subject, and called for a trial on the question of contract formation.  (ECF 63).  This Court then scheduled a trial to begin May 29, 2024.  (ECF 76).  The Plaintiff then prepared in earnest for a jury trial and submitted a final pretrial memorandum, jury instructions, and verdict slip.  (ECF 86).  Motions *in limine* were filed and ruled upon.  (See ECF 92).  Then, on May 17, 2024 – a mere 12 days before the scheduled jury trial – 1st Light, followed by GoodLeap, withdrew the motions to compel arbitration they had been pressing for nearly three years.  (ECF 94, 95).

Of course, the case was then scheduled for a jury trial on the merits scheduled for August 20, 2024.  However, 1st Light then chose on May 21, 2024, after three years, to simply stop defending the case (ECF 113), necessitating the damages trial on default. The tactics of these defendants – particularly surrounding arbitration – made this case especially difficult for Plaintiffs and their counsel, making this *Johnson* factor easily satisfied.

### 4. Time limitations imposed by the client or the circumstances

The de Moura Castros are in their eighties.  Luiz is suffering from Parkinson's disease and

6

has had several strokes. (Ex. 1, Milz Cert. at ¶43). As a result, time was of the essence in this case. Moreover, forced arbitration is particularly damaging to the plight of elderly consumers to obtain justice. In *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 143 S. Ct. 1915, 216 L. Ed. 2d 671 (2023), the U.S. Supreme Court held that filing of a motion to compel arbitration and any subsequent appeal could stay a case indefinitely until the appeal is resolved. For defrauded consumers in their 80's or 90's, a defendant's motion to compel arbitration could mean the end of their court case and can often result in them capitulating to proceed in a hostile arbitration forum. (See Ex. 1, Milz Cert. at ¶43). Nonetheless, Plaintiffs' counsel did their very best to move this case forward as fast as possible, without sacrificing substantive or procedural rights. This factor supports the fee request here.

### 5. "Undesirability" of the case

This was a difficult case, with substantial risk for the attorneys undertaking it. Counsel only took this case because, based on Mr. Milz's experience in other solar fraud matters, they knew they had a fighting chance to defeat arbitration because the contracts were the product of forgery and fraud in the execution. (Ex. 1, Milz Cert. at ¶44). Clearly, based on two judicial opinions and a scheduled trial on the question, defeating arbitration was not a foregone conclusion. If arbitration could not be overcome, this would have been an undesirable case for a consumer attorney to take. According to one study:

> [A]ttorneys decide whether to accept a case based on their judgment about the likely outcome. But as we have seen, the average outcome is substantially lower in mandatory arbitration than it is for litigation: Damages from arbitration are 16 percent of the average damages from federal court litigation and a mere 7 percent of the average damages in state court. Thus lawyers are reluctant to take cases that are subject to mandatory arbitration. Even if arbitration cases are easier and cheaper to process, the large differences in outcomes can substantially reduce the financial incentive and ability of plaintiffs' attorneys to accept cases brought by employees covered by mandatory arbitration.

7

See Stone & Colvin, "The arbitration epidemic: Mandatory arbitration deprives workers and consumers of their rights," Economic Policy Institute, Dec. 7, 2015, available at https://www.epi.org/publication/the-arbitration-epidemic/ (last visited Sept. 20, 2024). Counsel believes this analysis is sound and, through experience, knows that attorneys shy away from cases where there is an anticipation of the case being sent to mandatory arbitration. (Ex. 1, Milz Cert. at ¶44). For this reason, this *Johnson* factor supports the fee application here.

### 6. Level of skill required by de Moura Castros' attorneys

As demonstrated in the paragraphs above, successfully fighting 1st Light's arbitration motion, then preparing for what was, in reality, three separate trials – one on contract formation, one on the merits, and then one on default damages – required a substantial effort by Plaintiffs' counsel, let alone a steadfast commitment to the case by counsel and client alike. 1st Light was defended for most of the case by experienced attorneys from Hassett & George, PC, a firm with two dozen lawyers. GoodLeap was represented by Phillips Lytle, LLP, a New York firm boasting 148 attorneys. The zealous defense waged by these defendants forced Plaintiffs' counsel to expend a great deal of time and resources at their small firms to successfully prosecute this case to its conclusion. (See Ex. 1, Cert. of Milz at ¶44 and Ex. 3, Gentes Decl. at ¶12-13).

Flitter Milz, PC has represented defrauded consumers in solar cases since 2016, and is one of the foremost firms in the country doing this sort of work. (Ex. 1, Milz Cert. at ¶45). Connecticut Fair Housing Center is the foremost nonprofit law office in this state helping homeowners hurt by the misfeasance and malfeasance in the financial industry. (Ex. 3, Gentes Decl. at ¶13). In addition to the knowledge of the subject matter of the case, counsel was required to expertly use the federal rules to defeat arbitration, develop discovery to support their case on the merits, prepare for three trials, and shepherd this case to its successful conclusion.

### 7. Plaintiffs' contingent fee agreement with counsel

Under the de Moura Castros' engagement agreement with counsel, the law firms here would only receive payment for their fees if they succeeded in obtaining a recovery for the plaintiffs. The engagement letter states: "In the event there is no recovery, you will have no obligation to pay us for legal fees." (Ex. 1, Milz Cert. at ¶46). Plaintiffs' counsel thus ran the very real risk of not getting paid at all for over three years of work on this case. Courts have long held that "contingency risks are 'necessary factors' in determining reasonable fees." *Wells v. Sullivan*, 907 F.2d 367, 371 (2d Cir. 1990). The contingent nature of the attorneys' fees here supports a full award of the amount sought.

### 8. Nature and length of the professional relationship with the client

This is counsel's only case representing the de Moura Castros, who they represented since the case's inception in 2021. (Ex. 1, Milz Cert. at ¶46). This *Johnson* factor weighs neutral.

### 9. Preclusion of other work

Although the de Moura Castros' counsel was not precluded from accepting other cases by virtue of representing them, as a practical matter, this case took up substantial time and resources from both firms. Flitter Milz, PC spent 421.6 hours on the case. (Ex. 1, Milz Cert. at ¶48). Connecticut Fair Housing spent 217.1 hours. (Ex. 3, Gentes Cert. at ¶15). This time could have been spent helping consumers in other matters, but was necessary for the successful prosecution here. A large chunk of this time can be directly linked to 1st Light continuing to push its motion for arbitration, the hearing associated therewith, and preparation for the trial on contract formation that was scheduled for May of 2024. Handling those events and preparing for trial ate up a great deal of attorney time and effort. This factor supports approval.

9

### 10. Experience of attorneys

The de Moura Castros reached out to the Flitter Milz, PC firm because of that firm's expertise in handling solar fraud matters. Flitter Milz then asked Connecticut Fair Housing Center to assist with this case for these consumers from Avon, CT. Both firms have a great deal of experience in consumer protection litigation, and that experience readily supports the award of full attorney fees here.

<u>Flitter Milz, PC.</u> Andrew Milz was lead counsel and is responsible for the lion's share of fees in the case for the firm. From meeting the client and strategizing, filing of the complaint through trial, Mr. Milz spent 254.10 hours at his rate of $595/hour for a total lodestar of $151,189.50 (before reductions). As set forth in his certification (Ex. 1), Milz has practiced consumer protection law for 16 years, is a nationally recognized authority on consumer protection law, and particularly solar fraud matters. He has litigated solar cases from New Jersey to California, and has won a number of precedential legal opinions favorable to consumers on topics such as forced arbitration (*Knight v. Vivint Solar Developer, LLC*, 243 A.3d 956 (N.J. Super. Ct. App. Div. 2020)), and pattern evidence in solar cases (*Brown v. Vivint Solar, Inc.*, 614 F. Supp. 3d 1127 (M.D. Fla. 2020)). He has lectured nationally on solar fraud topics. NPR News, TIME, the AARP Bulletin, and others have quoted him recently in articles warning consumers of solar fraud schemes. (Id. at ¶8-11). In addition to the solar fraud work, Mr. Milz has been counsel of record in over 500 cases in federal court, tried more than two dozen consumer and civil rights cases to verdict or judgment throughout the Third Circuit, and has had incremental increases to his hourly rates approved by numerous federal courts over the years. (Id. at ¶26-42).

Other attorney work at the Flitter Milz firm, largely legal research and legal briefing, was performed by associate Jody López-Jacobs (123.80 hours x $390 for a total lodestar of $48,282.00).

Mr. Lopez-Jacobs graduated from Temple Law in 2015 in the top 10% of his class with *magna cum laude* and Order of the Coif honors. (Ex. 2, Lopez-Jacobs Cert.). After law school, Mr. López-Jacobs served as a law clerk for the Honorable Mark A. Kearney of the Eastern District of Pennsylvania. (Id. ¶5). Senior partner Cary Flitter's time (6.0 hours at $905/hour) was limited to case management and strategy, and Plaintiffs are not seeking fees for his work here. In a three-lawyer firm with a junior partner trying the case, an associate providing support and research, and a senior partner assisting with strategy, the Flitter Milz firm demonstrated efficiency in delegation of tasks among its three lawyers. (Ex. 1, Milz Cert at ¶51).

<u>Connecticut Fair Housing Center</u>. Jeffrey Gentes spent 161.8 total hours on this case, for a lodestar of $72,810 (before substantive voluntary reductions). As the Managing Attorney, Foreclosure Prevention at the Center and the Clinical Lecturer at Yale Law School's Housing Clinic, Gentes runs the only nonprofit groups in Connecticut representing homeowners in foreclosure. (Ex. 3, Gentes Decl., ¶ 1). He has served as counsel of record in over forty cases in the District, and in over fifty Connecticut state appellate matters involving issues around mortgages and foreclosure procedures. (*Id*. at ¶ 4). Attorney Gentes has been involved in national working groups regarding mortgage servicing and origination, and in more than two hundred trial court matters involving primarily mortgage servicing and foreclosure issues. (*Id.*) He has been disclosed as an expert witness in four cases, including one on behalf of the federal Consumer Financial Protection Bureau in the Central District of California. Ex. 3, Gentes Decl. ¶4).

Sarah White spent 55.3 hours at $350.00/hour for a lodestar of $19,355. (Ex. 3, Gentes Decl. at Ex. 1 thereto, timesheets). Attorney White has been practicing housing and consumer law since graduating law school in 2010. She has been recognized as a national expert on issues affecting elderly consumers, and, most notably, led an intensive training at an Indianapolis

11

conference run by the National Consumer Law Center and was appointed by the Bankruptcy Court of the Southern District of New York to serve on the Consumer Creditors Committee of a bankrupt mortgage company. (Ex. 4, White Decl. ¶¶ 8, 9).

### 11. Hourly rates are reasonable

As discussed above, Attorney Milz's hourly rate for 2024 is $595.00 per hour.  Mr. Lopez-Jacobs' hourly rate is $390.00.  Both support their rates with their detailed certifications and numerous incremental rate approvals by federal courts over the years. (Exs. 1-2).  Additionally, the Flitter Milz, PC firm bills $235.00/hr for their skilled paralegals Valerie Bolton and Joan Raughley. (Ex. 1, Milz Cert. at ¶49).  Mr. Gentes's hourly rate for 2024 is $450.00 per hour, and Ms. White's rate is $350.00 per hour.  Both are likewise supported by their detailed certifications.  (Exs. 3-4).

All the rates sought here are reasonable and customary for this market.  David N. Rosen, a well-regarded and experienced practitioner in the U.S. District Court for the District of Connecticut, reviewed the certifications of all of Plaintiffs' counsel in this case and opines that "the rates sought by plaintiffs' counsel in this action are well within what is reasonable in this District given my familiarity with the local bar, plaintiffs-side civil litigation, this District, and its prevailing rates." (See Ex. 5, Rosen Aff. at ¶ 9).

It bears note, that the de Moura Castros selected the Flitter Milz firm for the expertise in solar fraud matters.  Mr. Gentes similarly states that had they come to him directly, he would have brought the case to the Flitter Milz firm due to their expertise.  (Ex. 3, Gentes Decl. at ¶9-11).  This court has recognized that clients may "select[] out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result." *Strauch v. Computer Sciences*

*Corp.* No. 3:14-CV-956, 2020 WL 4289955 at 4 (D. Conn. July 27, 2020) (quoting *Simmons v. New York City*, 575 F.3d 170, 175 (2d. Cir. 2009)).[2]

Trial skills were necessary to prosecute this case, as the case was set down for evidentiary hearing or trial a total of four times. Furthermore, given the length and complexity of the parties' controversy, the limited time and resources available to Attorneys Gentes and White, and the fact that there are hardly any private attorneys in Connecticut who regularly represent homeowners as plaintiffs in suits against solar sales companies in either state or federal court, and very few who have done so more than two or three times, *see* Ex. 3, Gentes Decl. ¶¶ 12, 15,  the de Moura Castros' decision to retain out-of-district counsel was reasonable.

In *Simmons*, the Second Circuit went on to say that in determining whether a higher hourly rate is reasonable, this Court should consider "counsel's special expertise in litigating the particular type of case, if the case is of such nature as to benefit from special expertise, or if local counsel possessing requisite experience were unwilling or unable to take the case." *Simmons*, supra, 575 F.3d 170, 175. All three of these circumstances exist in this case.  Attorneys Milz and López-Jacobs brought considerable special expertise in consumer law and solar fraud to the case, this is a case that benefitted from their expertise. (Ex. 3, Gentes Decl. ¶¶ 9-11). Given their specialization, the skill they brought to this action, and the hourly rates customarily awarded in the District of Connecticut, counsel's hourly rates are reasonable.

### 12. Total time and labor involved, discretionary reductions, and lodestar sought

The complete bill for Flitter Milz, PC's time is included as Exhibit 1 to Mr. Milz's

---

[2] Federal judges have imported Mr. Milz's and Mr. Lopez-Jacobs' Philadelphia hourly rates into other venues on other occasions, recognizing their expertise in trying consumer protection cases.  Most recently, this occurred in the rural Johnstown vicinage of the Western District of Pennsylvania by Senior U.S. District Judge Kim R. Gibson in *Hyman v. Devlin*, 2019 WL 2271113 (W.D. Pa. May 28, 2019) (granting fee petition in its entirety on contest after jury verdict, holding "the Eastern District of Pennsylvania rates for Hyman's attorneys are reasonable given the specialized nature of this case").

13

certification (Ex. 1). The complete bill for Connecticut Fair Housing is Exhibit 1 to Mr. Gentes' certification (Ex. 3). Combined, Plaintiffs' counsel expended a total of **638.7 hours** on this matter (FM: 421.6 + CFHC: 217.1). (See Ex. 1, Milz Cert. at Ex. 1 thereto, FM timesheets; Ex. 3, Gentes Decl. at Ex. 1 thereto, CFHC timesheets). The firms' **combined lodestar equals $323,856.00** (FM: $213,761 +CFHC: $92,095). (Id.). The time spent by each of the de Moura Castros' attorneys was thoughtfully planned and includes no duplication that was not reasonable under the circumstances. This total lodestar is less than 33% of the $1,000,000 judgment, and is reasonable on its face.

While not entirely necessary in a consumer protection case such as this one, counsel nonetheless recognizes that certain tasks should fairly be billed to the settling defendant GoodLeap, and counsel has made discretionary reductions to their lodestars reflecting this. Subsection "a" discusses the necessity of time spent on certain tasks. Subsection "b" lists the voluntary reductions to lodestar made by counsel in their respective billings. Subsection "c" lays out the total lodestar requested here after voluntary reductions.

### a. Time spent on case milestones

The table below sets forth the work that counsel had to do in the successful prosecution of the case. The dates are approximate to the tasks completed during these milestones in the case. All this time was reasonable and necessary.

| Dates | Description of time entries | FM Hours | CFH Hours | TOTAL TIME IN HOURS FOR PLAINTIFFS' COUNSEL |
|---|---|---|---|---|
| Feb. 26, 2021- Sept. 12, 2021 | Initial client intake, meetings with clients, researching claims, drafting complaint, serving defendants | 39.2 | 25.8 | **65.0** |

| | | | | |
|---|---|---|---|---|
| Sept. 13, 2021 – Jan. 12, 2022 | Opposing motion to compel arbitration, i.e. initial brief and sur-reply | 32.0 | 8.6 | **40.6** |
| Jan. 31, 2022 – May 11, 2022 | Service attempts on Prime and investigation into whereabouts and registration | 2.1 | 2.7 | **4.8** |
| May 23, 2022 – Mar. 2, 2023 | Continuing work opposing motion to compel arbitration, preparation and trial of evidentiary hearing on contract formation in July 2022, post-hearing briefing (discrete items re default, set forth immediately below, excluded) | 51.7 | 21.2 | **72.9** |
| Aug. 8-10, 23-24, 2022 | Work on motion for default judgment against Prime | 7.4 | 1.7 | **9.1** |
| Mar. 8, 2023 – Feb. 7, 2024 | Discovery and trial preparation, including preparing and taking the clients' depositions | 31.60 | 17.4 | **49** |
| Feb. 8, 2024 – May 17, 2024 | Preparation for scheduled trial on contract formation, including compilation of final pretrial memo, jury charges and verdict slip, preparation of exhibits and witnesses, and associated trial prep work. | 51.0 | 20.5 | **71.5** |
| May 18, 2024 – June 20, 2024 | Merits discovery after GoodLeap and 1st Light withdrew their motions to compel arbitration. | 27.3 | 18.4 | **45.7** |

15

| | | | | |
|---|---|---|---|---|
| | Document and written discovery was followed by the depositions of Plaintiffs' daughters and son-in-law, and corporate representatives. June 20th is the day that 1st Light withdrew from the case and defaulted. | | | |
| June 20, 2024 – Aug. 9, 2024 | Preparation for trial against GoodLeap (excluding discrete items listed below) | 102.1 | 63.4 | **165.5** |
| July 1, 2024 | Legal research re damages, right to trial, against defaulted defendants. | 1.9 | 0.9 | **2.8** |
| July 10, 16, 2024 | Prepare for and take deposition of Mark Murphy, salesman | 8.1 | 3.1 | **11.2** |
| July 19, 2024 | Edits to second motion for default judgment against Prime and 1st Light | 1.2 | 3.9 | **5.1** |
| July 31, 2024 and Aug. 2, 2024 | Work on joint pretrial memo and exhibit list that carried over into preparation of same for trial against defaulted defendants | 4.5 | 1.1 | **5.6** |
| Aug. 9, 2024 – Sept. 6, 2024 | Prepare for damages trial against defaulted defendants, try damages hearing | 32.5 | 31 | **63.5** |

| Sept. 9, 2024 – Sept. 19, 2024` | Prepare and file fee petition, supporting certifications, associated legal research | 17.4 | 5 | **22.4** |

**Fees for this fee application**. Plaintiff's time spent on this motion for attorney's fee and accompanying declarations is compensable. *Weyant v. Okst*, 198 F.3d 311, 316 (2d Cir. 1999) (holding that "[A] reasonable fee should be awarded for time reasonably spent in preparing an application for ... fees).

### b.     Voluntary reductions to lodestars

Each firm has made certain voluntary reductions to their lodestars based on the confidential settlement with GoodLeap. (See Ex. 1, Milz Cert. at ¶52, Ex. 3, Gentes Decl. at ¶ 14). In counsel's billing discretion, certain categories of time required certain reductions from the lodestars. For example, while the Flitter Milz, PC firm incurred 102.1 hours for a lodestar of $50,052 in preparing for the merits trial against GoodLeap, counsel has excluded that time entirely from this fee request. (Id.).

In making their voluntary reductions, Plaintiffs' counsel categorized the tasks associated with the case as follows:

a. **Merits** – this includes time that was spent to prosecute the merits of the case against all three defendants, no matter the stage of the case. This includes intake, meeting with the clients, drafting of the complaint, service of process, discovery on the merits, taking and defending the clients' depositions, the Mark Murphy depositions, and preparation for the merits trial. (Plaintiffs have applied a voluntary **1/3 (33%) reduction** to this time to account for the settling defendant, GoodLeap).

b. **Arbitration** – this includes time that was spent to defend against the motions of 1st Light and GoodLeap to compel arbitration, briefing and legal research associated

17

       therewith, the July 2022 evidentiary hearing, supplemental briefing that followed, discovery limited to contract formation, and preparation for the jury trial on contract formation. (As Prime did not move for arbitration[3] and GoodLeap has settled, Plaintiffs apply a voluntary **reduction of ½ or 50%** of lodestar to these entries).

   c. **GoodLeap only** – from June 21, 2024 through August 9, 2024, only GoodLeap was contesting the case in the lead-up to the merits trial. (Plaintiffs apply a **100% discretionary reduction** for that time).

   d. **Default** – this includes time spent serving Prime and 1st Light, drafting and filing the motions for default judgment against them, preparing for and trying the August 21, 2024 damages hearing against those defendants, entry of judgment, and preparation of the filing of this fee petition. (There is **NO** discretionary reduction to this time).

Each firm has made the discretionary reductions noted, and they are reflected in the certifications of Milz (Ex. 1) and Gentes (Ex. 3).

Additionally, the Flitter Milz, PC firm is not seeking the 6.0 hours incurred by senior partner Cary Flitter. (Ex. 1, Milz Cert. at ¶51). Connecticut Fair Housing Center is not seeking time for internal meetings, conferrals with Legal Director Greg Kirschner, call setups internally, and other administrative work. (Ex. 3, Gentes Decl. at ¶ 14). All voluntary reductions are more fully explained in the respective certifications of Milz and Gentes, submitted herewith.

---

[3]    Prime Energy would have, however, been subject to arbitration had the other Defendants been successful in processing their motions to stay. *See* ECF No. 83. Nevertheless, Plaintiffs apply a reduction of ½ rather than 1/3.

    **c.**    **Total lodestar sought here**

**TOTAL LODESTAR SOUGHT IN THIS MOTION**
**(AFTER DISCRETIONARY REDUCTIONS)**

Plaintiffs are not seeking the award of litigation costs.

| **Firm** | **Total Lodestar** | **Amount of Reduction** | **Amount of Lodestar Sought Here (After Reduction)** |
|---|---|---|---|
| Flitter Milz, PC | $213,761.00 | $109,630.06 | $104,130.94 |
| Connecticut Fair Housing Center | $92,095.00 | $43,506.67 | $48,588.33 |
| **TOTAL LODESTAR SOUGHT AFTER REDUCTIONS** | | | **$152,719.27** |

### III. CONCLUSION

For the foregoing reasons, all of the relevant *Johnson* factors support the award of attorney fees to Plaintiffs here. Plaintiffs Luiz and Bridget de Moura Castro respectfully request that the Court award attorney fees in the amount of **$152,719.27**. Judgment should be modified accordingly.

Dated: September 23, 2024

THE PLAINTIFFS
BRIDGET DE MOURA CASTRO &
LUIZ DE MOURA CASTRO

/s/ Jeffrey Gentes
Jeffrey Gentes (ct28561)
Sarah White (ct29329)
Connecticut Fair Housing Center
60 Popieluszko Court
Hartford, CT 06106
Phone: (860) 263-0741

/s/ Andrew M. Milz
Andrew M. Milz (pro hac vice)
Flitter Milz, P.C.
450 N. Narberth Ave., Suite 101
Narberth, PA 19072
Phone: (610) 822-0781